H. JASON GOLD (Pro Hac Vice)
VALERIE P. MORRISON (Pro Hac Vice)
DYLAN G. TRACHE (Pro Hac Vice)
WILEY REIN LLP
1776 K Street, N.W.
Washington, D.C. 20006
Telephone:    (202) 719-7000
Facsimile:    (202) 719-7049
Email: jgold@wileyrein.com
Email: vmorrison@wileyrein.com
Email: dtrache@wileyrein.com

ROBERT A. FRANKLIN (091653)
CRAIG M. PRIM (077820)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone: (650) 852-9000; (408) 907-9200
Facsimile: (650) 852-9244
Email: rfranklin@murraylaw.com
Email: cprim@murraylaw.com

Counsel to Howrey LLP

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>HOWREY LLP,<br><br>A District of Columbia Limited Liability Partnership,<br><br>        Debtor(s).<br><br>   1299 Pennsylvania Avenue<br>   Washington D.C., 20004<br><br>Employer's Tax I.D. No: 53-0231650 | Case No. 11-31376-DM<br><br>Chapter 11<br><br>Date:     June 8, 2011<br>Time:    9:30 a.m.<br>Dept:    U.S. Bankruptcy Court<br>          235 Pine Street, 22nd Floor<br>          San Francisco, CA<br>Judge:  Honorable Dennis Montali |

### EXHIBIT "C" TO

### MOTION OF DEBTOR FOR ORDER: (A) AUTHORIZING USE OF CASH COLLATERAL ON AN INTERIM AND FINAL BASIS; (B) GRANTING ADEQUATE PROTECTION AND RELATED RELIEF; AND (C) SCHEDULING FINAL HEARING ON USE OF CASH COLLATERAL

FOURTH AMENDED AND RESTATED
SECURED LOAN AGREEMENT

Dated as of October 19, 2010

Among

HOWREY LLP

a District of Columbia
limited liability partnership

as borrower, and

CITIBANK, N.A.,

as Lender

# TABLE OF CONTENTS

Section 1.  DEFINITIONS....................................................................................1

1.1.  Accounting Terms.......................................................11
1.2.  Other Definitional Provisions .........................................11

Section 2.  AMOUNT AND TERMS OF COMMITMENTS AND LOANS; NOTES..........11

2.1.  Term Loan and Term Note ...........................................11
2.2.  Demand Line of Credit and Demand Note ......................12
2.3.  Reducing Revolving Credit Facility ..............................15
2.4.  Demand Line of Credit for Contingency Cases and Demand Note for Contingency Cases......................................16
2.5.  Interest on the Loans.................................................18
2.6.  Conversion of Loans..................................................22
2.7.  Eurodollar Rate Loan Limits ......................................24
2.8.  Letters of Credit.......................................................24

Section 3.  CONDITIONS TO LOANS ...............................................25

3.1.  Conditions to Original R/T Loan .................................25
3.2.  Condition to Demand Line of Credit Advances .............26
3.3.  Conditions to Reducing Revolving Credit Facility Advances.................26
3.4.  Condition to Contingency Cases Advances.....................26
3.5.  Conditions to All Loans .............................................27

Section 4.  THE FIRM'S REPRESENTATIONS AND WARRANTIES ...............27

4.1.  Existence and Rights.................................................28
4.2.  Agreement and Notes Authorized.................................28
4.3.  No Conflict..............................................................28
4.4.  Litigation................................................................28
4.5.  Financial Condition...................................................29
4.6.  Title to Assets .........................................................29
4.7.  Tax Status...............................................................29
4.8.  Other Regulations ....................................................29
4.9.  Security Interests......................................................29

Section 5.  THE FIRM'S AFFIRMATIVE COVENANTS ..............................30

5.1.  Rights and Facilities.................................................30
5.2.  Insurance................................................................30
5.3.  Records and Reports ................................................30
5.4.  Notice of Certain Events...........................................31
5.5.  Lender Expenses......................................................32
5.6.  Partnership Changes.................................................32

i

| | | | |
|---|---|---|---|
| | 5.7. | Partnership Reports | 32 |
| | 5.8. | Minimum Cash Flow | 32 |
| Section 6. | | THE FIRM'S NEGATIVE COVENANTS | 33 |
| | 6.1. | Borrowing Base | 33 |
| | 6.2. | Annual Distributions | 33 |
| | 6.3. | Debt | 34 |
| | 6.4. | Paid-In Capital | 34 |
| | 6.5. | Advances | 35 |
| | 6.6. | Accounting Changes | 36 |
| | 6.7. | Partnership Amendments | 36 |
| | 6.8. | Chief Executive Office | 36 |
| | 6.9. | Investments | 36 |
| Section 7. | | EVENTS OF DEFAULT | 37 |
| | 7.1. | Failure to Pay | 38 |
| | 7.2. | Default in Other Debt Agreements | 38 |
| | 7.3. | Material Default Under Warner Lease | 38 |
| | 7.4. | Breach of Covenant | 38 |
| | 7.5. | Breach of Representation or Warranty | 38 |
| | 7.6. | Adverse Events | 38 |
| | 7.7. | Departure of Partners | 39 |
| | 7.8. | Dissolution | 39 |
| | 7.9. | Insolvency or Bankruptcy | 39 |
| | 7.10. | Mergers, Etc. | 39 |
| | 7.11. | Sales, Etc. of Assets | 40 |
| | 7.12. | Money Judgment | 40 |
| Section 8. | | LIABILITY OF PARTNERS | 40 |
| Section 9. | | MISCELLANEOUS | 40 |
| | 9.1. | Survival of Warranties | 40 |
| | 9.2. | Failure or Indulgence Not Waiver | 40 |
| | 9.3. | Modification | 40 |
| | 9.4. | Notices | 40 |
| | 9.5. | Severability | 41 |
| | 9.6. | Applicable Law | 41 |
| | 9.7. | Assignment and Participations | 41 |
| | 9.8. | Right of Set-off | 42 |
| | 9.9. | Counterparts | 42 |
| | 9.10. | Headings | 43 |
| | 9.11. | Indemnification | 43 |
| | 9.12. | Restated Loan Agreement; No Novation | 43 |
| | 9.13. | WAIVER OF JURY TRIAL | 43 |

Case: 11-31376    Doc# 64-3    Filed: 06/06/11    Entered: 06/06/11 14:37:42    Page 4 of
50

## LIST OF EXHIBITS

| | |
|---|---|
| EXHIBIT I | NOTICE OF BORROWING |
| EXHIBIT II | TERM AMORTIZING NOTE ($20,000,000 TERM LOAN) |
| EXHIBIT III | TERM AMORTIZING NOTE ($9,000,000 TERM LOAN) |
| EXHIBIT IV | AMENDED AND RESTATED PROMISSORY NOTE (DEMAND LINE OF CREDIT) |
| EXHIBIT V | COMMITTED REVOLVING CREDIT FACILITY PROMISSORY NOTE (COMMITTED REVOLVING CREDIT FACILITY LOANS) |
| EXHIBIT VI | PROMISSORY NOTE (DEMAND LINE FOR CONTINGENCY CASES) |
| EXHIBIT VII | FORM OF OPINION OF THE FIRM |
| EXHIBIT VIII | FOURTH AMENDED AND RESTATED SECURITY AGREEMENT |
| EXHIBIT IX | COMPLIANCE CERTIFICATE |
| EXHIBIT X | PARTNERSHIP CERTIFICATE |
| EXHIBIT XI | PARTNERSHIP AUTHORIZATION OF HOWREY LLP AUTHORIZING INCURRING OF DEBT TO LENDER |
| EXHIBIT XII | EXISTING LIENS (IF ANY) |
| EXHIBIT XIII | CONTINUING GUARANTY OF FIRM AFFILIATE (GENERAL INDEBTEDNESS) |
| EXHIBIT XIV | COVENANT DEFAULT WAIVER LETTER |
| EXHIBIT XV | STANDALONE LETTERS OF CREDIT |
| EXHIBIT XVI | APPLICATION AND AGREEMENT FOR CLEAN LETTERS OF CREDIT |
| EXHIBIT XVII | FORM OF PIPELINE CASE REPORT |
| EXHIBIT XVIII | FORM OF CONTINGENCY CASES BORROWING BASE REPORT |

Case: 11-31376   Doc# 64-3   Filed: 06/06/11   Entered: 06/06/11 14:37:42   Page 5 of 50

## FOURTH AMENDED AND RESTATED SECURED LOAN AGREEMENT

       This Fourth Amended and Restated Secured Loan Agreement dated as of October 19, 2010, is entered into between the firm of **Howrey LLP**, a District of Columbia limited liability partnership f/k/a Howrey Simon Arnold & White, LLP (the "Firm"), and **Citibank N.A.** (together with its affiliates, the "Lender") for the purpose of establishing, in favor of the Firm, two revolving demand lines of credit, Standalone Letters of Credit (as hereafter defined), two term loan facilities, and a committed revolving line of credit for capital expenditures and general partnership purposes and for the purpose of providing for the issuance of letters of credit, all on the terms and conditions hereinafter set forth.

    Section 1.    DEFINITIONS

       1.1.    Certain Defined Terms

       The following terms used in this Agreement shall have the following meanings:

       "$9,000,000 Term Commitment" has the meaning specified in Section 2.1.1.

       "$9,000,000 Term Loan" means the amount borrowed pursuant to the $9,000,000 Term Commitment.

       "$9,000,000 Term Note" means the Amortizing Term Note ($9,000,000 Term Loan) issued pursuant to Section 2.1.B and substantially in the form of Exhibit III hereto.

       "$20,000,000 Term Commitment" has the meaning specified in Section 2.1.A.

       "$20,000,000 Term Loan" means the principal amount of the loan advanced pursuant to the $20,000,000 Term Commitment.

       "$20,000,000 Term Note" means the Amortizing Term Note of the Firm issued pursuant to Section 2.1.B and substantially in the form of Exhibit II hereto.

       "Accounts Receivable" means, as of any date of determination, the value of billed, but not collected, (i) time for work performed and (ii) services performed, as of such date of determination, as reflected in the books and records of the Firm or any Firm Affiliate.

       "Advance" means a borrowing of principal under any Loan, including a Demand Advance, a Committed Revolving Credit Facility Advance and a Demand Contingency Cases Advance.

       "Agreement" means this Fourth Amended and Restated Secured Loan Agreement as it may be amended, supplemented amended and restated or otherwise modified from time to time.

       "Alternate Base Rate" means a fluctuating annual rate of interest in effect from time to time that for any day shall be equal to the highest of: (a) the Base Rate in effect on such

day; and (b) the Federal Funds Rate in effect on such day plus 2.0% per annum; and (c) the Eurodollar Rate for an Interest Period of one month beginning on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 2.0% per annum.

"Alternate Base Rate Loan" means that part of any Loan the Applicable Rate for which is the Alternate Base Rate.

"Authorized Person" means (i) any member of the Firm's Executive Committee, (ii) the Firm's Chief Financial Officer, or (iii) the Firm's Chief Operating Officer.

"Base Rate" means a fluctuating annual rate of interest in effect from time to time that for any day shall be equal to the rate of interest for such day announced publicly by Citibank, N.A., in New York, New York, as Citibank, N.A.'s base rate (which Borrower acknowledges and agrees is announced by such bank and used by the Lender for reference purposes only and may not represent the lowest or best rate available to any of the customers of such bank or the Lender).

"Billed Disbursements" means monies advanced or expenses incurred for or on behalf of clients of the Firm or any Firm Affiliate, which, at the time of determination, have been billed, but not collected.

"Business Day" means a day of the year on which the Lender is not required or authorized by law to close and, if the applicable Business Day relates to any Eurodollar Rate Loans, on which dealings are carried on in the London interbank market.

"CC Demand" and "CC Demand Amount" have the respective meanings assigned to such terms in Section 2.4.F.

"Capital Lease" means any lease of any property (whether real, personal or mixed) by the Firm or any Firm Affiliate as lessee that is accounted for, or under generally accepted accounting principles should be accounted for, as a capital lease on the Firm's statements of assets, liabilities and partners' capital.

"Cash Collateral Account" has the meaning assigned to such term in Section 7.

"Cash Concentration Account" has the meaning assigned to such term in the Security Agreement.

"Cash Equivalents" means (i) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (*provided* that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than one (1) year from the date of acquisition, (ii) time deposits or certificates of deposit of Citibank, (iii) repurchase obligations with a term of not more than seven (7) days for underlying securities of the types described in clauses (i) and (ii) above entered into with Citibank, (iv) commercial paper or finance company paper issued by any corporation incorporated under the laws of the United States or any state thereof and rated at least A-2 or the equivalent thereof by S&P or at least P-2 or the equivalent thereof by Moody's, and in each case maturing not more than one (1) year after the date of acquisition, and (v) investments in money market funds that are registered

2

under the Investment Company Act of 1940, as amended, which have net assets of at least $1,000,000,000 and at least eighty-five percent (85%) of whose assets consist of securities and other obligations of the type described in clauses (i) through (iv) above (although not necessarily in Citibank securities or obligations).

"Cash Flow" for any fiscal year means the Firm's Net Income (after payments to retired Partners) plus depreciation and other non-cash amortization charges for such fiscal year as shown in the Firm's year-end financial statements, minus any revenues attributable to contingent fee arrangements for such fiscal year.

"Citibank" means Citibank N. A., a national association.

"Clean-up Period" means, with respect to Demand Advances or Demand Contingency Cases Advances, a period of thirty (30) consecutive days during which no Demand Advances or Demand Contingency Cases Advances, as the case may be, are outstanding.

"Collateral" means (a) all presently existing or hereafter acquired or created accounts or general intangibles (as such terms are defined in the UCC) of the Firm and Firm Affiliates, including, without limitation, (1) all presently existing or hereafter acquired Accounts Receivable of the Firm and Firm Affiliates and all presently existing or hereafter created Unbilled Time of the Firm and Firm Affiliates, along with any and all proceeds, products or increase of such Accounts Receivable or Unbilled Time, and any and all property which the Firm or Firm Affiliates may receive on account of or in satisfaction of such Accounts Receivable or Unbilled Time and (2) all rights of the Firm or Firm Affiliates with respect to Billed Disbursements and Unbilled Disbursements, along with any and all proceeds, products or increase of such Billed or Unbilled Disbursements and any and all property which the Firm or Firm Affiliates may receive on account of or in reimbursement of any such Billed Disbursements or Unbilled Disbursements, (b) all furniture, furnishings, fixtures, equipment and other tangible personal property (whether affixed to real property or not) presently owned or hereafter acquired by the Firm or Firm Affiliates (excluding client files and work product of the Firm or Firm Affiliates), along with any and all proceeds, products or increase of such furniture, furnishings, fixtures, equipment and other tangible personal property, and (c) all of the Firm's right, title and interest in the Cash Concentration Account, all funds held therein and all certificates and instruments, if any, representing or evidencing the Cash Concentration Account. Under no circumstances, however, shall the Collateral be construed to include: (x) the Firm's client trust accounts or any interest therein; or (y) other funds or property held by the Firm for or on behalf of clients or other parties in a fiduciary capacity.

"Commitment" means the obligation of the Lender pursuant to this Agreement to make any Loan or to pay any Letter of Credit.

"Committed Revolving Credit Facility" has the meaning assigned to it in Section 2.3.A.

"Committed Revolving Credit Facility Advances" had the meaning assigned to it in Section 2.3.A.

3

"Committed Revolving Credit Facility Loan" means, as the context requires, the principal amount of any borrowing by the Firm pursuant to the Committed Revolving Credit Facility or the aggregate principal amount outstanding of all such borrowings.

"Committed Revolving Credit Facility Note" means the Amended and Restated Committed Revolving Credit Facility Promissory Note of the Firm issued pursuant to Section 2.3.D and substantially in the Form of Exhibit V hereto.

"Compliance Certificate" means a certificate substantially in the form of Exhibit IX hereto.

"Contingency Case" means any litigation (including a civil or criminal proceeding, arbitration, administrative proceeding and appellate proceedings in connection with the foregoing) on behalf of a Firm client and with respect to which all, or a substantial part, of the professional fees and/or related costs and expenses are wholly or partly contingent on the Firm obtaining a successful outcome for the client.

"Contingency Cases Borrowing Base" means, as at any date for the determination thereof, the lesser of:

(i)     the sum of (A) Accounts Receivable aged more than one hundred twenty (120) days from such date plus (B) Unbilled Time and Unbilled Disbursements aged more than one hundred twenty (120) days from such date, or

(ii)     (D) aggregate Probability Adjusted Pre-Settlement Fees reduced by (E) the amount, if any, of Probability Adjusted Pre-Settlement Fees from each individual Contingency Case that exceeds twenty-five percent (25%) of the aggregate of all Probability Adjusted Pre-Settlement Fees (For avoidance of doubt, the reduction in this clause (E) as to any individual Contingency Case is limited to the amount of such excess.)

"Contingency Cases Borrowing Base Report" means a report in the form of Exhibit XVIII attached hereto.

"Contract Partner" means any individual or entity who is a new Partner of the Firm or a former Partner of the Firm but who by action of the Firm's Executive Committee has been designated as a "Contract Partner" and who receives a guaranteed payment from the Firm.

"Conversion," "Convert" and "Converted" each refers to a conversion of Loans of one Type into Loans of the other Type pursuant to Section 2.8.

"Core Partners" means Partners who by virtue of their contributions to the Firm, including but not limited to controlling key client relationships, generating significant billings or maintaining significant capital positions in the Firm such that his or her departure from the Firm could have a material adverse impact on the performance or prospects of the Firm.

"Debt" means, without duplication, (a) all indebtedness for borrowed money; (b) all obligations for the deferred purchase price of property or services (but not including trade

4

payables of Firm or Firm Affiliates, payment of which is deferred in the ordinary course of the Firm's or Firm Affiliates' business, or the Firm's or Firm Affiliates' obligations under leases which are not Capital Leases); (c) all obligations evidenced by notes, bonds, debentures or other similar instruments and obligations under swap or hedging agreements or in respect of other derivative agreements; (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by the Firm or Firm Affiliates (even though the rights and remedies of the seller or the Lender under such agreement in the event of default are limited to repossession or sale of such property); (e) all obligations as lessee under Capital Leases; (f) all obligations, contingent or otherwise, under acceptance, letter of credit or similar facilities; (g) all obligations to purchase, redeem, retire, defease or otherwise acquire for value Paid-In Capital, except in the ordinary course of the Firm's business in connection with the withdrawal, retirement or death of a Partner; (h) all obligations in respect of unfunded vested benefits under plans covered by Title IV of ERISA; (i) all Debt of others referred to in clauses (a) through (h) above guaranteed directly or indirectly in any manner, or in effect guaranteed directly or indirectly through an agreement, excluding however guarantees provided by the Firm with respect to loans to Partners for capital contributions made to the Firm (1) to pay or purchase such Debt or to advance or supply funds for the payment or purchase of such Debt, (2) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Debt or to assure the holder of such Debt against loss, (3) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (4) otherwise to assure a creditor against loss; and (j) as to any person, all Debt referred to in clauses (a) through (i) above secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, against such person to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such person to the extent of the lesser of the amount of the Debt or the fair market value of the property unencumbered by other debt, even though such person has not assumed or become liable for the payment of such Debt.

"Demand Advances" has the meaning assigned to it in Section 2.2.A.

"Demand Contingency Cases Advances" has the meaning assigned to it in Section 2.4.A.

"Demand Line of Credit" means the Loans made by the Lender to the Firm pursuant to Section 2.2.A.

"Demand Line of Credit for Contingency Cases" has the meaning assigned to it in Section 2.4.A.

"Demand Note" means the Sixth Amended and Restated Promissory Note of the Firm issued pursuant to Section 2.2.D and substantially in the form of Exhibit IV attached hereto.

"Demand Note-Contingency Cases Line" means the Promissory Note (Demand Line for Contingency Cases) issued pursuant to Section 2.4.D and substantially in the form of Exhibit VI attached hereto.

5

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time and the regulations promulgated and rulings issued thereunder.

"Eurocurrency Liabilities" has the meaning specified in Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"Eurodollar Rate" means, for any Interest Period, the rate per annum equal to the British Bankers Association LIBOR Rate ("BBA LIBOR"), as published by Reuters (or another commercially available source providing quotations of BBA LIBOR as designated by the Lender from time to time) at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period, for U.S. dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period. If such rate is not available at such time for any reason, then the "Eurodollar Rate" for such Interest Period shall be the rate per annum determined by the Lender to be the rate at which U.S. dollar deposits with a term equivalent to such Interest Period would be offered by Citibank, N.A. in London, England to major banks in the London or other offshore interbank market at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period.

"Eurodollar Rate Loans" means Loans made by the Lender pursuant to Section 2.1.A, 2.1.1.A, 2.2.A, 2.3.A or 2.4.A and bearing interest at rates determined by reference to the Eurodollar Rate as provided in Section 2.5.A.

"Eurodollar Rate Reserve Percentage" for any Interest Period for each Eurodollar Rate Loan means the reserve percentage applicable two Business Days before the first day of such Interest Period under regulations issued from time to time by the Board of Governors of the Federal Reserve System (or any successor) for determining the maximum reserve requirement (including, without limitation, any emergency, supplemental or other marginal reserve requirement) for a member bank of the Federal Reserve System in New York City with respect to liabilities or assets consisting of or including Eurocurrency Liabilities (or with respect to any other category of liabilities that includes deposits by reference to which the interest rate on Eurodollar Rate Loans is determined) having a term equal to such Interest Period.

"Event of Default" means each of the events set forth in Section 7.

"Extended Mandatory Clean-Up Period" has the meaning specified in Section 2.4.A.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal for each day during such period to (i) the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the preceding Business Day) by the Federal Reserve Bank of New York, or (ii) if such rate is not so published for any day that is a Business Day, the average of the quotations at approximately 11:00 a.m., New York City time, for the day for such transactions received by Citibank, N.A. from three Federal funds brokers of recognized standing selected by it.

"Firm Affiliate" means each of The CapAnalysis Group, LLC, a District of Columbia limited liability company, Maxiam, LLC, a District of Columbia limited liability

6

company, and Howrey Martinez Lage, S.L., a company organized under the laws of Spain, one hundred percent (100%) of the equity interests of each of which are owned directly or indirectly by the Firm.

"Funding Date" means the date of funding of a Loan.

"Guaranty" means each amended and restated continuing guaranty in the form attached hereto as Exhibit XIII, to be executed and delivered from time to time by certain Firm Affiliates pursuant to which such Firm Affiliates guaranty the punctual payment at maturity to the Lender of each and all liabilities and obligations of the Firm to the Lender, now or hereafter existing.

"Indemnified Party" has the meaning assigned to it in Section 9.11.

"Initial Remedy Period" has the meaning assigned to it in the first paragraph of Section 7.

"Interest Payment Date" means, with respect to any Loan, the first day of each month of each year, commencing on the first such date to occur after the making of such Loan.

"Interest Period" means, for each Eurodollar Rate Loan, the period commencing on the date of such Eurodollar Rate Loan or the date of the Conversion of any Alternate Base Rate Loan into such Eurodollar Rate Loan, and ending on the last day of the period selected by the Firm pursuant to the provisions below, thereafter, each subsequent period commencing on the last day of the immediately preceding Interest Period and ending on the last day of the period selected by the Firm pursuant to the provisions below. The duration of each such Interest Period shall be one, two, three or six months, as the Firm may, upon notice received by the Lender not later than 1:00 P.M. (eastern time) on the third Business Day prior to the first day of such Interest Period, select; *provided, however,* that:

> (i)     The Firm may not select any Interest Period that ends after any principal repayment installment date unless, after giving effect to such selection, the aggregate principal amount of Alternate Base Rate Loans and of Eurodollar Rate Loans having Interest Periods that end on or prior to such principal repayment installment date shall be at least equal to the principal amount of Loans due and payable on or prior to such date;

> (ii)     The Firm may not select any Interest Period in respect of the Demand Line of Credit that ends on a date that, assuming that a Eurodollar Rate Loan under the Demand Line of Credit were outstanding during the entirety of such Interest Period, would prevent the Firm from complying with the third sentence of Section 2.2.E hereof;

> (iii)     only one Eurodollar Rate Loan and related Interest Period may commence on the same date;

> (iv)     whenever the last day of any Interest Period would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall be extended

7

to occur on the next succeeding Business Day; *provided, however*, that, if such extension would cause the last day of such Interest Period to occur in the next following calendar month, the last day of such Interest Period shall occur on the next preceding Business Day;

(v)     whenever the first day of any Interest Period occurs on a day of an initial calendar month for which there is no numerically corresponding day in the calendar month that succeeds such initial calendar month by the number of months equal to the number of months in such Interest Period, such Interest Period shall end on the last Business Day of such succeeding calendar month; and

(vi)     if the Firm fails to select the duration of any Interest Period in accordance with the provision of this definition of "Interest Period", then the Firm shall be deemed to have selected (subject to the provisions of this definition) the same duration as the duration of the Interest Period that it succeeds.

"Letter of Credit" means any letter of credit (including Standalone Letters of Credit) issued by the Lender for the account of the Firm on a standalone basis and under the Demand Line of Credit pursuant to the terms of Section 2.11.

"Letter of Credit Agreement" means an Application and Agreement for Clean Irrevocable Letter of Credit of Lender substantially in the form of Exhibit XVI attached hereto.

"Lien" means any lien, mortgage, pledge, security interest, charge or encumbrance of any kind (including, without limitation, any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give any security interest).

"Limited Liability Entity" means a corporation, a limited liability company, a limited liability partnership or other entity the equity owners of which are not liable, or have limited liability, for the debts of the entity.

"Loan" or "Loans" means amounts borrowed under the Demand Line of Credit, the Committed Revolving Credit Facility, Term Loan, Amortizing Term Loan, Demand Line of Credit for Contingency Cases or any combination thereof.

"Loan Documents" means this Agreement, the Notes, the Letter of Credit Agreements, the Security Agreement, the Guarantees and all other related documents contemplated herein or delivered in connection herewith, including (without limitation) any amendments to any such documents executed or approved by the parties from time to time.

"Mandatory Clean-Up Period" means, for any period of twelve (12) consecutive months (with the first such period commencing on the Original Effective Date), the last thirty (30) days of such 12-month period if a Clean-Up Period has not commenced prior thereto during such 12-month period.

"Net Income" means, for any period, the net income (or loss) from the practice of law and any related activity, such as consulting, of the Firm and the Firm Affiliates for such

8

period taken as a single accounting period, determined in conformity with the modified cash accounting basis used by the Firm in the preparation of the Firm's consolidated financial statements.

"New Effective Date" means the first date on which all the conditions set forth in Section 3 shall have been satisfied.

"Non Equity Partner" means any individual or entity who is a partner of the Firm from whom no equity contribution is required which exceeds fifteen percent (15%) of budgeted annual compensation, who receives a guaranteed payment from the Firm and who has been designated by the Firm's Executive Committee as a special type of partner known as a Level I Partner, Non Equity Partner or Fixed Equity Partner.

"Note" or "Notes" means the Demand Note, the Committed Revolving Credit Facility Note, the Term Notes, the Demand Note-Contingency Case Line or any of them.

"Notice of Borrowing" means a notice substantially in the form of Exhibit I attached hereto with respect to a proposed borrowing pursuant to Section 2.2.B, 2.3.B or 2.4.B.

"Original Credit Agreement" means the Secured Loan Agreement dated as of April 30, 1992, entered into between Borrower (then known as Howrey Simon Arnold & White, LLP and previous thereto as Howrey & Simon) and Citibank F.S.B. (as predecessor in interest to Lender), as amended and restated by the Amended and Restated Secured Loan Agreement dated as of August 31, 2001 entered into between such parties, as further amended and restated by the Second Amended and Restated Secured Loan Agreement dated as of March 21, 2003 entered into between such parties, and as further amended and restated as of February 26, 2008 entered into by such parties, and as amended by First Amendment thereto dated as of March 16, 2009 and Second Amendment thereto dated as of November 16, 2009.

"Original Effective Date" means the first date on which the conditions set forth in Section 3 under the Original Credit Agreement were satisfied.

"Paid-In Capital" means, as of any date of determination, the aggregate partners' capital accounts of the Firm's Partners in the Firm. The parties acknowledge that such Partners' capital accounts are intended to be calculated in the same manner as in financial statements heretofore furnished by the Firm to the Lender and shall not include Partners' draw accounts.

"Partner" or "Partners" means, as of any date of determination, any or all of the persons who partners of the Firm then constituting the partners (as defined in the Firm's partnership agreement as of the date of this Agreement) of the Firm, but excluding, however, any Non Equity Partner, any Contract Partner and Arnold, White & Durkee Corporation, a Texas professional corporation. The term shall include natural persons who are the ultimate equity owners of entities which are Partners in the Firm whether or not such owners are denominated "partners" under the partnership agreement of the Firm.

"Partnership Authorization" means an authorization substantially in the form of Exhibit XI attached hereto.

"Partnership Certificate" means a certificate substantially in the form of Exhibit X attached hereto.

"Pipeline Case Report" means a report of the Firm, substantially in the form of Exhibit XVII attached hereto, which contains a list of the Probability Adjusted Pre-Settlement Fees projected to be received by the Firm during the twelve (12) month period following the delivery of the Pipeline Case Report to the Lender, with the projected amounts reflected on a calendar quarterly basis.

"Potential Event of Default" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default if that condition or event were not cured or removed within any applicable grace or cure period. The term "Potential Event of Default" shall not include any condition or event which would arise out of a failure of performance by the Firm until the date on which such performance is actually due (such date being determined without regard to any applicable grace or cure period).

"Probability Adjusted Pre-Settlement Fees" means all projected fees and disbursements of the Firm from Contingency Cases as set forth in the most recently delivered Pipeline Case Report (a) which are projected to be collected within a twelve (12) month period from the last day of the most recently ended fiscal quarter, and (b) which, in the good faith judgment of the Firm, have a probability of greater than seventy-five percent (75%) of being collected in such period.

"Principal" when used with reference to the owners or equity holders of any Limited Liability Entity, means a shareholder, member, partner or other equity owner of such Entity.

"Security Agreement" means the Fourth Amended and Restated Security Agreement to be executed and delivered by the Firm and certain Firm Affiliates pursuant to Section 3.1.E, substantially in the form of Exhibit VIII attached hereto, granting the Lender a security interest in the Collateral as security for the Firm's obligations under the Loan Documents (and as security for possible future Loans, future amendments, future credit increases and/or any other obligations of the Firm to the Lender) and setting forth various related rights and obligations of the Lender, on the one hand, and the Firm and such Firm Affiliates, on the other hand, as amended from time to time.

"Standalone Letters of Credit" has the meaning assigned to it in Section 2.11.A(i).

"Term Notes" means the $9,000,000 Term Note and the $20,000,000 Term Note.

"Type" refers to the distinction between Alternate Base Rate Loans and Eurodollar Rate Loans.

"UCC" means the Uniform Commercial Code as in effect from time to time in the District of Columbia or in any other jurisdiction that may be applicable.

"Unbilled Disbursements" means monies advanced or expenses incurred for or on behalf of clients of the Firm or Firm Affiliates to be billed to or on behalf of clients in the

10

ordinary course of business but that are unbilled at the time of determination, as reflected in the books and records of the Firm or any Firm Affiliate.

"Unbilled Time" means, as of any date of determination, the estimated value of unbilled (i) time for work in progress and (ii) services performed, as of such date of determination, as reflected in the books and records of the Firm or any Firm Affiliate.

"Warner Lease" has the meaning assigned to it in Section 7.3.

## 1.2.    Accounting Terms

For purposes of this Agreement, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with generally accepted accounting principles, except to the extent that deviations from the meanings assigned to such terms by generally accepted accounting principles are required by the modified cash basis of accounting currently used by the Firm in the preparation of its consolidated financial statements.

## 1.3.    Other Definitional Provisions

References to "Sections" shall be construed to refer to Sections of this Agreement unless otherwise specifically provided. Any of the terms defined in Section 1.1 may, unless the context otherwise requires, be used in the singular or the plural depending on the reference.

## Section 2.    AMOUNT AND TERMS OF COMMITMENTS AND LOANS; NOTES

## 2.1.    Term Loans.

A.    $20,000,000 Term Loan.    Subject to the terms and provisions of this Agreement, the $20,000,000 Term Note and the related documents required hereby, and in reliance upon the representations and warranties of the Firm herein set forth, and upon compliance with the provisions of Sections 2.1.B, 2.1.C, 3.1 and 3.4, the Lender agrees to make available to the Firm on the New Effective Date, a term loan in the principal amount of Twenty Million Dollars ($20,000,000) (such amount, being the "20,000,000 Term Commitment").

B.    $20,000,000 Term Note.    On or before the Original Effective Date, the Firm executed and delivered to the Lender, with appropriate insertions the $20,000,000 Term Note to evidence the $20,000,000 Term Loan in the principal amount of the $20,000,000 Term Commitment.

C.    Repayment of Principal.    The principal amount of the $20,000,000 Term Loan shall be paid in equal quarterly installments of $1,333,333.33 each, commencing on September 30, 2008, and continuing on the last day of each calendar quarter thereafter until March 31, 2012, at which time all amounts outstanding under the $20,000,000 Term Loan, whether principal, interest or otherwise shall be immediately due and payable.

11

2.1.1. $9,000,000 Term Loan.

B. $9,000,000 Term Loan. Subject to the terms and provisions of this Agreement, the $9,000,000 Term Note and the related documents required hereby, and in reliance upon the representations and warranties of the Firm herein set forth, and upon compliance with the provisions of Sections 2.1.1.B, 2.1.1.C, 3.1 and 3.4, the Lender agrees to make available to the Firm, an amortizing term loan (the "$9,000,000 Term Loan") in the principal amount of Nine Million Dollars ($9,000,000) (such amount, being the "9,000,000 Term Commitment").

C. $9,000,000 Term Note. On or before the Original Effective Date, the Firm executed and delivered to the Lender, with appropriate insertions the $9,000,000 Term Note to evidence the $9,000,000 Term Loan in the principal amount of the $9,000,000 Term Commitment.

C. Repayment of Principal. The principal amount of the $9,000,000 Term Loan shall be paid in equal quarterly installments of $1,125,000 each, commencing on September 30, 2009, and continuing on the last day of each calendar quarter thereafter until June 30, 2011, at which time all amounts outstanding under the $9,000,000 Term Loan, whether principal, interest or otherwise shall be immediately due and payable.

2.2. Demand Line of Credit

A. Demand Line of Credit. Subject to the terms and provisions of this Agreement, the Demand Note and the related documents required hereby, and in reliance upon the representations and warranties of the Firm herein set forth, and upon compliance with the provision of Sections 2.2.B, 2.2.D, 2.2.E, 3.1 and 3.4, the Lender agrees to make available to the Firm, beginning on the Original Effective Date, a demand line of credit not to exceed (i) the principal amount of Ninety Million Dollars ($90,000,000) at any one time outstanding less (ii) the aggregate face amount of outstanding Letters of Credit (other than Standalone Letters of Credit) issued after the New Effective Date pursuant to Section 2.10 (the "Demand Line of Credit"), for the purposes identified in Section 2.7.B. Amounts of principal borrowed (the "Demand Advances") and repaid (subject to the provisions of Section 2.6) under the Demand Line of Credit may be re-borrowed, subject to all applicable terms of this Agreement. Notwithstanding the foregoing, the amount available for borrowing under the Demand Line of Credit shall decrease to Seventy Million Dollars ($70,000,000) beginning on each September 30 through December 31 during the term hereof. Provided no Event of Default has occurred and is continuing, such available amount shall increase back to Ninety Million Dollars ($90,000,000) on each January 1 during the term hereof. Either party hereto may terminate the Demand Line of Credit at any time, with or without cause, effective upon written notice to the other party, and the Firm acknowledges that the Lender will re-evaluate the Demand Line of Credit periodically (on an annual basis or at such other intervals as the Lender may deem appropriate) to determine whether to terminate or continue the same. Notwithstanding the foregoing, no Demand Advances may be made under this Section 2.2.A during any Mandatory Clean-up Period.

B. Notice of Borrowing. Whenever the Firm desires to borrow under the Demand Line of Credit, it shall deliver to the Lender a Notice of Borrowing not later than 1:00

Case: 11-31376   Doc# 64-3   Filed: 06/06/11   Entered: 06/06/11 14:37:42   Page 17 of 50

p.m. eastern time on (i) in the case of a proposed Eurodollar Rate Loan, the third Business Day prior to the proposed Funding Date or (ii) in the case of a proposed Alternate Base Rate Loan, the Business Day prior to the proposed Funding Date. The Notice of Borrowing shall specify (a) the proposed Funding Date (which shall be a Business Day), (b) the Type of Loan to be funded, (c) the amount of the proposed borrowing (which shall not exceed, when added to all amounts already outstanding under the Demand Line of Credit, the maximum amount of the Demand Line of Credit), and (d) in the case of a Eurodollar Rate Loan, the initial Interest Period for such Eurodollar Rate Loan. In lieu of delivering such a Notice of Borrowing, any Authorized Person (or if no Authorized Person is reasonably available, then the controller or assistant controller of the Firm) may give the Lender telephonic or facsimile notice by the required time of any proposed borrowing under this Section 2.2.B; *provided, however* that such notice shall be promptly confirmed in writing by delivery of an original executed Notice of Borrowing to the Lender on or prior to the Funding Date of the requested Demand Advance. The Lender shall not incur any liability to the Firm in acting upon any such telephonic or facsimile notice that the Lender believes in good faith to have been given by an Authorized Person (or the Controller or Assistant Controller, as provided above) on behalf of the Firm or for otherwise acting in good faith under this Section 2.2.B and in funding Loans in accordance with this Agreement pursuant to any telephonic or facsimile notice received by the Lender.

Each Notice of Borrowing shall be irrevocable and binding on the Firm. In the case of any borrowing that the related Notice of Borrowing specifies is to be comprised of Eurodollar Rate Loans, the Firm shall indemnify the Lender against any loss, cost or expense incurred by the Lender or its affiliates as a result of any failure to fulfill on or before the date specified in such Notice of Borrowing for such borrowing the applicable conditions set forth in Section 3.3 hereof, including, without limitation, any loss (including loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by the Lender or its affiliates to fund the Loan to be made by the Lender as part of such borrowing when such Loan, as a result of such failure, is not made on such date.

C. Disbursement of Funds. All disbursements of Demand Advances shall be made by deposit of the disbursed funds in the Firm's deposit account with the Lender. The Firm may request disbursements in minimum amounts of One Hundred Thousand Dollars ($100,000) or integral multiples of Twenty-Five Thousand ($25,000) in excess thereof. The Lender shall enter each amount disbursed and each amount repaid in its records and such entries shall be prima facie evidence of the amount of the Demand Line of Credit outstanding. The aggregate principal amount of all (i) such Demand Advances and (ii) all Letters of Credit (other than Standalone Letters of Credit) outstanding under the Demand Line of Credit at any time shall not exceed the maximum amount of the Demand Line of Credit as specified herein.

D. Demand Note. On or before the New Effective Date, the Firm shall execute and deliver to the Lender the Demand Note to evidence all Loans made under the Demand Line of Credit, in the principal amount of the Demand Line of Credit and with other appropriate insertions. Upon receipt by Lender of the executed Demand Note, Lender shall return to the Firm the original promissory note being replaced by the Demand Note, marked cancelled.

13

E.   Repayment of Principal. As is customary with a demand line of credit, the Lender reserves the right to demand repayment of amounts outstanding under the Demand Line of Credit at any time and from time to time. The principal balance outstanding under the Demand Line of Credit shall be payable in full on such demand. Notwithstanding the foregoing, the Firm shall, on the first day of each Mandatory Clean-up Period, prepay in full all then outstanding Demand Advances. Neither the Firm's option under the Demand Line of Credit to incur Eurodollar Rate Loans, nor the Firm's option to Convert Alternate Base Rate Loans into Eurodollar Rate Loans having Interest Periods of one, two, three or six months, shall be construed to impair or affect in any way the unconditional demand nature of the Demand Note or the right of the Lender to exercise its demand right with respect to the Demand Note at any time.

F.   Grace Period. In the event the Lender makes a demand (a "Demand") for all amounts then outstanding under the Demand Line of Credit (the "Demand Amount") when (i) no default or Event of Default under this Agreement or any of the Loan Documents has occurred and is then continuing at the time of the Demand, and (ii) the Lender has made such Demand solely as a result of a business decision by the Lender or its affiliates to terminate this Agreement (which business decision shall be unrelated to and independent of the Firm's performance of its obligations under this Agreement or any of the Loan Documents or of the Firm's financial condition prior to or at the time of such Demand), the Firm may take up to forty-five (45) Business Days from the date of such Demand to remit payment in full of the Demand Amount (such period being the "Grace Period"), provided, however, that if any Potential Event of Default or Event of Default under this Agreement or any of the Loan Documents occurs during the pendency of the Grace Period, the Grace Period shall end immediately, effective as of the date of such Potential Event of Default or Event of Default, and the Demand Amount shall become immediately due and payable in full to the Lender. At the termination of such Grace Period and notwithstanding any other provision of this Agreement, the Demand Amount shall become immediately due and payable in full to the Lender. The provisions of this Section 2.2.F shall not effect or amend in any way any other cure periods granted to the Firm under any other provision of the this Agreement, except to the extent any such cure period would extend beyond the Grace Period, in which case such cure period shall also terminate as of the date of termination of the Grace Period.

As a condition precedent to the continuation of the Grace Period referred to above, during the pendency of the Grace Period and until payment in full in cash of the Demand Amount is made by the Firm to the Lender pursuant to the Demand immediately preceding such Grace Period, the Firm will maintain, in any account(s) in the Firm's name or for the benefit of the Firm as may exist with the Lender, balance(s) consistent with the Firm's usual and normal business practice for that calendar period prior to the date of such Demand.

2.3.   Committed Revolving Credit Facility

A.   Committed Revolving Credit Facility Commitment. Subject to the terms and provisions of this Agreement, the Committed Revolving Credit Facility Note and the related documents required hereby, and in reliance upon the representations and warranties of the Firm herein set forth, and upon compliance with the provision of Sections 2.3.B, 2.3.D, 3.1, 3.3 and 3.4, the Lender agrees to make available to the Firm, beginning on the New Effective Date, a line of credit not to exceed the principal amount of Twenty-Five Million Dollars ($25,000,000) at any

14

one time outstanding (the "<u>Committed Revolving Credit Facility</u>"), for the purposes identified in <u>Section 2.6.C</u>. The Firm agrees to pay to the Lender a commitment fee of 1/4 of 1% per annum on the daily average unused amount of the Committed Revolving Credit Facility from the Original Effective Date to June 30, 2011, payable quarterly in arrears on the first day of each calendar quarter, and upon termination in full of the Commitment provided for in this <u>Section 2.3</u>. Amounts of principal borrowed (the "<u>Committed Revolving Credit Facility Advances</u>") and repaid (subject to the provisions of <u>Section 2.6</u>) under the Committed Revolving Credit Facility may be re-borrowed, subject to all applicable terms of this Agreement. Unless sooner in accordance with the terms of this Agreement, all amounts outstanding under this Committed Revolving Credit Facility, whether as principal, interest or otherwise, shall be due and payable on June 30, 2011.

   B. <u>Notice of Borrowing</u>. Whenever the Firm desires to borrow under the Committed Revolving Credit Facility, it shall deliver to the Lender a Notice of Borrowing not later than 1:00 p.m. Eastern time on (i) in the case of a proposed Eurodollar Rate Loan, the third Business Day prior to the proposed Funding Date or (ii) in the case of a proposed Alternate Base Rate Loan, the Business Day prior to the proposed Funding Date. The Notice of Borrowing shall specify (a) the proposed Funding Date (which shall be a Business Day), (b) the Type of Loan to be funded, (c) the amount of the proposed borrowing (which shall not exceed, when added to all amounts already outstanding under Committed Revolving Credit Facility, the maximum amount of the Committed Revolving Credit Facility), and (d) in the case of a Eurodollar Rate Loan, the initial Interest Period for such Eurodollar Rate Loan. In lieu of delivering such a Notice of Borrowing, any Authorized Person (or if no Authorized Person is reasonably available, then the controller or assistant controller of the Firm) may give the Lender telephonic or facsimile notice by the required time of any proposed borrowing under this <u>Section 2.3</u>; <i>provided, however</i> that such notice shall be promptly confirmed in writing by delivery of an original executed Notice of Borrowing to the Lender on or prior to the Funding Date of the requested Committed Revolving Credit Facility Advance. The Lender shall not incur any liability to the Firm in acting upon any such telephonic or facsimile notice that the Lender believes in good faith to have been given by an Authorized Person (or the Controller or Assistant Controller, as provided above) on behalf of the Firm or for otherwise acting in good faith under this <u>Section 2.3.B</u> and in funding Loans in accordance with this Agreement pursuant to any telephonic or facsimile notice received by the Lender.

   Each Notice of Borrowing shall be irrevocable and binding on the Firm. In the case of any borrowing that the related Notice of Borrowing specifies is to be comprised of Eurodollar Rate Loans, the Firm shall indemnify the Lender against any loss, cost or expense incurred by the Lender or its affiliates as a result of any failure to fulfill on or before the date specified in such Notice of Borrowing for such borrowing the applicable conditions set forth in <u>Section 3.3</u> hereof, including, without limitation, any loss (including loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by the Lender or its affiliates to fund the Loan to be made by the Lender as part of such borrowing when such Loan, as a result of such failure, is not made on such date.

   C. <u>Disbursement of Funds</u>. All disbursements of funds advanced under Committed Revolving Credit Facility shall be made by deposit of the disbursed funds in the Firm's deposit account with the Lender. The Firm may request disbursements in minimum

15

amounts of One Hundred Thousand Dollars ($100,000) or integral multiples of Twenty-Five Thousand ($25,000) in excess thereof. The Lender shall enter each amount disbursed and each amount repaid in its records and such entries shall be prima facie evidence of the amount of the Committed Revolving Credit Facility outstanding. The aggregate principal amount of all such Loans outstanding under the Committed Revolving Credit Facility at any time shall not exceed the maximum amount of the Committed Revolving Credit Facility as specified herein.

      D.    <u>Committed Revolving Credit Facility Note</u>. On or before the initial Funding Date for the Committed Revolving Credit Facility, the Firm shall execute and deliver to the Lender a Committed Revolving Credit Facility Note to evidence the Committed Revolving Credit Facility, in the principal amount of Committed Revolving Credit Facility and with other appropriate insertions. Upon receipt by Lender of the executed Committed Revolving Credit Facility Note, Lender shall return to the Firm the original promissory note being replaced, marked cancelled.

      2.4.    <u>Demand Line of Credit for Contingency Cases.</u>

      A.    <u>Demand Line of Credit for Contingency Cases</u>. Subject to the terms and provisions of this Agreement, the Demand Note-Contingency Cases Line and the related documents required hereby, and in reliance upon the representations and warranties of the Firm herein set forth, and upon compliance with the provision of <u>Sections 2.4.B</u>, <u>2.4.D</u>, <u>2.4.E</u>, <u>2.4.F</u>, <u>3.1</u> and <u>3.4</u>, the Lender agrees to make available to the Firm, beginning on the New Effective Date, a demand line of credit not to exceed the principal amount of Ten Million Dollars ($10,000,000) at any one time outstanding (the "<u>Demand Line of Credit for Contingency Cases</u>"), for the purposes identified in <u>Section 2.7.E</u>. Amounts of principal borrowed (the "<u>Demand Contingency Cases Advances</u>") and repaid (subject to the provisions of <u>Section 2.6</u>) under the Demand Line of Credit for Contingency Cases may be re-borrowed, subject to all applicable terms of this Agreement. Either party hereto may terminate the Demand Line of Credit for Contingency Cases at any time, with or without cause, effective upon written notice to the other party, and the Firm acknowledges that the Lender will re-evaluate the Demand Line of Credit for Contingency Cases periodically (on an annual basis or at such other intervals as the Lender may deem appropriate) to determine whether to terminate or continue the same. Notwithstanding the foregoing, no Demand Contingency Cases Advances may be made under this <u>Section 2.4.A</u> during the last thirty (30) days of any period of twenty-four (24) consecutive months (with the first such period commencing on the New Effective Date), if a Clean-Up Period has not commenced prior thereto during such 24-month period (the "<u>Extended Mandatory Clean-up Period</u>").

      B.    <u>Notice of Borrowing</u>. Whenever the Firm desires to borrow under the Demand Line of Credit for Contingency Cases, it shall deliver to the Lender a Notice of Borrowing not later than 1:00 p.m. eastern time on (i) in the case of a proposed Eurodollar Rate Loan, the third Business Day prior to the proposed Funding Date or (ii) in the case of a proposed Alternate Base Rate Loan, the Business Day prior to the proposed Funding Date. The Notice of Borrowing shall specify (a) the proposed Funding Date (which shall be a Business Day), (b) the Type of Loan to be funded, (c) the amount of the proposed borrowing (which shall not exceed, when added to all amounts already outstanding under the Demand Line of Credit for Contingency Cases, the maximum amount of the Demand Line of Credit for Contingency

16

Cases), and (d) in the case of a Eurodollar Rate Loan, the initial Interest Period for such Eurodollar Rate Loan. In lieu of delivering such a Notice of Borrowing, any Authorized Person (or if no Authorized Person is reasonably available, then the controller or assistant controller of the Firm) may give the Lender telephonic or facsimile notice by the required time of any proposed borrowing under this Section 2.4.B; *provided, however* that such notice shall be promptly confirmed in writing by delivery of an original executed Notice of Borrowing to the Lender on or prior to the Funding Date of the requested Demand Contingency Cases Advance. The Lender shall not incur any liability to the Firm in acting upon any such telephonic or facsimile notice that the Lender believes in good faith to have been given by an Authorized Person (or the Controller or Assistant Controller, as provided above) on behalf of the Firm or for otherwise acting in good faith under this Section 2.4.B and in funding Loans in accordance with this Agreement pursuant to any telephonic or facsimile notice received by the Lender.

Each Notice of Borrowing shall be irrevocable and binding on the Firm. In the case of any borrowing that the related Notice of Borrowing specifies is to be comprised of Eurodollar Rate Loans, the Firm shall indemnify the Lender against any loss, cost or expense incurred by the Lender or its affiliates as a result of any failure to fulfill on or before the date specified in such Notice of Borrowing for such borrowing the applicable conditions set forth in Section 3.3 hereof, including, without limitation, any loss (including loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by the Lender or its affiliates to fund the Loan to be made by the Lender as part of such borrowing when such Loan, as a result of such failure, is not made on such date.

C. <u>Disbursement of Funds</u>. All disbursements of Demand Contingency Cases Advances shall be made by deposit of the disbursed funds in the Firm's deposit account with the Lender. The Firm may request disbursements in minimum amounts of One Hundred Thousand Dollars ($100,000) or integral multiples of Twenty-Five Thousand ($25,000) in excess thereof. The Lender shall enter each amount disbursed and each amount repaid in its records and such entries shall be prima facie evidence of the amount of the Demand Contingency Cases Advances outstanding. The aggregate principal amount of all such Demand Contingency Cases Advances outstanding under the Demand Line of Credit for Contingency Cases at any time shall not exceed the maximum amount of the Demand Line of Credit for Contingency Cases as specified herein.

D. <u>Demand Note-Contingency Cases Line</u>. On or before the New Effective Date, the Firm shall execute and deliver to the Lender the Demand Note-Contingency Cases Line to evidence all Loans made under the Demand Line of Credit for Contingency Cases, in the principal amount of the Demand Line of Credit for Contingency Cases and with other appropriate insertions.

E. <u>Repayment of Principal</u>. As is customary with a demand line of credit, the Lender reserves the right to demand repayment of amounts outstanding under the Demand Line of Credit for Contingency Cases at any time and from time to time. The principal balance outstanding under the Demand Line of Credit for Contingency Cases shall be payable in full on such demand. Notwithstanding the foregoing, the Firm shall, on the first day of each Extended Mandatory Clean-up Period, prepay in full all then outstanding Demand Contingency Cases Advances. Neither the Firm's option under the Demand Line of Credit for Contingency Cases to incur Eurodollar Rate Loans, nor the Firm's option to Convert Alternate Base Rate Loans into

17

Eurodollar Rate Loans having Interest Periods of one, two, three or six months, shall be construed to impair or affect in any way the unconditional demand nature of the Demand Note-Contingency Cases Line or the right of the Lender to exercise its demand right with respect to the Demand Note-Contingency Cases Line at any time.

F.   Grace Period.  In the event the Lender makes a demand (a "CC Demand") for all amounts then outstanding under the Demand Line of Credit for Contingency Cases (the "CC Demand Amount") when (i) no default or Event of Default under this Agreement or any of the Loan Documents has occurred and is then continuing at the time of the CC Demand, and (ii) the Lender has made such CC Demand solely as a result of a business decision by the Lender or its affiliates to terminate the Demand Line of Credit for Contingency Cases (which business decision shall be unrelated to and independent of the Firm's performance of its obligations under this Agreement or any of the Loan Documents or of the Firm's financial condition prior to or at the time of such CC Demand), the Firm may take up to forty-five (45) Business Days from the date of such CC Demand to remit payment in full of the CC Demand Amount (such period being the "CC Grace Period"), *provided, however*, that if any Potential Event of Default or Event of Default under this Agreement or any of the Loan Documents occurs during the pendency of the CC Grace Period, the CC Grace Period shall end immediately, effective as of the date of such Potential Event of Default or Event of Default, and the CC Demand Amount shall become immediately due and payable in full to the Lender.  At the termination of such CC Grace Period and notwithstanding any other provision of this Agreement, the CC Demand Amount shall become immediately due and payable in full to the Lender.  The provisions of this Section 2.4.F shall not effect or amend in any way any other cure periods granted to the Firm under any other provision of the this Agreement, except to the extent any such cure period would extend beyond the CC Grace Period, in which case such cure period shall also terminate as of the date of termination of the CC Grace Period.

As a condition precedent to the continuation of the CC Grace Period referred to above, during the pendency of the CC Grace Period and until payment in full in cash of the CC Demand Amount is made by the Firm to the Lender pursuant to the CC Demand immediately preceding such CC Grace Period, the Firm will maintain, in any account(s) in the Firm's name or for the benefit of the Firm as may exist with the Lender, balance(s) consistent with the Firm's usual and normal business practice for that calendar period prior to the date of such CC Demand.

2.5.   Interest on the Loans

A.   Rate of Interest.  The Loans shall bear interest on the unpaid principal amount thereof from the date made through maturity (whether by acceleration, demand, permitted prepayment or otherwise) at the following rates:

(i)   As to amounts outstanding under the $20,000,000 Term Loan:

(a) Any portion of the $20,000,000 Term Loan that is an Alternate Base Rate Loan shall bear interest at the Base Rate; and

(b) During such periods as any portion of the $20,000,000 Term Loan is a Eurodollar Rate Loan, at all times during each Interest Period therefor, such Loan

18

shall bear interest at a rate per annum equal to the sum of the Eurodollar Rate for such Interest Period plus .95% per annum.

(ii)    As to amounts outstanding under the Demand Line of Credit:

(a) Loans under the Demand Line of Credit that are Alternate Base Rate Loans shall bear interest at the Alternate Base Rate; and

(b) During such periods as any amount outstanding under the Demand Line of Credit is a Eurodollar Rate Loan, at all times during each Interest Period for such amount, such amount shall bear interest at a rate per annum equal to the sum of the Eurodollar Rate for such Interest Period plus .95% per annum.

(iii)    As to amounts outstanding under the Committed Revolving Credit Facility:

(a) Any Committed Revolving Credit Facility Loan that is an Alternate Base Rate Loan shall bear interest per annum at the Alternate Base Rate; and

(b) During such periods as any Committed Revolving Credit Facility Loan is a Eurodollar Rate Loan, at all times during each Interest Period therefor, such Loan shall bear interest at a rate per annum equal to the sum of the Eurodollar Rate for such Interest Period plus .95% per annum.

(iv)    As to amounts outstanding under the $9,000,000 Term Loan:

(a) Any portion of the $9,000,000 Term Loan that is an Alternate Base Rate Loan shall bear interest at the Alternate Base Rate; and

(b) During such periods as any portion of the $9,000,000 Term Loan is a Eurodollar Rate Loan, at all times during each Interest Period therefor, such Loan shall bear interest at a rate per annum equal to the sum of the Eurodollar Rate for such Interest Period plus .95% per annum.

(v)    As to amounts outstanding under the Demand Line of Credit for Contingency Cases:

(a)    Any Demand Contingency Cases Advance that is an Alternate Base Rate Loan shall bear interest per annum at the Alternate Base Rate; and

(b)    During such periods as any Demand Contingency Cases Advance is a Eurodollar Rate Loan, at all times during each Interest Period therefor, such Loan shall bear interest at a rate per annum equal to the sum of the Eurodollar Rate for such Interest Period plus 1.50% per annum.

B.    Interest Payments. Subject to Section 2.5.C, interest shall be payable on each Loan in arrears on and to each Interest Payment Date applicable to that Loan, upon any

19

prepayment of that Loan (to the extent accrued on the amount being prepaid), whether voluntary, mandatory, or upon acceleration or demand, and at maturity.

C. <u>Post-Maturity Interest</u>. Any principal payments on any Loan not paid when due, whether at stated maturity, by notice of prepayment, by acceleration, by demand or otherwise but excluding during the Grace Period or CC Grace Period, and, to the extent allowed by applicable law, any interest payment not paid within five days from the due date thereof, shall thereafter bear interest payable upon demand at a rate that is two percent (2.0%) per annum in excess of the rate of interest otherwise payable under this Agreement.

D. <u>Computation of Interest</u>. Interest on the Loans and all fees payable under this Agreement and the other Loan Documents shall be computed on the basis of a 360-day year, actual days elapsed. In computing interest on any Loan, the date of the making of such Loan shall be included and the date of full repayment of principal shall be excluded; *provided* that if a Loan is repaid on the same day on which it is made, one day's interest shall be paid thereon.

2.6. <u>Prepayments and Payments</u>

A. <u>Voluntary Prepayments</u>. Subject to <u>Section 2.9.E</u>, the Firm may, upon not less than one Business Day's prior written, telephonic or facsimile notice confirmed in writing to the Lender, at any time and from time to time, prepay the Loans in whole or in part, without premium or penalty, in an aggregate minimum amount of (i) in the case of Loans under the Demand Line of Credit, the Committed Revolving Line of Credit or the Demand Line of Credit for Contingency Cases, $50,000 and integral multiples of $50,000 in excess of that amount, and (ii) in the case of the Term Loans, $100,000 and integral multiples of $100,000 in excess of that amount, *provided, however*, that no such prepayment of a Eurodollar Rate Loan shall be made other than on the last day of an Interest Period therefor. If such notice does not specify how such prepayment shall be applied, it shall be applied first to the Term Loan and Amortizing Term Loan, and then to the Demand Line of Credit and then Committed Revolving Credit Facility and then to the Demand Line of Credit for Contingency Cases on a pro rata basis. Notice of prepayment having been given as aforesaid, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date. Prepayments of principal made on a Term Loan shall be applied in inverse order against the installments of principal provided for therein unpaid at the time of any such prepayment, *i.e.*, such prepayments shall be applied first against the final principal payment to become due under the applicable Term Note, then against the next preceding payment, and so on until the prepayment is exhausted. All prepayments shall include payment of accrued interest on the principal amount so prepaid and shall be applied to the payment of interest before application to principal.

B. <u>Manner and Time of Payment</u>. All payments of principal, interest and fees hereunder and under the Notes shall be made without defense, set-off or counterclaim and in same day funds (which may include, for this purpose, checks drawn on an account with the Lender) and delivered to the Lender not later than 12:00 Noon (eastern time) on the date due at its office located at Citibank N.A., 1101 Pennsylvania Avenue, N.W., 9th Floor, Washington, D.C. 20004, or such other address as the Lender may designate to the Firm by written notice. Payments in cash or by check drawn on an account with the Lender so delivered by such time shall be credited to the account of the Lender on the date delivered. Funds received by the

20

Lender after that time shall be deemed to have been paid by the Firm on the next succeeding Business Day.

C. <u>Payments on Non-Business Days</u>. Whenever any payment to be made hereunder or under the Notes shall be stated to be due on a day that is not a Business Day, the payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder or under the Notes.

D. <u>Notation of Payment</u>. The Lender agrees that before disposing of any Note held by it, or any part thereof, the Lender will make a notation thereon of all Loans made thereunder and principal payments previously made thereon and of the date to which interest thereon has been paid and will notify the Firm of the name and address of the proposed transferee of such Note; *provided, however,* that the failure to make a notation of any Loan made under such Notes shall not limit or otherwise affect the obligation of the Firm hereunder or under such Notes with respect to any Loan and payments of principal or interest on any such Note or the right of the Firm to credit for payments of principal or interest actually made, other than in respect of obligations of the Firm to a bona fide purchaser for value of such Note.

2.7. <u>Use of Proceeds</u>

A. The proceeds of the $20,000,000 Term Loan shall be used by the Firm solely to finance capital expenditures, fixed assets and other duly authorized uses consistent with past practices.

B. The proceeds of any Loans made under the Demand Line of Credit after the date hereof shall be used by the Firm solely for the Firm's general working capital requirements, and issuance of Letters of Credit (other than Standalone Letters of Credit) under this Agreement.

C. The proceeds of any Committed Revolving Credit Facility Loan shall be used by the Firm solely to finance new capital expenditures, including leasehold improvements, and for general partnership purposes.

D. The proceeds of the $9,000,000 Term Loan shall be used by the Firm solely to finance the Thelan practice acquisition and London build-out.

E. The proceeds of the Demand Line for Contingency Cases shall be available to the Firm solely for the purpose of financing the Firm's costs and expenses (including without limitation attorney and staff labor costs at the Firm's standard billing rates, court costs and fees and costs of outside consultants and experts, but not partner distributions) which the Firm lawfully incurs and which are directly attributable to prosecuting or defending Contingency Cases. Upon request of the Lender in connection with any requested Demand Contingency Cases Advances, the Firm shall provide Lender with all information available to the Firm relating to the anticipated use of such Advance in order to demonstrate compliance by the Firm with the provisions of this <u>Section 2.7.E</u>, *subject, however,* to any applicable attorney-client confidentiality requirements that would prohibit disclosure of such information to Lender.

2.8. <u>Conversion of Loans</u>

21

A. _Optional_. Subject to Section 2.9.E, the Firm may on any Business Day, upon notice given to the Lender not later than 1:00 p.m. (eastern time) on the third Business Day prior to the date of the proposed Conversion and subject to the provisions of this Section 2.8 and Section 2.9, Convert all or any portion of the Loans of one Type into Loans of the other Type; *provided, however,* that (i) any Conversion of Eurodollar Rate Loans into Alternate Base Rate Loans shall be made on, and only on, the last day of an Interest Period for such Eurodollar Rate Loans, any Conversion of a Loan of one Type into a Loan of the other Type shall be in an amount not less than the minimum amount specified in Section 2.10, and no Conversion of any Loans shall result in more separate Eurodollar Loans outstanding than permitted under Section 2.10. Each such notice of Conversion shall, within the restrictions specified above, specify (a) the date of such Conversion, (b) the Loans to be Converted and (c) if such Conversion is not of a Eurodollar Rate Loan into an Alternate Base Rate Loan, the duration of the initial Interest Period for such Loans. Each notice of Conversion shall be irrevocable and binding on the Firm.

B. _Mandatory_. On the date on which the aggregate unpaid principal amount of Eurodollar Rate Loans shall be reduced, by payment or prepayment or otherwise, to less than $1,000,000, such Loans shall automatically Convert into Alternate Base Rate Loans.

If the Firm shall fail to select the duration of any Interest Period for any Eurodollar Rate Loan in accordance with the provisions contained in the definition of "Interest Period" in Section 1.1, such Eurodollar Rate Loan will automatically, on the last day of the then existing Interest Period therefor, Convert into an Alternate Base Rate Loan.

2.9.     Increased Costs, Etc.

A. _Regulatory Changes_. If, due to either (i) the introduction of or any change (other than any change by way of imposition or increase of reserve requirements included in the Eurodollar Rate Reserve Percentage) in or in the interpretation of any law or regulation or (ii) the compliance with any guideline or request from any central bank or other governmental authority (whether or not having the force of law), there shall be any increase in the cost to the Lender or its affiliates of agreeing to make or making, funding or maintaining Eurodollar Rate Loans or of agreeing to issue or of issuing or maintaining or participating in Letters of Credit, then the Firm shall from time to time, upon demand by the Lender, pay to the Lender additional amounts sufficient to compensate the Lender for such increased cost. A certificate as to the amount of and setting forth in reasonable detail the basis for such increased cost, submitted to the Firm by the Lender, shall be conclusive and binding for all purposes, absent manifest error. With respect to any Loan outstanding at the time any such change, introduction, interpretation or (increased cost due to) compliance takes effect, all claims for compensation under the terms of this Section 2.9.A must be made by Lender within forty-five (45) days after such increased costs were incurred or such claims are waived.

B. _Capital Compliance_. If the Lender determines that compliance with any law or regulation or any guideline or request from any central bank or other governmental authority (whether or not having the force or law) affects or would affect the amount of capital required or expected to be maintained by the Lender or any affiliate of the Lender and that the amount of such capital is increased by or based upon the existence of the Lender's obligations hereunder and other obligations of this type, then, upon demand by the Lender, the Firm shall

22

pay the Lender, from time to time as specified by the Lender, additional amounts sufficient to compensate the Lender in the light of such circumstances, to the extent that the Lender reasonably determines such increase in capital to be allocable to the existence of the Lender's obligations hereunder or to the issuance or maintenance of any Letters of Credit. A certificate as to such amounts, submitted to the Firm by the Lender setting forth in reasonable detail the basis therefor, shall be conclusive and binding for all purposes, absent manifest error. With respect to any Loan outstanding at the time of any such determination by the Lender, all claims for compensation under the terms of this Section 2.9.B must be made by Lender within forty-five (45) days after such increased costs were incurred or such claims are waived.

C. <u>Inadequate Reflection of Cost</u>. If, with respect to any Eurodollar Rate Loans, the Lender notifies the Firm that the Eurodollar Rate for any Interest Period for such Loans will not adequately reflect the cost to the Lender or its affiliates, of making, funding or maintaining such Eurodollar Rate Loans for such Interest Period, then (i) each such Eurodollar Rate Loan will automatically, on the last day of the then existing Interest Period therefor, Convert into an Alternate Base Rate Loan, and (ii) the obligation of the Lender to make, or to Convert Loans into, Eurodollar Rate Loans shall be suspended until the Lender shall notify the Firm that the Lender has determined that the circumstances causing such suspension no longer exist.

D. <u>Automatic Conversion</u>. Notwithstanding any other provision of this Agreement, if the introduction of or any change in or in the interpretation of any law or regulation shall make it unlawful, or any central bank or other governmental authority shall assert that it is unlawful, for the Lender or any affiliate to perform its obligations hereunder to make Eurodollar Rate Loans or to continue to fund or maintain Eurodollar Rate Loans hereunder, then, on notice thereof and demand therefor by the Lender to the Firm (i) each Eurodollar Rate Loan will automatically, upon such demand, Convert into an Alternate Base Rate Loan and (ii) the obligation of the Lender to make, or to Convert Loans into, Eurodollar Rate Loans shall be suspended until the Lender shall notify the Firm that the Lender has determined that the circumstances causing such suspension no longer exist.

Upon the occurrence and during the continuance of any Event of Default (i) each Eurodollar Rate Loan will automatically, on the last day of the then existing Interest Period therefor, Convert into an Alternate Base Rate Loan and (ii) the obligation of the Lender to make, or to Convert Loans into, Eurodollar Rate Loans shall be suspended.

E. <u>Prepayment of Eurodollar Rate Loans</u>. If any payment of principal of, or Conversion of, any Eurodollar Rate Loan is made by the Firm to or for the account of the Lender other than on the last day of the Interest Period for such Loan, as a result of a payment or Conversion pursuant to Section 2.8 or this Section 2.9, acceleration of the maturity of Loans pursuant to Section 7, demand under the Demand Line of Credit or the Demand Line of Credit for Contingency Cases or for any other reason, the Firm shall, upon demand by the Lender pay to the Lender any amounts required to compensate the Lender for any additional losses, costs or expenses that it or its affiliates may reasonably incur as a result of such payment or Conversion, including, without limitation, any loss (including loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by the Lender or its affiliates to fund or maintain such Loan. With respect to any Loan outstanding at

23

the time of such payment, all claims for additional losses, costs or expenses must be made within forty-five (45) days after they were incurred or such claims are waived.

2.10. Eurodollar Rate Loan Limits

Anything to the contrary herein notwithstanding, the total number of Eurodollar Rate Loans outstanding shall not exceed three per each category of Loan at any one time, and no Eurodollar Rate Loan shall be made, or purported Conversion honored, in an aggregate principal amount of less than $1,000,000.

2.11. Letters of Credit

A. Subject to the terms and provisions of this Agreement and in reliance upon the representations and warranties of the Firm herein set forth, the Lender agrees:

(i) to maintain the Letters of Credit described in Exhibit XV hereto, each of which is annually renewable at the Lender's sole option, for the purpose of securing the obligations of the Firm under leases or occupancy agreements for its various offices (collectively, the "Standalone Letters of Credit");

(ii) to consider whether it will issue such additional Letters of Credit as may be requested by the Firm from time to time, so long as the aggregate face amount of such Letters of Credit (but specifically excluding the Standalone Letters of Credit), together with the aggregate of all outstanding Loans under the Demand Line of Credit on the date of issuance of such additional Letters of Credit, do not exceed the amount of the Lender's total Commitment under the Demand Line of Credit.

B. Each Letter of Credit issued by the Lender for the account of the Firm shall be subject to the terms and conditions identified in Letter of Credit Agreement in respect of such Letter of Credit, the terms and conditions of which are herein incorporated by reference as if fully set forth herein.

C. The Firm shall be irrevocably and unconditionally obligated forthwith upon written notice but without presentment, demand, protest or other formalities of any kind, to reimburse the Lender for any amounts paid by the Lender with respect to any and all Letters of Credit issued by the Lender for the account of the Firm.

D. The Lender reserves the right to have any or all Letters of Credit issued by affiliates of Lender, and to that extent such affiliates shall be deemed the Lender hereunder, and all rights of the Lender under the this Agreement and the Security Agreement shall inure to the benefit of such affiliates to the extent of the Firm's obligations under the related Letter of Credit Agreements, with such affiliates being a third party creditor beneficiary of all of Lender's rights under the Loan Documents in respect of all Letters of Credit. In addition to, and without limiting the foregoing, the obligations, including reimbursement obligations of the Firm under or in respect of any and all Letters of Credit issued by the Lender or its affiliates under the terms of this Section 2.11 and related Letter of Credit Agreements shall be secured by the Collateral.

Section 3. CONDITIONS TO LOANS

24

The obligation of the Lender to make Loans hereunder is subject to satisfaction of all of the following conditions:

### 3.1. Conditions to Term Loans

The obligation of the Lender to make the Term Loans is, in addition to the conditions precedent specified in Section 3.5, subject to satisfaction of the following conditions on or before the date hereof:

A. The Firm shall have delivered to the Lender executed copies of the Term Notes executed by two Authorized Persons and drawn to the order of the Lender and with the appropriate insertions.

B. The Lender shall have received concurrently with the execution of this Agreement an original executed copy of a written opinion of the Firm as to the status of the Loan Documents and as to matters of federal law and the law of the District of Columbia, substantially in the form of Exhibit VII attached hereto.

C. The Firm shall have delivered to the Lender audited statements of the Firm's assets, liabilities and partners' capital-income tax basis as of December 31, 2009, and related audited statements of revenue and expense-income tax basis and cash flows-income tax basis for the years then ended, and monthly financial statements for the month ended December 31, 2009 substantially in conformity with the monthly financial statements required by Section 5.3(b) hereof.

D. The Firm shall have delivered to the Lender Guaranties in the form of Exhibit XIII duly executed by the Firm Affiliates party thereto, if not previously delivered to Lender in connection with the Original Credit Agreement.

E. The Firm shall have delivered to the Lender any other documentation applicable or appropriate to this type of credit transaction, as reasonably determined and requested by the Lender, including (without limitation) executed originals of the Security Agreement, the Partnership Certificate attached hereto as Exhibit X and the Partnership Authorization attached hereto as Exhibit XI, and all such documents shall then be in full force and effect.

F. The Firm shall confirm that the certified copy of limited liability partnership registration filed by the Firm with the District of Columbia, together with any amendments thereto, as previously delivered to the Bank, has not been further amended and remains in full force and effect, all of which shall be in form and substance satisfactory to the Lender.

G. The Firm shall have delivered a copy of the resolutions of the Executive Committee of the Firm authorizing the execution, delivery and performance of each Loan Document to which it is a party, and such certified copies evidencing other necessary partnership action and governmental approvals, if any, as the Lender may reasonably request with respect to due authorization, execution, delivery and performance of the Loan Documents to which it is a party by the Firm.

25

H. The Firm shall have delivered a certificate of a member of the Executive Committee of the Firm certifying the (i) names and true signatures of the partners authorized to sign each Loan Document to which the Firm is a party and the other documents to be delivered thereunder and (ii) as to the identity of the Core Partners as of the New Effective Date.

I. The Firm shall have provided the Lender with evidence that all other actions that the Lender may deem necessary or desirable in order to protect and perfect the liens and security interest created under the Security Agreement have been taken.

3.2. <u>Condition to Demand Line of Credit Advances</u>. The willingness of the Lender to make Advances to the Firm under the Demand Line of Credit is, in addition to the conditions precedent specified in <u>Sections 3.1.B</u> through <u>3.1.I</u> and <u>3.5</u>, subject to Lender having received the Demand Note, executed by two Authorized Persons and drawn to the Lender's order with appropriate insertions.

3.3. <u>Conditions to Committed Revolving Credit Facility Advances</u>. The obligation of the Lender to make any Advance to the Firm under the Committed Revolving Credit Facility is, in addition to the conditions precedent specified in <u>Sections 3.1.B</u> through <u>3.1.I</u> and <u>3.5</u>, subject to the Lender having received the Committed Revolving Credit Facility Note, executed by two Authorized Persons and drawn to the Lender's order and with appropriate insertions.

3.4. <u>Condition to Demand Contingency Cases Advances</u>. The willingness of the Lender to make a Contingency Cases Advance to the Firm under the Demand Line of Credit for Contingency Cases is, in addition to the conditions precedent specified in <u>Sections 3.1.B</u> through <u>3.1.I</u> and <u>3.5</u>, subject to (i) the Lender having received the Demand Note-Contingency Cases Line, executed by two Authorized Persons and drawn to the Lender's order with appropriate insertions, (ii) the total principal amount of all Contingency Cases Advances then outstanding, after giving effect to such requested Advance, shall not exceed twenty-five percent (25%) of the Contingency Cases Borrowing Base, and (iii) the Lender's receipt of a completed Pipeline Case Report with information updated through the date of such requested Advance and a completed and signed Contingency Cases Borrowing Base Report as of such date.

3.5. <u>Conditions to All Loans</u>

The obligation of the Lender to make any Advance of any Loan is subject to the following further conditions precedent:

A. The Lender shall have received, in accordance with the provisions of <u>Section 2.2.B</u>, <u>2.3.B</u> or <u>2.4B</u>, as applicable, on or before the Funding Date applicable to such Advance, an original executed Notice of Borrowing signed by an Authorized Person.

B. As of each Funding Date applicable to such Advance:

(i) The representations and warranties of the Firm contained herein and in each other Loan Document shall be true, correct and complete in all material respects to the same extent as though made on and as of that date;

26

(ii)     No Event of Default or Potential Event of Default shall have occurred and be continuing, nor shall any event result from the consummation of the borrowing contemplated by such Notice of Borrowing that would constitute an Event of Default or a Potential Event of Default; and

B.     After giving effect to the amount requested to be advanced to the Firm on the Funding Date, together with all other amounts then outstanding under the Notes and the aggregate amount of all then outstanding Letters of Credit (other than Standalone Letters of Credit), the Firm shall not be in violation of the borrowing limit set forth in Section 6.1.

C.     The Firm will have paid to the Lender, on or before the Firm's execution and delivery of this Agreement, a waiver fee of $187,500 in consideration of the covenant default waivers contained in the letter attached hereto as Exhibit XIV.

D.     The Firm shall have paid to the Lender, on or before the Firm's execution and delivery of this Agreement, a structuring fee of $25,000 in respect of the Demand Line of Credit for Contingency Cases.

Section 4.     THE FIRM'S REPRESENTATIONS AND WARRANTIES

In order to induce the Lender to enter into this Agreement and to make the Loans, the Firm represents and warrants to the Lender that the following statements are true, correct and complete and agrees that any request for a future Advance shall be deemed a reaffirmation as of the date of such request of all representations and warranties in this Agreement and in the other Loan Documents:

4.1.     Existence and Rights

The Firm is a registered limited liability partnership duly organized and existing under the laws of the District of Columbia and is qualified or licensed to do business in all other jurisdictions in which the laws thereof require the Firm to be so qualified or licensed. The Firm has the power and authority to execute, deliver and perform this Agreement and the other Loan Documents as herein provided. The chief executive office (within the meaning of the UCC) is located at the address of the Firm specified in Section 9.4 hereof.

27

### 4.2. Agreement and Notes Authorized

The execution, delivery and performance of this Agreement and of the other Loan Documents have been duly authorized by all action necessary on the part of the Firm and the Firm Affiliates (to the extent they are parties thereto), do not require the consent or approval of any governmental body or other regulatory authority and are not in contravention of or in conflict with any law or regulation or any term or provision of the Firm's or any Firm Affiliate's partnership agreement. This Agreement and each other Loan Document is, and each Note when delivered for value received will be, duly executed and delivered by the Firm and each Firm Affiliate party thereto and does or will constitute a legally valid and binding obligation of the Firm and such Firm Affiliate, enforceable in accordance with its respective terms. The Partnership Authorization of the Firm required hereunder has been duly adopted, is accurate and correct and shall continue in full force and effect so long as any portion of any Loan is available or outstanding. The Firm has delivered to the Lender a true and complete copy of the Firm's and each Firm Affiliate's organizational documents (including any and all amendments thereto) as in effect on the effective date of this representation and warranty.

### 4.3. No Conflict

The execution, delivery and performance by the Firm and Firm Affiliates of this Agreement and of the other Loan Documents to which they are a party do not and shall not constitute a breach or violation of any provision contained in any agreement, indenture, undertaking or other instrument to which the Firm or any Firm Affiliate is a party or by which it or any of its property may be bound (except for breaches or violations which, in the aggregate, do not have a material adverse effect on the financial condition, properties or operations of the Firm and Firm Affiliates, taken as a whole), and such execution, delivery and performance will not result in the creation or imposition of any Lien on any of the property of the Firm or Firm Affiliates, except as expressly provided in the Security Agreement.

### 4.4. Litigation

There is no litigation or other proceeding pending or, to the knowledge of the Firm, threatened against or involving the Firm or Firm Affiliates or their properties that, if determined adversely to the Firm or Firm Affiliates, would have a material adverse effect on the financial condition, properties, operations or prospects of the Firm and Firm Affiliates, taken as a whole, and neither the Firm nor any Firm Affiliate is in default with respect to any order, writ, injunction, decree or demand of any court or other governmental or regulatory authority.

### 4.5. Financial Condition

The consolidated financial statements of the Firm required hereby and heretofore delivered to the Lender are true and correct, fairly present (in conformity with the modified cash basis of accounting used by the Firm in the preparation of its consolidated financial statements) the assets, liabilities and financial condition of the Firm as of the date thereof and the results of the operations of the Firm for the period covered thereby, and have been prepared in accordance with sound accounting principles on a basis consistently applied. Since said date there have been no material adverse changes in the financial condition of the Firm. The Firm has disclosed to the

28

Lender in writing all circumstances and facts that are or may be material with respect to such financial statements. Except as so disclosed in writing to the Lender, the Firm has no knowledge of any material liabilities of the Firm or the Firm Affiliates, contingent or otherwise, as of said date not reflected in said financial statements.

4.6.  Title to Assets

Each of the Firm and the Firm Affiliates has good and clear title to its assets, subject to any Liens permitted under Section 6.5 and to the Liens created by or under the Security Agreement.

4.7.  Tax Status

Neither the Firm nor any the Firm Affiliate has liability for any delinquent state, local, federal or other applicable governmental taxes, other than for taxes the payment of which is being contested in good faith and by appropriate proceedings. The Firm has provided written notice to the Lender of any such taxes that the Firm or any the Firm Affiliate is contesting and that exceed $10,000 in amount, either individually or in the aggregate.

4.8.  Other Regulations

Neither the Firm nor any affiliate thereof (as defined in Rule 405 of Regulation C under the Securities Act of 1933, as amended) is subject to the Investment Company Act of 1940, the Public Utility Holding Company Act of 1935, or the Interstate Commerce Act. The Firm is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U), and no proceeds of any Advance or drawings under any Letter of Credit will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

4.9.  Security Interests

The Security Agreement creates a valid security interest in the Collateral which, with respect to the Collateral located in the United States, upon filing of UCC financing statements in the office of the Washington, D.C. Recorder of Deeds will create perfected first priority security interests securing the payment of the Secured Obligations (as defined in the Security Agreement). The Firm and the Firm Affiliates are the legal and beneficial owners of the Collateral free and clear of any Lien, except for the Liens created or permitted under the Loan Documents.

Section 5.  THE FIRM'S AFFIRMATIVE COVENANTS.

The Firm covenants and agrees that, so long as any amounts are owing to the Lender hereunder, any Letter of Credit shall remain outstanding or the Lender shall have any Commitments hereunder and until payment in full of all outstanding Notes and any other obligations of the Firm hereunder or under any of the other Loan Documents, unless the Lender shall otherwise consent in writing, the Firm shall do all of the following:

5.1.  Rights and Facilities

29

Maintain and preserve its existence and all rights, privileges, franchises and other authority adequate for the conduct of its law practice and related activities; maintain its properties, equipment and facilities in good order and repair; and conduct its law practice and related activities in an orderly manner without voluntary interruption; *provided, however,* that the Firm may from time to time admit new Partners and permit the withdrawal of existing Partners, subject to any limitations expressly set forth in this Agreement.

### 5.2. Insurance

A. Maintain professional liability (malpractice) insurance with aggregate liability limits equal to at least $100,000,000 or $175,000 per attorney, whichever is greater, or if such insurance is not available at commercially reasonable rates, then with such lesser liability limits as may be reasonable in light of then current market conditions (including, without limitation, availability, price and coverages maintained by similar law firms);

B. Maintain insurance against such other risks and in such amounts as is customarily carried by similar law firms, including, without limitation, fire, public liability, property damage, workers' compensation and interruption of business insurance or, if any of such insurance is not available at commercially reasonable rates, the Firm may self-insure against such risks; *provided, however*, that the Firm's right to self-insure (other than to the extent of commercially reasonable deductible amounts) shall be conditional upon the Firm maintaining, and demonstrating to the Lender's reasonable satisfaction, loss reserves in amounts acceptable to the Lender in its reasonable discretion; and

C. Provide to the Lender (i) annually, promptly following receipt by the Firm, a copy of the Firm's professional liability (malpractice) insurance policy maintained pursuant to Section 5.2.A; (ii) annually, when furnishing the Firm's professional liability (malpractice) insurance policy under clause (i), and at such other times as the Lender may reasonably request from time to time, a written history of any and all claims against the Firm alleging or relating to professional malpractice, errors or omissions; and (iii) written notice, within thirty (30) days after the Firm receives notice thereof, of any such claims against the Firm alleging or relating to professional malpractice, errors or omissions and seeking damages in excess of $250,000.

### 5.3. Records and Reports

Maintain a system of accounting in accordance with sound accounting principles consistently applied; permit representatives of the Lender to have access to and to examine the Firm's and the Firm's Affiliates' properties, books and records at all reasonable times upon reasonable notice and discuss the same with the Firm's outside auditors and financial personnel; and furnish at the Firm's expense to the Lender the following:

(a) As soon as available, and in any event within ninety (90) days after the close of each fiscal year of the Firm, audited consolidated financial statements consisting of a statement of assets, liabilities and partners' capital-income tax basis and a statement of revenues and expense-income tax basis and a statement of cash flows-income tax basis as at the close of and for such fiscal year, all in reasonable detail and stating in comparative form the figures as at

30

the close of and for the previous fiscal year, certified as having been audited by and with the opinion of Salter & Company or another certified public accountants reasonably satisfactory to the Lender, to the effect that such statements fairly present the financial condition of the Firm on the basis of the accounting principles described therein, consistently applied;

(b)     As soon as available, and in any event within fifteen (15) Business Days, but not later than twenty (20) calendar days, after the end of each calendar month, (i) a statement of collections for such month, Accounts Receivable, Unbilled Time, Billed Disbursements and Unbilled Disbursements, including an aging of the Accounts Receivable, Unbilled Time, Billed Disbursements and Unbilled Disbursements, as of the close of business on the last day of such calendar month, prepared in accordance with sound accounting principles on a basis consistently applied by the Firm and certified by an appropriate Partner or staff member of the Firm, together with (ii) calculations, in form reasonably satisfactory to the Lender, demonstrating the Firm's compliance (as of the end of such calendar month) with the negative covenant contained in Section 6.1 hereof;

(c)     Concurrently with the documents provided for in Sections 5.3(a) and 5.3(b) hereof, a Compliance Certificate executed by the managing partner or chief financial officer in the form of Exhibit IX attached hereto;

(d)     Concurrently with the documents provided quarterly under this Section 5.3, a completed and updated Pipeline Case Report; and

(e)     Such other information relating to the affairs of the Firm as the Lender may reasonably request from time to time.

5.4.     Notice of Certain Events

Immediately notify the Lender in writing of the occurrence of (a) any Event of Default or Potential Event of Default, (b) any material adverse change in the assets, liabilities or financial condition of the Firm and the Firm Affiliates, taken as a whole, since the date of the most recent financial statements delivered to the Lender, (c) any actions, proceedings or litigation pending or, to the best of the Firm's knowledge, threatened against the Firm or any the Firm Affiliate that could reasonably be expected to result in a material adverse change to the Firm's consolidated financial condition, and/or (d) any substantive proposal received and considered or made by the Firm in connection with, or any action by the Executive Committee or Partners of the Firm authorizing, (i) any purchase by the Firm of substantially all of the assets of or a controlling equity interest in any other entity, (ii) any purchase of substantially all of the assets of or of a controlling partnership interest in the Firm by another entity and/or its equity owners, or (iii) any merger or consolidation between or among the Firm and any other entity (and/or the equity owners thereof).

5.5.     Lender Expenses

Pay all reasonable expenses of the Lender (including, without limitation, reasonable attorneys' fees and the reasonable allocated costs and expenses of in-house counsel and legal staff) incurred in connection with the preparation, administration and enforcement of this Agreement and the other Loan Documents or any waiver or amendment of any provision

31

hereof or thereof. The obligations of the Firm under this Section 5.5 shall survive payment of the Loans and assignment of any rights hereunder.

### 5.6. Partnership Changes

Promptly upon (and in all events within thirty (30) days after) any admission of a new Partner to the Firm from time to time subsequent to the date hereof, provide written notice of such admission to the Lender; and promptly upon (and in all events within fifteen (15) Business Days after) any retirement, withdrawal, death or permanent disability of any Partner (or Principal of a Partner that is a Limited Liability Entity), provide written notice of such event or circumstances to the Lender. Within fifteen (15) Business Days after any change in the Core Partners, the Firm will provide the Lender with an updated list of the remaining Core Partners.

### 5.7. Partnership Reports

A. Furnish to the Lender, concurrently with the execution of this Agreement and then prior to March 31 of each calendar year commencing March 31, 2011 and at such additional times as the Firm receives demand therefor from the Lender, a listing of all Partners in the Firm, specifying each Partner's respective percentage profits interest in the Firm.

B. Furnish to the Lender, within ten (10) days after the adoption thereof, copies of any amendments to the Firm's partnership agreement from time to time.

### 5.8. Minimum Cash Flow

Cause Cash Flow for each of the Firm's fiscal years to exceed, for each fiscal year in which any Notes, Loans or Letters of Credit or Commitments remain outstanding (beginning with the fiscal year in which the date of this Agreement falls), the greater of (i) $80,000,000 and (ii) eighty-five percent (85%) of the immediately preceding fiscal year's Cash Flow.

### 5.9. Partners

At all times maintain at least a minimum aggregate number of Partners in the Firm equal to the greater of (i) one hundred two (102) Partners and (ii) eighty-five percent (85%) of the number of Partners in the Firm as of the end of the immediately preceding fiscal year inclusive of all Partners that are Limited Liability Entities; *provided, that*, for the calendar year 2010, the minimum number shall be one hundred two (102) Partners.

### 5.10. Execution of Other Documents

From time to time promptly, upon demand by the Lender, execute all such additional agreements, contracts, indentures, documents and instruments in connection with this Agreement as the Lender, in its sole discretion, may reasonably deem necessary or appropriate to effectuate the provisions of this Agreement; *provided, however*, that nothing in this Section 5.10 shall be deemed to empower the Lender to demand the execution of any agreement, contract, indenture, document or instrument containing provisions that are inconsistent with the provisions hereof.

32

Section 6.   THE FIRM'S NEGATIVE COVENANTS

The Firm covenants and agrees that, so long as any amounts are owing to the Lender hereunder, any Letter of Credit shall remain outstanding or the Lender shall have any Commitments hereunder and until payment in full of all outstanding Notes and any other obligations of the Firm hereunder, the Firm shall not do, nor shall the Firm permit any Firm Affiliate to do, any of the following at any time without the written consent of the Lender.

### 6.1.   Borrowing Base

A.   Permit the Firm's aggregate indebtedness to the Lender (i) under the Notes other than indebtedness under the Demand Note-Contingency Line Cases, (ii) under all Letter of Credit Agreements (including any Letter of Credit Agreements relating to Standalone Letters of Credit) issued by any affiliate or Lender, and (iii) in respect of pre-settlement exposure under foreign exchange or interest rate hedging arrangements with Lender and the Firm Affiliates to at any time exceed the sum of (x) seventy percent (70%) of the sum of Accounts Receivable and Billed Disbursements, excluding any and all such Accounts Receivable and Billed Disbursements outstanding for one hundred twenty (120) days or more since the applicable invoice date, *plus* (y) forty percent (40%) of the sum of Unbilled Time and Unbilled Disbursements, excluding any and all components of such Unbilled Time and Unbilled Disbursements representing services performed or costs incurred one hundred twenty (120) days or more prior to the applicable date of determination.

B.   Permit the Firm's aggregate indebtedness to the Lender under the Demand Note-Contingency Cases Line to at any time exceed twenty-five percent (25%) of the Contingency Cases Borrowing Base as of the most recently completed quarter-end.

### 6.2.   Annual Distributions

Make cash distributions to the partners of the Firm (excluding undistributed earnings to equity partners from the preceding fiscal year but including undistributed earnings to Equity Partners for the current fiscal year) that in the aggregate for any fiscal year of the Firm exceed (i) the Firm's Net Income for the current fiscal year plus (ii) depreciation for the current fiscal year, minus (iii) without duplication, all principal payments made or required to have been made by the Firm in respect of the Firm's Debt under the Term Notes during the current fiscal year.

### 6.3.   Debt

After giving effect on the date hereof to the use of proceeds set forth under Section 2.7, create, incur, assume or suffer to exist, any Debt other than:

(i)      Debt under this Agreement;

(ii)     Unsecured Debt, other than Debt incurred under this Agreement or permitted under Section 6.3 (iii), of the Firm incurred in the ordinary course of business, not to exceed $1,000,000 in aggregate principal amount at any one time outstanding; and

33

(iii)    Debt in respect of unfunded vested benefits under plans covered by Title IV of ERISA in an amount not to exceed $400,000 in any given fiscal year.

### 6.4.    Paid-In Capital

Permit the Firm's Paid-In Capital, at the end of any fiscal year during which any Notes, Loans, Letters of Credit or Commitments remain outstanding under this Agreement, to be less than (i) the greater of (y) $45,000,000 and (z) eighty-five percent (85%) of the Firm's Paid-In Capital at the end of the immediately preceding fiscal year.  Notwithstanding the foregoing, on not more than three (3) occasions during any fiscal year of the Firm ending after December 31, 2007, Paid-In Capital may fall below $45,000,000, but not below $40,000,000 (each a "Shortfall"), *provided* that the Firm restores each such Shortfall within not more than 30 days following the end of the month in which the Shortfall occurs

### 6.5.    Liens

Directly or indirectly create, incur, assume or permit to exist any Lien on or with respect to any Collateral or any other property or asset of the Firm or any Firm Affiliate, whether now owned or hereafter acquired, or any income or profits therefrom, except:

(a)    the following Liens on property or assets other than Accounts Receivable, Unbilled Time, Billed Disbursements or Unbilled Disbursements:

(i)    Liens for taxes, assessments or governmental charges or claims the payment of which is not at the time required by Section 4.7;

(ii)    Statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, materialmen and other Liens imposed by law incurred in the ordinary course of business for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, as shall be required by sound accounting principles shall have been made therefor;

(iii)    Liens (other than any Lien imposed by ERISA) incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(iv)    Any attachment or judgment Lien, *provided* that any such attachment Lien shall have been discharged within forty-five (45) days after creation thereof and *provided further* that any judgment secured by such a judgment Lien shall, within forty-five (45) days after the entry thereof, have been discharged or execution thereof stayed pending appeal (in which event such judgment shall have been discharged within forty-five (45) days after the expiration of such stay);

(v)    Leases or subleases granted to others not interfering with the ordinary conduct of the business of the Firm;

34

(vi)    Easements, rights-of-way, restrictions and other similar charges or encumbrances not interfering with the ordinary conduct of the business of the Firm; and

(vii)    Liens in existence as of the date hereof, if any, and set forth on Exhibit XII attached hereto, including any Liens arising in connection with the renewal, extension or refinancing of the indebtedness secured by such Liens so long as the principal amount of such indebtedness is not increased thereby, but excluding any Liens on the Firm's Accounts Receivable, Unbilled Time, Billed Disbursements or Unbilled Disbursements (which items are required to be Lien-free except for the Lien granted to the Lender under the Security Agreement);

(b)    Liens granted or arising in favor of the Lender; and

(c)    Purchase money Liens upon or in property acquired or held by the Firm in the ordinary course of business to secure the purchase price of such property or to secure Debt incurred solely for the purpose of financing the acquisition, construction or improvement of any such property to be subject to such Liens, or Liens existing on any such property at the time of acquisition, or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount; *provided, however,* that no such Lien shall extend to or cover any property other than the property being acquired, constructed or improved, and no such extension, renewal or replacement shall extend to or cover any property not theretofore subject to the Lien being extended, renewed or replaced; and *provided further* that the aggregate principal amount of the Debt at any one time outstanding secured by Liens permitted by this clause (c) shall not exceed the limitations imposed by Section 6.3(ii) on the principal amount of Debt at any one time outstanding and that any such Debt shall not otherwise be prohibited by the terms of the Loan Documents.

6.6.    Advances

Make any loans or other advances of money to any person or entity in excess of $25,000 with respect to any such person or entity, or in excess of $500,000 in the aggregate outstanding at any time; *provided, however,* that notwithstanding this Section 6.6 the Firm may make advances to fund Partner draws in a manner consistent with past practice (it being understood and agreed that under no circumstances will the Firm make advances to fund Partner draws in any given fiscal year in an amount that exceeds seventy percent (70%) of the Firm's previously budgeted Net Income for such period or in an amount that would cause annual distributions to exceed the limitation on distributions set forth under Section 6.2 hereof).

6.7.    Accounting Changes

Make any material change in financial accounting policies or financial reporting practices, including, without limitation, any material departure from the modified cash basis of accounting currently used by the Firm in the preparation of its consolidated financial statements.

6.8.    Partnership Amendments

Modify or amend any portions of the partnership agreement of the Firm (or any other agreement) so as to (a) eliminate or reduce the obligation of the Principals of any Partners

35

in the Firm which are Limited Liability Entities to satisfy the liabilities of such Partners to the Firm, or (b) in any respect impair or materially and adversely affect the Firm's authority and/or ability to perform and discharge its obligations under any of the Loan Documents. Without limiting the generality of the foregoing, the Firm shall not amend its partnership agreement to create any class of partners other than Partners, Contract Partners and Non Equity Partners without prior written consent of the Lender.

### 6.9. Chief Executive Office.

Change the location of its chief executive office without giving the Lender at least thirty (30) days' prior written notice of such change.

### 6.10. Investments.

Directly or indirectly purchase, acquire or own any stock, bonds, notes or other securities of, or any partnership (whether general or limited) or membership interest in, or any other investment or interest in, or make any capital contribution to, any entity, in an amount exceeding $5,000,000 in the aggregate, other than:

(i) investments in Cash Equivalents; and

(ii) equity interests taken by the Firm in lieu of legal fees and disbursements.

It shall be a condition precedent to the Firm's right to make any investment in any entity after the New Effective Date that is not permitted under clauses (i) or (ii) of this section, that such investment be in an entity which is wholly owned, directly or indirectly, by the Firm, and that upon such investment, such entity shall execute and deliver to the Lender an unlimited guaranty and a security agreement covering all such entity's rights, assets and properties substantially in the forms of Exhibits XIII and VIII, respectively.

### Section 7. EVENTS OF DEFAULT

Without limiting the demand nature of the Demand Line of Credit or the Demand Line of Credit for Contingency Cases, upon the occurrence and during the continuance of any of the following Events of Default, the Lender may, at its option, terminate all credit hereunder and all Commitments and obligations of the Lender to make any Loan hereunder or issue any Letter of Credit and, at the option of the Lender, make all sums of principal and interest then remaining unpaid on the Notes and all other amounts payable hereunder and under any other Loan documents immediately due and payable, all without demand, presentment or notice, all of which hereby are expressly waived; *provided, however*, that upon the occurrence and during the continuance of an Event of Default specified in Sections 7.8 or 7.9, then automatically all credit hereunder and all Commitments and obligations of the Lender to make any Loans or issue any Letters of Credit hereunder shall be terminated and all sums of principal and interest then remaining unpaid on the Notes and all other amounts payable hereunder and under any other Loan documents shall become immediately due and payable. The Lender agrees that during the first one hundred twenty (120) days after the occurrence and continuation of an Event of Default (the "Initial Remedy Period"), to pursue in good faith enforcement of remedies against the

36

Collateral and the Firm and shall not pursue other remedies against the guarantors, except in the case of a default under Sections 7.8 or 7.9 hereunder. Following the expiration of such Initial Remedy Period, the Firm, on its own behalf and on behalf of the Firm Affiliates, hereby expressly waives any right to require the Lender to pursue enforcement of remedies against the Collateral prior to pursuing other remedies against the Firm or against any Firm Affiliate, and agrees that after the expiration of the Initial Remedy Period, the Lender may proceed concurrently or sequentially against any or all of the Firm, its Partners, the guarantors who executed the Guarantees and/or the Collateral, in such manner and in such order as the Lender in its sole and absolute discretion may elect, without prejudice to the Lender's right subsequently to pursue other remedies available under any of the Loan Documents or under applicable law. If any Event of Default shall have occurred and be continuing, the Lender may, irrespective of whether it is taking any of the actions described in this Section 7 or otherwise, make demand upon the Firm to, and forthwith upon such demand the Firm will, pay to the Lender in same day funds at the Lender's office designated in such demand, for deposit in a cash collateral deposit account (the "Cash Collateral Account"), an amount equal to 100% of the aggregate available amount of all Letters of Credit then outstanding. If at any time the Lender determines that any funds held in the Cash Collateral Account are subject to any right or claim of any Person other than the Lender or that the total amount of such funds is less than the aggregate available amount of all Letters of Credit, the Firm will, forthwith upon demand by the Lender, pay to the Lender, as additional funds to be deposited and held in the Cash Collateral Account, an amount equal to the excess of (a) such aggregate available amount over (b) the total amount of funds, if any, then held in the Cash Collateral Account that the Lender determines to be free and clear of any such right and claim. Upon the drawing of any Letter of Credit for which funds are on deposit in the Cash Collateral Account, such funds shall be applied to reimburse the Lender to the extent permitted by applicable law.

### 7.1. Failure to Pay

Failure to pay any amount of principal under any Debt created hereby when due (including, but not limited to, any principal that becomes due by reason of an acceleration by the Lender under the preceding provisions of this Section 7), or failure to pay interest on any Note or any other amount owing hereunder, if such failure shall continue for five (5) days after the date such payment is due.

### 7.2. Default in Other Debt Agreements

Failure to pay or any default in the payment of any principal of or any interest on any Debt of the Firm beyond any period of grace provided, or any breach with respect to any material term of any evidence of such Debt or of any loan agreement, mortgage, indenture or other agreement relating thereto, in each instance in excess of $50,000, if the effect of such failure, default or breach is to cause any of such Debt to become or be declared due prior to its stated maturity.

37

### 7.3. Material Default Under Warner Lease.

The occurrence of any material default (including, without limitation, the non-payment of Base Rent (as defined in the lease executed by the Firm for its offices located at 1299 Pennsylvania Avenue, Washington, D.C. (the "Warner Lease")) after any applicable grace period) under the Warner Lease whether or not the landlord thereunder has terminated such lease or otherwise invoked any remedies available to such landlord under such lease. Nothing in this Section 7.3 shall be deemed to preclude the Firm from contesting in good faith its obligations in respect of Additional Rent (as defined in the Warner Lease) under the Warner Lease; so long as such contest is being pursued promptly, diligently and in good faith in accordance with the arbitration procedures prescribed in the Warner Lease.

### 7.4. Breach of Covenant

Failure of the Firm or any Firm Affiliate to perform or observe any other term or condition of this Agreement or the other Loan Documents to be performed or observed by the Firm or such Firm Affiliate within fifteen (15) days after written notice from the Lender to the Firm or from the Firm to the Lender specifying such failure.

### 7.5. Breach of Representation or Warranty

Any of the Firm's representations or warranties made herein or any statement or certificate at any time given in writing pursuant hereto or in connection herewith shall be false or misleading in any material respect on the date as of which made.

### 7.6. Adverse Events

Any event shall occur or condition exist that shall (i) have a material adverse effect upon the financial condition of the Firm as shown on the financial statements required hereby or otherwise, or (ii) materially and adversely impair the Firm's ability to repay the Loans or to perform its obligations hereunder and under the other Loan Documents.

### 7.7. Departure of Partners

Partners holding, immediately prior to their respective departures, an aggregate percentage interest of ten percent (10%) or more in the capital or profits of the Firm shall cease to be Partners in the Firm during any period of twelve (12) consecutive calendar months for any reason other than retirement, disability, government service or death; *provided, however,* that for the calendar year 2010, such percentage shall be twenty percent (20%).

### 7.8. Dissolution

The Firm shall dissolve or otherwise discontinue the practice of law.

38

7.9.    Insolvency or Bankruptcy

The Firm shall commence a voluntary case concerning itself under the United States Bankruptcy Code, 11 U.S.C. §§101-1330, as amended, as now or hereafter in effect (or any successor thereto); or the Firm shall commence any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to the Firm or there is commenced against the Firm any involuntary proceeding of the character described in this Section 7.9 which remains undismissed for a period of sixty (60) days; or the Firm is adjudicated insolvent or bankrupt; or any order of relief or other order approving any such case or proceeding is entered; or the Firm suffers the appointment of any custodian or the like for it or any substantial part of its property to continue undischarged or unstayed for a period of thirty (30) days; or the Firm makes a general assignment for the benefit of creditors; or the Firm shall admit in writing that it is unable to pay its debts generally as they become due; or the Firm shall call a meeting of its creditors with a view to arranging a composition or adjustment of its debts; or the Firm shall by any act or failure to act indicate its consent to, approval of or acquiescence in any of the foregoing; or any partnership action is taken by the Firm for the purpose of effecting any of the foregoing.

7.10.    Mergers, Etc.

The Firm shall have merged with or into any other person or entity or have sold or transferred any material portion of its assets to another person or entity in a transaction or series of related transactions or have ceased the practice of law, *provided, however*, it shall not be a Default or Event of Default for the Firm to merge with or into or consolidate with or into another law firm if the Firm is (i) the surviving firm or (ii) succeeded by another law firm, in each case *provided* that 80% of the partners of the Firm or successor firm were partners of the Firm at the end of the Firm's most recent fiscal year.

7.11.    Sales, Etc. of Assets

The Firm shall have sold or otherwise disposed of all or a substantially portion of its assets in any transaction or series of related transactions other than a transaction in the ordinary course of business or a transaction described in the proviso to Section 7.10; *provided, however*, that the sale of the assets of the Firm's Amsterdam, Netherlands, office shall not be a violation of this section.

7.12.    Money Judgment

Any judgment or order for the payment of money in excess of $500,000 (after giving effect to any payment of insurance made in respect thereto) shall be rendered against the Firm and shall remain undischarged and there shall be any period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect.

39

Section 8.   NON-LIABILITY OF PARTNERS.

Notwithstanding any other provisions of this Agreement or of any other Loan Documents, no Partner and no Principal of any Partner that is a Limited Liability Entity (whether currently a Partner or admitted as such in the future) shall be personally liable, either in his or her capacity as a Partner or Principal of a Partner, for repayment of the Firm's or any Firm Affiliate's indebtedness to the Lender under or relating to this Agreement.

Section 9.   MISCELLANEOUS

9.1.   Survival of Warranties

All agreements, covenants, representations and warranties made herein shall survive the execution and delivery of this Agreement, the making of the Loans hereunder, the issuance of the Letters of Credit and the execution and delivery of the other Loan Documents.

9.2.   Failure or Indulgence Not Waiver

No failure or delay on the part of the Lender or any holder of a Note in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege. All rights and remedies existing under this Agreement or the Notes are cumulative to, and not exclusive of, any rights or remedies otherwise available.

9.3.   Modification

This Agreement and the Notes provided for herein may not be amended, waived or modified without the written consent of the Lender and the Firm.

9.4.   Notices

Except as otherwise expressly provided herein, any notice herein required or permitted to be given shall be in writing and may be personally served or sent by United States mail or by facsimile transmission with a copy sent by first class mail and shall be deemed to have been given on the earlier of the date of receipt or two (2) Business Days after deposit in the United States mail, certified, return receipt requested, with postage prepaid and properly addressed, *provided* that notices under Section 2 shall not be effective until actually received by the recipient thereof. For the purposes hereof, the addresses of the parties hereto (until notice of a change thereof served as provided in this Section 9.4) shall be as follows:

> Firm:   Howrey LLP
> 1299 Pennsylvania Avenue, N.W.
> Washington, D.C.  20004-2402
> Attn: Robert F. Ruyak, Managing Partner/CEO,
> Fax: (202) 383-6610, with a copy sent to the same address and fax
> number to:  Roger A. Klein, General Counsel

40

Lender:    Citibank, N.A.
           Law Firm Group, The Citigroup Private Bank
           1101 Pennsylvania Avenue, N.W., Suite 900
           Washington, D.C. 20004
           Fax: (202) 220-3680
           Attn: Michael J. McKenney, Vice President


### 9.5.    Severability

In case any provision in this Agreement or in any Note shall be invalid, illegal or unenforceable, such provision shall be severable from the remaining provisions thereof and the validity, legality and enforceability of such remaining provisions shall not in any way be affected or impaired thereby.

### 9.6.    Applicable Law

This Agreement, the Notes, all other Loan Documents and the rights and obligations of the parties hereto and thereto shall be governed by the laws of the District of Columbia applicable to contracts made and to be performed in the District of Columbia.

### 9.7.    Assignment and Participations

A.    Subject to the provisions of this Section 9.7.A, the Lender, after thirty (30) days written notice to the Firm (pursuant to Section 9.4), may assign and otherwise transfer all or any part of this Agreement, the Notes, the Security Agreement, the Guarantees and the other Loan Documents and the Lender's rights hereunder and thereunder (including, but not limited to, any such assignment or transfer in connection with any sale of participations in the Notes or any of them), at any time or from time to time, and such assignee shall thereupon become party to the relevant Loan Document, and, to the extent the that rights and obligations have been assigned to it, the assignee shall be vested with all the powers, rights and obligations of the Lender under the Loan Documents and the Lender thereafter shall, to the extent that rights and obligations under the Loan Documents have been assigned by it, relinquish its rights and be released from its obligations under the Loan Documents. In the case of any such transfer or assignment to an entity controlling, controlled by or under common control with the Lender, no consent of the Firm shall be required but the Lender shall give written notice of such transfer or assignment to the Firm not less than thirty (30) days prior to the transfer or assignment. In the case of any other transfer or assignment, the Lender shall first be required to obtain the Firm's written consent to the transfer or assignment, which consent shall not be unreasonably withheld or delayed.

B.    The Lender, after thirty (30) days written notice to the Firm (pursuant to Section 9.4), may sell participations to one or more financial institutions or other entities in or to all or a portion of its rights and obligations under the Loan Documents; *provided* that (i) the Lender's obligations under the Loan Documents shall remain unchanged, (ii) the Lender shall remain solely responsible for the performance of such obligations, (iii) the Firm shall continue to

41

deal solely and directly with the Lender and (iv) such participations shall not result in any increased costs to the Firm.

C. Notwithstanding anything to the contrary in the Loan Agreement, the Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement and the other Loan Documents to secure obligations of the Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided* that no such pledge or assignment shall release the Lender from any of its obligations under any Loan Document or substitute any such pledgee or assignee for the Lender as a party to any Loan Document.

D. The Firm's rights and obligations under this Agreement, the Notes and the other Loan Documents may not be assigned or delegated.

### 9.8. Right of Set-off

Upon the occurrence and during the continuance of any Event of Default, the Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, but in no event to include funds held or deposited in escrow accounts) at any time held and other indebtedness at any time owing by the Lender to or for the credit or the account of the Firm or Firm Affiliates against any and all of the Debt of the Firm now or hereafter existing under this Agreement, irrespective of whether such obligations may be unmatured, *provided* that the Lender shall have made a demand under this Agreement. The Lender agrees promptly to notify the Firm after any such set-off and application made by the Lender; *provided, however,* that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Lender under this Section 9.8 are in addition to other rights and remedies (including, without limitation, other rights of set-off) that the Lender may have.

### 9.9. Counterparts

This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

### 9.10. Headings

The various headings used in this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provision hereof.

Case: 11-31376    Doc# 64-3    Filed: 06/06/11    Entered: 06/06/11 14:37:42    Page 47 of 50

9.11.   Indemnification

The Firm agrees to indemnify, defend, save and hold harmless the Lender and its officers, directors, employees, agents and advisors (each an "Indemnified Party") from and against, and shall pay on demand, any and all claims, damages, losses, liabilities and documented expenses (including, without limitation, fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or resulting from this Agreement or any of the other Loan Documents (including, without limitation, enforcement of this Agreement and the other Loan Documents) but excluding any losses, liabilities or expenses directly and solely resulting from a breach of this Agreement or any of the other Loan Documents by the Indemnified Party.

9.12.   Restated Loan Agreement; No Novation.

This Agreement amends, modifies, supersedes and replaces in its entirety, but shall not act as a novation of, the Original Credit Agreement. All Loans and Letters of Credit outstanding on the date of this Agreement shall be deemed to have been made pursuant to this Agreement and the other Loan Documents, whether or not so stated, which shall hereafter govern and control for all purposes.

9.13.   WAIVER OF JURY TRIAL

THE FIRM AND THE LENDER HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO ANY OF THE LOAN DOCUMENTS, OR THE ACTIONS OF THE LENDER IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT THEREOF.

*[Signatures are on next page]*

43

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their properly and duly authorized representatives as of the date first set forth above.

HOWREY LLP (formerly Howrey Simon Arnold & White, LLP), a District of Columbia limited liability partnership

By: _____
      Robert F. Ruyak, Managing Partner/CEO

By: _____, Member of the
      John Taladay
      Executive Committee

CITIBANK, N.A

By: _____
      Michael J. McKenney, Vice President

44

## RATIFICATION AND REAFFIRMATION

The undersigned Firm Affiliates hereby (i) acknowledge and consent to this Fourth Amended and Restated Secured Loan Agreement, and (ii) acknowledge and agree that the terms and conditions of their respective Continuing Guaranty of Firm Affiliate (General Indebtedness) and the other Loan Documents to which each is a party remain in full force and effect and are hereby ratified and confirmed in all respects.

Dated as of October 19, 2010

> MAXIAM, LLC, a District of Columbia
> limited liability company
>
> By: Howrey LLP, as member
>
> By: _____
> Robert F. Ruyak, Managing Partner/CEO
>
>
> THE CAPANALYSIS GROUP, LLC, a
> District of Columbia limited liability company
>
> By: Howrey LLP, as member
>
> By: _____
> Robert F. Ruyak, Managing Partner/CEO

Case: 11-31376   Doc# 64-3   Filed: 06/06/11   Entered: 06/06/11 14:37:42   Page 50 of 50