H. JASON GOLD (Pro Hac Vice)
VALERIE P. MORRISON (Pro Hac Vice)
DYLAN G. TRACHE (Pro Hac Vice)
WILEY REIN LLP
1776 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 719-7000
Facsimile: (202) 719-7049
Email: jgold@wileyrein.com
Email: vmorrison@wileyrein.com
Email: dtrache@wileyrein.com

ROBERT A. FRANKLIN (091653)
CRAIG M. PRIM (077820)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone: (650) 852-9000; (408) 907-9200
Facsimile: (650) 852-9244
Email: rfranklin@murraylaw.com
Email: cprim@murraylaw.com

Counsel to Howrey LLP

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re: | Case No. 11-31376-DM |
| HOWREY LLP, | Chapter 11 |
| A District of Columbia Limited Liability Partnership, | Date: June 8, 2011<br>Time: 9:30 a.m.<br>Dept: U.S. Bankruptcy Court<br>235 Pine Street, 22nd Floor<br>San Francisco, CA |
| Debtor(s). | |
| 1299 Pennsylvania Avenue<br>Washington D.C., 20004 | Judge: Honorable Dennis Montali |
| Employer's Tax I.D. No: 53-0231650 | |

**DECLARATION OF ROBERT RUYAK IN SUPPORT OF FIRST DAY MOTIONS**

I, Robert Ruyak, declare as follows:

1. I am one of the five members of the Dissolution Committee of Howrey LLP ("Howrey" or "Debtor"). I have been employed by Howrey since 1976. Prior to Howrey's

dissolution on March 15, 2011, I was Howrey's Managing Partner and Chief Executive Officer and had served in that role since January 1, 2000. I am familiar with Howrey's day-to-day operations, financial condition, business affairs and books and records.

2. I submit this Declaration in support of the of the following motions filed on this date (collectively, the "First Day Motions"):

a. MOTION OF DEBTOR FOR ORDER: (1) AUTHORIZING USE OF CASH COLLATERAL ON AN INTERIM AND FINAL BASIS; (2) GRANTING ADEQUATE PROTECTION AND OTHER RELIEF; AND (3) SCHEDULING FINAL HEARING ON USE OF CASH COLLATERAL ("Cash Collateral Motion");

b. MOTION OF THE DEBTOR FOR ORDER (I) AUTHORIZING THE DEBTOR TO (A) PAY GAP PERIOD EMPLOYEE OBLIGATIONS AND (B) CONTINUE EMPLOYEE BENEFIT PLANS AND PROGRAMS; (II) AUTHORIZING THE DEBTOR TO PAY WITHHOLDING AND PAYROLL-RELATED TAXES AND (III) DIRECTING ALL BANKS TO HONOR CHECKS AND TRANSFERS FOR PAYMENT OF EMPLOYEE OBLIGATIONS ("Employee Obligation Motion");

c. MOTION OF THE DEBTOR FOR ORDER (A) AUTHORIZING CONTINUED USE OF CASH MANAGEMENT SYSTEM; AND (B) AUTHORIZING CONTINUED USE OF THE DEBTOR'S EXISTING BANK ACCOUNTS AND BUSINESS FORMS ("Cash Management Motion");

d. MOTION OF THE DEBTOR FOR ORDER EXTENDING TIME WITHIN WHICH THE DEBTOR MUST FILE ITS SCHEDULES AND STATEMENT OF AFFAIRS ("Extension of Time to File Schedules");

e. MOTION OF THE DEBTOR FOR ORDER (I) AUTHORIZING THE REJECTION OF CERTAIN UNEXPIRED LEASES AND SUBLEASES EFFECTIVE AS OF THE DATE OF THE MOTION AND (II) AUTHORITY TO ABANDON CERTAIN PERSONAL PROPERTY ("Rejection Motion").

**GENERAL BACKGROUND.**

3. Howrey is a limited liability partnership organized under the laws of the District of Columbia. Howrey's affairs are governed by a Partnership Agreement dated January 31, 2000, as amended, modified and supplemented from time to time (the "Partnership Agreement").

4. Howrey was founded in the District of Columbia in 1956 and has maintained

its headquarters in the District of Colombia since that date. Over subsequent years, Howrey opened legal and support offices in Chicago, Illinois; Houston, Texas; Irvine, San Francisco and Los Angeles, California; Silicon Valley in California; Falls Church, Virginia, New York, New York; Salt Lake City, Utah; as well as international offices in Amsterdam, Brussels, Dusseldorf and Munich, and had affiliated with international offices in London[1], Madrid, Paris and Taiwan.

5. At its peak, more than 750 attorneys practiced at Howrey and its affiliated offices, and Howrey had more than 900 additional employees.

6. As the result of a significant decline in profits beginning in 2009 and the departure of approximately 30% of Howrey's partners in 2010, on March 9, 2011, Howrey's remaining partners voted to dissolve the partnership effective March 15, 2011. Howrey adopted a Plan of Dissolution ("Plan of Dissolution") to govern the wind-down of operations and appointed a five member Dissolution Committee to oversee the wind-down of the firm's affairs.

7. Howrey currently maintains a single operating office in Washington, D.C. and employs approximately 5 attorneys and 45 non-attorney employees[2] to assist the firm in the wind-down of its operations, which is being conducted exclusively from the firm's Washington, D.C. office.

8. Howrey presently represents clients in a number of ongoing matters ("Pending Matters"). As part of the wind-down of operations, these Pending Matters are being handled and/or managed out of Howrey's Washington, D.C. office. Howrey's principal assets include accounts receivable and work in process in connection with client matters, including hourly, contingent and other fee arrangements.

9. Howrey has two domestic non-debtor affiliates, CapAnalysis Group, LLC ("CAG") and Maxiam, LLC ("Maxiam").

---

[1] A separate limited liability partnership also named "Howrey LLP" ("Howrey UK") was formed under the laws of the United Kingdom and operated affiliated offices in London and Paris. The relationship between Howrey UK and Howrey was governed by contract.

[2] As of the date of this filing, Howrey also employs eleven temporary and/or part-time workers to assist the firm with the wind-down of operations.

**Pre-Petition Credit Facility.**

10. Howrey is a party to: (a) the FOURTH AMENDED AND RESTATED SECURED LOAN AGREEMENT dated as of October 19, 2010 by and between Howrey and Citibank, N.A. ("Citibank") as Lender, as amended by a First Amendment thereto dated as of December 3, 2010, and as further amended by a Second Amendment thereto dated as of December 20, 2010 (as so amended, the "Pre-Petition Financing Agreement"), a copy of which is attached to the Cash Collateral Motion as Exhibit C; (b) the FOURTH AMENDED AND RESTATED SECURITY AGREEMENT dated as of October 19, 2010 made by and among Howrey and CAG and Maxiam, as Grantors, in favor of Citibank, a copy of which is attached to the Cash Collateral Motion as Exhibit D; and (c) each other "Loan Document" as defined in the Pre-Petition Financing Agreement (collectively, the "Pre-Petition Financing Documents").

11. Pursuant to the terms of the Pre-Petition Financing Documents, the Pre-Petition Debt is secured by, among other things, liens and security interests (the "Pre-Petition Liens") granted by the Debtor on substantially all of its personal property assets, including, without limitation, all presently existing and hereafter acquired accounts and general intangibles, including all billed and unbilled accounts receivable, time and disbursements and all proceeds, products and/or property received on account of or in satisfaction thereof, all furniture, furnishings, fixtures, equipment and other tangible personal property, and all cash, securities entitlements, financial assets and deposit accounts, including the main operating account maintained with Citibank and all funds held therein and all certificates and instruments, if any, representing or evidencing same (collectively, the "Pre-Petition Collateral"), but such Pre-Petition Collateral excludes the Debtor's foreign cash and the assets of its foreign affiliates.

**Current Operations and Filing of Involuntary Petition.**

12. Between March 15, 2011 and the Petition Date, Howrey worked diligently with CitiBank to reduce its operations, collect outstanding receivables, monetize assets, compromise claims of landlords and other creditors and otherwise wind-down its operations. Howrey had hoped that it would be able to wind-down its operations and pay the claims of its creditors outside of bankruptcy, however, on the petition date, three alleged creditors holding claims in the aggregate

amount of $36,608.89 filed an involuntary petition ("Involuntary Petition") against Howrey under Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of California.

13. On May 3, 2011, Howrey filed its Motion to Dismiss Involuntary Petition or, in the Alternative, to Transfer Venue, ("Venue Motion"). As explained in the Venue Motion and accompanying affidavit, San Francisco is not the proper forum for this bankruptcy case. Accordingly, Howrey intends to pursue its Venue Motion and seek transfer of this case to Washington, D.C. A hearing on the Venue Motion is scheduled to be held on June 29, 2011.

**Conversion to Chapter 11.**

14. Howrey determined that it was in the best interests of the firm, its creditors and other parties in interest to consent to entry of the order for relief and to convert this case to one under chapter 11 of the United States Bankruptcy Code in order to facilitate the completion of Howrey's wind-down. On June 6, 2011, Howrey filed the necessary pleadings to facilitate the entry of the order for relief ("Order for Relief") and conversion of the case to chapter 11.

**Assets and Liabilities.**

15. As of the date hereof, the Debtor's assets consist primarily of the following:
    a. Approximately $3.6 million in unrestricted cash.
    b. Approximately $63 million in accounts receivable and work in process.
    c. Contingent fees - value uncertain.
    d. Capital in the Debtor's errors and omissions insurer with an approximate value of $8.2 million.
    e. Furniture fixtures and equipment – value uncertain.
    f. Other personal property, including artwork – value uncertain.

16. As of the date hereof, the Debtor's liabilities consist primarily of the following:
    a. Secured obligation to Citibank in the amount of $49 million.
    b. Approximately $8.0 million in accounts payable.

5 DECLARATION OF ROBERT RUYAK
Case: 11-31376 Doc# 67 Filed: 06/06/11 Entered: 06/06/11 15:11:51 Page 5 of 10

  c. Approximately $8.4 million in pension, deferred compensation claims, claims by former employees for accrued vacation time, and employee health insurance obligations.

  d. Unpaid rent in the approximate amount of $12.7 million.

  e. Disputed claims for alleged violations of the WARN Act – amount unknown.

**Exit Strategy.**

17. Howrey intends to wind-down its operations in an orderly manner, including the collection of accounts receivable, work in process, liquidation of other assets, bringing the Pending Matters to a conclusion, transferring client records and information in accordance with professional responsibilities, and other required tasks. Howrey intends to propose a chapter 11 plan of liquidation.

## FIRST DAY MOTIONS.

18. I have read each of the First Day Motions and verify that the facts there are true and correct to the best of my personal knowledge and based upon my review of business records and other relevant documents, including those prepared by professionals retained by Howrey.

**Cash Collateral Motion.**

19. The Debtor has no access to cash, other than Cash Collateral (as defined in the Cash Collateral Motion), to satisfy its ongoing payroll and other business obligations which will continue to become due during the chapter 11 case. Most critically, the Debtor's payroll for the two-week period ending June 15, 2011 is due on Friday, June 15, 2011 and the Debtor has other obligations as set forth in the budget ("Budget") attached as Exhibit B to the Cash Collateral Motion. Missing these payments poses a substantial threat to the Debtor's ability to continue to effectively and efficiently collect assets, wind-down the Debtor's affairs, and discharge the Debtor's responsibilities to its current and former clients. Consequently, absent immediate authority to use Cash Collateral on an interim basis, the Debtor's estate would suffer irreparable harm. The Budget reflects the results of the parties' arms-length negotiations and agreement for the Debtor's use of Cash Collateral.

6 DECLARATION OF ROBERT RUYAK

Case: 11-31376 Doc# 67 Filed: 06/06/11 Entered: 06/06/11 15:11:51 Page 6 of 10

20. The Cash Collateral Motion provides Citibank with adequate protection against any diminution in value of Citibank's interest in the Pre-Petition Collateral, including Cash Collateral, as a result of the Debtor's sale, use or other disposition thereof and the imposition of the automatic stay. The proposed adequate protection as set forth in the Cash Collateral Motion, including without limitation, the replacement liens proposed to be granted, is fair and reasonable.

**Employee Obligation Motion.**

21. The Debtor has 50 remaining employees, including 5 attorneys. Through the Employee Obligation Motion, the Debtor requests authority to pay all unpaid wages and salaries accruing during the Gap Period, including payroll taxes, all federal, state and local withholding taxes, Social Security taxes, Medicare taxes and other withholdings.

22. The Debtor also provides its employees with benefits, including the following: medical, vision and prescription, dental, short and long-term disability, life insurance, worker's compensation, and 401(k) retirement plans (collectively, the "Employee Benefits"). The Debtor seeks authorization to continue providing these benefits following entry of the Order for Relief and to pay amounts arising during the Gap Period in connection with the Employee Benefits.

23. Each of the Debtor's remaining employees is critical to the wind-down of the Debtor's affairs. During the Gap Period, these employees have been paid on a regular bi-monthly basis with the last payroll occurring on May 31, 2011, which brought the employees' wages and salaries current through that date. Additional Gap Period wages and benefits will accrue for the period of June 1 through the entry of the Order for Relief. In order to avoid a departure of key personnel, and the attendant immediate and irreparable harm, it is critical that Howrey is authorized to continue to pay employee wages, salaries and Employee Benefits, including those accruing during the Gap Period. It is also critical that the Court authorize the Debtor to continue to reimburse employees for customary expenses incurred in the ordinary course of business. The total amount of wages and salaries (including employer taxes) owed to Employees for the period of June 1 through June 3, 2011 is estimated at $130,025. A list of the amounts each employee is scheduled to receive is attached to the Employee Obligation Motion as Exhibit B.

**Cash Management Motion.**

24. In the ordinary course of business, the Debtor maintains an integrated cash management system ("Cash Management System") that provides a well-established mechanism for the collection, concentration, management and disbursement of funds and allows the Debtor to operate its business in an effective manner. A diagram describing the Cash Management System is attached to the Cash Management Motion as Exhibit C.

25. The Debtor maintains 25 active bank accounts which are all linked to the Cash Management System (the "Bank Accounts"). Fourteen of these accounts are maintained in the United States, including twelve accounts at Citibank, one account at Northern Trust Bank of Texas and one account at Wells Fargo Bank, N.A. In addition, the Debtor maintains 11 international accounts, including four accounts at Fortis Banque S.A./N.V., three accounts at ABN AMRO Bank N.V., and four accounts at Deutsche Bank A list of the Bank Accounts is attached as an Exhibit to the Cash Management Motion at Exhibit B.

26. The depository account (the "Domestic Depository") maintained by Citibank in Washington D.C. serves as the sole depository account for all domestic operations. The Domestic Depository is funded by deposits of accounts receivables from clients in the form of both checks and wires.

27. Disbursements on account of the Debtor's domestic general operating expenses are transferred from the Domestic Depository to a disbursement account held at Citibank for payment to creditors or employees of the Debtor.

28. A further description of the Debtor's Bank Accounts and Cash Management System is set forth in the Cash Management Motion.

29. The Debtor's cash management procedures constitute ordinary course, essential business practices for the Debtor. The Debtor's current Bank Accounts provide significant benefits to the Debtor including, inter alia, the ability to (i) ensure that clients are able to deposit funds in accordance with prior instructions; (ii) ensure the maximum availability of funds when necessary, and (ii) a reduction in administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance information. The Debtor submits that any

serious disruption to its Cash Management System and existing Bank Accounts could have a severe and adverse impact upon its efforts to collect accounts receivable and otherwise maximize value.

30. The Debtor requests authority to maintain and continue the use of its existing Bank Accounts as they currently exist. Among the Debtor's primary assets are its accounts receivable, and the related invoices often specify wire instructions into existing accounts. Closing the Bank Accounts and re-opening debtor-in-possession accounts would likely cause confusion among the Debtor's clients and may result in payments being deposited into the wrong account, misapplied or otherwise delayed.

31. Allowing the Debtor to maintain its existing Bank Accounts will not prejudice its creditors and will avoid the attendant delays and administrative costs associated with opening new accounts. Consistent with the requirements of the Bankruptcy Code, the Debtor will not pay any debts incurred prior to the entry of the Order for Relief without authorization from the Court.

**Motion to Extend Time – Schedules and Statements.**

32. Under Bankruptcy Rule 1007, the Debtor has 14 days following the entry of the Order for Relief within which to file its Schedules of Assets and Liabilities and Statements of Financial Affairs ("Schedules and Statements"). As explained above, the Debtor currently has only 50 employees assisting with the wind-down of the business. These employees are currently tasked with pursuing the collection of approximately $63 million in outstanding accounts receivable, overseeing the handling of the Pending Matters, engaging in negotiations with the Debtor's secured lender Citibank and other key creditor constituencies, managing the Debtor's remaining assets, transferring client files and information, and performing a number of bookkeeping, office and administrative services.

33. Requiring the Debtor and its professionals to complete the Schedules and Statements with 14 days of the entry of the Order for Relief would create an undue burden and potentially jeopardize the accuracy of the Schedules and Statements.

34. Following the entry of the Order for Relief, in addition to the day to day tasks associated with operating the business, the Debtor and its professionals will be required to, among other things, prepare for and attend a hearing in California on the Debtor's First Day Motions. In

addition, the Debtor and its professionals are preparing for the hearing on the Venue Motion and are engaged in discovery related to that motion with the Petitioning Creditors.

35. The Debtor submits that cause exists to grant an extension of thirty-one (31) additional days to file the Schedules and Statements due to the facts and circumstances of this case.

**Rejection Motion.**

36. As a result of its wind-down, the Debtor no longer requires the use of certain real and personal property in the operation of its business. In particular, the Debtor has vacated the relevant premises for each of the non-residential real property leases set forth in the Rejection Motion. Accordingly, the Debtor has determined in the exercise of its business judgment that the rejection of the contracts and leases listed in the Rejection Motion is in the best interests of its creditors and its estate and requests that the same be deemed rejected as of the date of the filing of the Rejection Motion.

37. Further, the Debtor seeks to abandon any personal property, including furniture, fixtures and equipment located at the certain leased premises subject to the Rejection Motion. The Debtor has determined that this property is of inconsequential value and that in many cases, the cost of removing such property exceeds the value of such property. Accordingly, the Debtor seeks to abandon such property effective as of the filing date of the Rejection Motion to the relevant landlord(s) for the rejected premises.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 6th day of June, 2011 in Washington, D.C.

                                                                             */s/ Robert Ruyak*
                                                                             Robert Ruyak