Aron M. Oliner (SBN: 152373)
Geoffrey A. Heaton (SBN: 206990)
**DUANE MORRIS LLP**
One Market Plaza
Spear Street Tower, Suite 2200
San Francisco, CA 94105-1127
Telephone: (415) 957-3000
Facsimile: (415) 957-3001
Email: roliner@duanemorris.com

Proposed Special Counsel for the Debtor

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>HOWREY LLP,<br><br>Debtor. | Case No. 11-31376 DM<br><br>Chapter 11<br><br>Date: TO BE SET<br>Time: TO BE SET<br>Place: 235 Pine Street, Courtroom 22<br>San Francisco, California 94104 |

## MOTION TO COMPEL CONNECTICUT GENERAL LIFE INSURANCE COMPANY TO PERFORM PURSUANT TO ADMINISTRATIVE SERVICES ONLY AGREEMENT

Howrey LLP, the debtor and debtor in possession (the "Debtor") in the above-captioned case (the "Bankruptcy Case"), hereby moves (the "Motion") for an Order compelling Connecticut General Life Insurance Company ("CIGNA") to perform pursuant to that certain Administrative Services Only Agreement, and in support hereof respectfully represents and alleges:

**Procedural Background**

1. On April 11, 2011, Give Something Back Inc., Jan Brown & Associates, and Matura Farrington Staffing Services, Inc. (collectively, the "Petitioning Creditors")[1] filed an

---
[1] Western Messenger Service, Inc., L.A. Best Photocopies, Inc., Kent Daniels and Associates, Inc. and Advanced Discovery LLC later filed joinders to the Petitioning Creditors as petitioning creditors.

DM2\2934216.1 F2163/00014     1

**MOTION TO COMPEL - CASE NO. 11-31376 DM**
Case: 11-31376   Doc# 154   Filed: 07/20/11   Entered: 07/20/11 11:13:15   Page 1 of 11

involuntary petition for relief pursuant to chapter 7 of the Bankruptcy Code commencing this Bankruptcy Case.

2. On May 3, 2011, the Debtor filed *Howrey LLP's Motion to Dismiss Involuntary Petition or, in the Alternative, to Transfer Venue* [Docket No. 13] seeking to either dismiss the Bankruptcy Case or transfer it to the United States Bankruptcy Court for the Eastern District of Virginia or the United States Bankruptcy Court for the District of Columbia.

3. On June 6, 2011, the Debtor filed the *Ex Parte Conditional Consent to Entry of Order for Relief and Motion to Convert Debtor's Case to Chapter 11* [Docket No. 58] and this Court entered the *Order for Relief and Converting Case to One Under Chapter 11* [Docket No. 59] (the "Order for Relief").

4. On June 6, 2011, the Debtor also filed the *Motion Of The Debtor For Order (A) Authorizing Continued Use Of Cash Management System; And (B) Authorizing Continued Use Of The Debtor's Existing Bank Accounts And Business Forms* [Docket No. 60] (the "Motion to Use Bank Accounts") seeking an Order permitting the Debtor, among other things, to use and maintain the Debtor's existing bank accounts, which include the use and disbursement of funds from an imprest account at Citibank in Washington, D.C. for the funding of self insurance claims administered by CIGNA pursuant to an Administrative Services Only Agreement dated June 25, 2010, by and between the Debtor and CIGNA (the "Services Agreement").

5. On June 6, 2011, the Debtor additionally filed the *Motion Of Debtor For Order: (A) Authorizing Use Of Cash Collateral On An Interim And Final Basis; (B) Granting Adequate Protection And Related Relief; And (C) Scheduling Final Hearing On Use Of Cash Collateral* [Docket No. 64] (the "Motion to Use Cash Collateral") seeking an order permitting the Debtor use of cash collateral to pay various ongoing expenses including $600,000 to fund the Debtor's self-funded health insurance benefit plan (the "Plan").

DM2\2934216.1 F2163/00014                                    2

**MOTION TO COMPEL - CASE NO. 11-31376 DM**
Case: 11-31376   Doc# 154   Filed: 07/20/11   Entered: 07/20/11 11:13:15   Page 2 of 11

6. On June 13, 2011, the Court entered an Interim Order granting the Motion to Use Bank Accounts.

7. On June 14, 2011, the Court entered an Interim Order granting the Motion to Use Cash Collateral and approving the $600,000 payment to fund the Plan.

8. On June 14, 2011, the Official Committee of Unsecured Creditors was appointed. [Docket No. 93].

**Background Concerning Services Agreement**

9. On June 25, 2010, the Debtor and CIGNA entered into the Services Agreement, whereby CIGNA agreed to furnish certain administration services in connection with the Plan. See Declaration of Robert Green ("Green Declaration") at ¶2 and Exhibit A.

10. Under the Services Agreement, CIGNA agreed to receive, process and, if appropriate, pay claims under the Plan for services rendered to Plan participants and/or beneficiaries. The Service Agreement further provides that the funding and payment of claims under the Plan shall be accomplished by Debtor's establishing a Bank Account (hereinafter the "Health Plan Bank Account") which is under the control of CIGNA, and by maintaining the account with sufficient amounts to fund payments of Plan benefits and charges and fees associated with CIGNA's providing services under the Service Agreement. Green Declaration at ¶3.

11. Consistent with these provisions, the practice of CIGNA and Debtor was that, on Monday of each week, Cigna would notify Debtor of the balance in the Health Plan Bank Account and whether additional funds were necessary to allow continued payment of claims and charges; Debtor would then deposit additional funds in the Health Plan Bank Account if necessary. Green Declaration at ¶4.

12. Beginning in March, 2011, as a result of its financial difficulties, the Debtor was required to obtain the advance consent of its lender, Citibank, prior to depositing additional funds into the Health Plan Bank Account. Green Declaration at ¶5.

13. Receipt of Citibank's consent was delayed briefly, causing the Debtor to be unable to deposit additional amounts in the Health Plan Bank Account in a timely fashion. Green Declaration at ¶6.

14. In mid-March, 2011, purportedly as a result of the Debtor's failure to deposit additional amounts in the Health Plan Bank Account in a timely fashion, CIGNA informed the Debtor that it would not continue to process or pay claims pursuant to the Services Agreement. Green Declaration at ¶7.

15. At the time CIGNA informed the Debtor that it would no longer continue to process or pay claims pursuant to the Services Agreement, the balance in the Health Plan Bank Account was approximately $225,000. Green Declaration at ¶8.

16. At the time CIGNA informed the Debtor that it would no longer continue to process or pay claims pursuant to the Services Agreement, CIGNA also advised Debtor that, if deposits were made by Debtor into the Health Plan Bank Account sufficient to bring the balance of the account up to $875,000, CIGNA would begin processing claims. Green Declaration at ¶9.

17. On April 12, 2011, Debtor sent CIGNA a letter advising that effective April 30, 2011, Debtor was terminating the Plan. Green Declaration at ¶10 and Exhibit B. .In its April 12, 2011 letter, Debtor also informed CIGNA that it was allowing Plan participants four months to submit incurred eligible claims for processing, and requested CIGNA to continue processing such claims through the end of the run-out period. Id.

DUANE MORRIS LLP
SAN FRANCISCO

DM2\2934216.1 F2163/00014

4

**MOTION TO COMPEL - CASE NO. 11-31376 DM**
Case: 11-31376   Doc# 154   Filed: 07/20/11   Entered: 07/20/11 11:13:15   Page 4 of 11

18. On April 26, 2011, after the Petition Date and in violation of the automatic stay under 11 U.S.C. § 362, CIGNA sent the Debtor a letter terminating the Services Agreement. Green Declaration at ¶11 and Exhibit C.

19. On April 26 and 27, 2011, the Debtor deposited $585,000 into the Health Plan Bank Account which CIGNA has retained. Green Declaration at ¶12.

20. On May 13, 2011, Debtor paid $97,015.16 to CIGNA, the amount which CIGNA, prior to the termination of the Plan, had advised Debtor was necessary for CIGNA to process claims through the run-out period assuming an April 30, 2011 Plan termination date. CIGNA has retained the $97,015.16 but has refused to process claims. Green Declaration at ¶13.

21. Currently, the balance in the Health Plan Bank Account is approximately $890,000.00. Despite the additional payments and/or deposits into, and the balance of approximately $890,000.00 in, the Health Plan Bank Account, CIGNA has continued to refuse to administer, process and pay claims under the Services Agreement. Green Declaration at ¶14.

22. In addition, despite repeated requests from representatives of the Debtor, CIGNA has refused and continues to refuse to provide information to Debtor with regard to (a) the Health Plan Bank Account and (b) the number of or dollar value of claims submitted under the Plan which remain unpaid. Green Declaration at ¶15.

23. Pending receipt of the information Debtor has requested from CIGNA as described in paragraph 22 and commencement by CIGNA of its duties under the Services Agreement, Debtor has not yet deposited into the Health Plan Bank Account the additional $600,000 which this Court authorized in its June 14, 2011 Interim Order, referred to in paragraph 7 herein. Green Declaration at 16.

24. Participants under the Plan are entitled to receive benefits under the Plan for services rendered prior to and including the Plan Termination Date. Green Declaration at 17.

DUANE MORRIS LLP
SAN FRANCISCO

DM2\2934216.1 F2163/00014

5

**MOTION TO COMPEL - CASE NO. 11-31376 DM**
Case: 11-31376  Doc# 154  Filed: 07/20/11  Entered: 07/20/11 11:13:15  Page 5 of 11

25. As a result of CIGNA's refusal to administer the claims, many participants under the Plan have not been receiving benefits. They have suffered and continue to suffer hardship including but not limited to being threatened with and/or subjected to collection efforts by service providers and collection agencies, as well as demands for interest, late fees, and other charges. If not already adversely affected, the credit ratings of some participants are at risk. Also, to the extent CIGNA refuses to process claims submitted by medical providers for services rendered to Plan participants and beneficiaries, the Plan participants, beneficiaries and the Debtor may lose the benefit of negotiated discounts between CIGNA and medical providers. Green Declaration at 18.

26. The impact on Plan participants of CIGNA's willful failure to perform is very real and, at times, very dramatic. For example, as recently as July 15, 2011, one Plan participant received a notice from CIGNA that benefits totaling approximately $32,000 had been denied, in part, because the ". . . coverage had been terminated at the time this expense was incurred." In reality, the stated reason for denial of coverage is untrue. All of the charges had been incurred prior to the Plan Termination Date. Over $19,000 of those charges were incurred as early as November 2010, long before the Plan was terminated. Attached as Exhibit D to the Green Declaration is the notice specific to the denial of the charges incurred in November 2010[2] received by the Plan participant. The Debtor believes that this notice is representative of notices being received by other Plan participants. Green Declaration at ¶19.

27. CIGNA knows that it is denying coverage in violation of the automatic stay and the express terms of the Agreement. Further, CIGNA has to know that its actions are in blatant disregard of its duties and that they have dramatic negative effects on Plan participants.

---

[2] Personal Information with regard to the Plan participant and beneficiary have been redacted.

## Basis for Relief

28. By this Motion, the Debtor seeks an Order pursuant to § 365 of title 11 of the United States Code (the "Bankruptcy Code"), compelling CIGNA to perform pursuant to the Services Agreement. In addition, the Debtor seeks entry of an Order awarding damages for CIGNA's willful violation of the automatic stay.

## Jurisdiction

29. This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.[3]

## Legal Argument

### I. The Services Agreement Is An Executory Contract

30. The Services Agreement is an executory contract subject to assumption or rejection pursuant to § 365 of the Bankruptcy Code.

31. A contract is executory and subject to § 365 of the Bankruptcy Code if: (i) obligations remained unperformed as of the commencement of the bankruptcy case; and (ii) one party's failure to render performance would excuse the other party's performance. *Zurich Am. Ins. Co. v. Int'l Fibercom, Inc. (In re Int'l Fibercom, Inc.)*, 503 F.3d 933, 941 (9th Cir. 2007) (citing *Commercial Union Ins. Co. v. Texscan Corp. (In re Texscan Corp.)*, 976 F.2d 1269, 1272 (9th Cir. 1992); *Pac. Express, Inc. v. Teknekron Infoswitch Corp. (In re Pac. Express, Inc.)*, 780 F.2d 1482, 1487 (9th Cir. 1986) (quoting Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1973)).

32. As of the commencement of this bankruptcy case, the Services Agreement was still in effect. Pursuant to its terms, the Services Agreement:

---

[3] The Debtor asserts that venue is proper for this matter in this Court *at this time* because the above-captioned bankruptcy case is still pending in this Court pending the Debtor's motion seeking to transfer venue.

DUANE MORRIS LLP
SAN FRANCISCO

DM2\2934216.1 F2163/00014

7

**MOTION TO COMPEL - CASE NO. 11-31376 DM**
Case: 11-31376    Doc# 154    Filed: 07/20/11    Entered: 07/20/11 11:13:15    Page 7 of 11

> is effective on the Effective Date and shall remain in effect until the earliest of the following dates: (i) The date which is at least sixty (60) days from the date that either Party provides written notice to the other party of termination of the Agreement; (ii) The effective date of any applicable law or governmental action which prohibits performance of the activities required by this Agreement; (iii) The date upon which Employer fails to fund the Bank Account as required by this Agreement or fails to pay Connecticut General any charges identified in this Agreement when due provided Connecticut General notifies Employer of its election to terminate; (iv) Any other date mutually agreed upon by the Parties.

Services Agreement, Section 1. Because none of the foregoing had occurred as of the commencement of this bankruptcy case, the Services Agreement was still in effect.

33. In addition, pursuant to the Services Agreement, both the Debtor and CIGNA had material obligations outstanding, the non-performance of which would have excused the other party's performance.

34. In addition, CIGNA was and is required to continue administering the Debtor's self funded employee insurance benefit plan.

35. Based upon the foregoing, the Services Agreement was undoubtedly an executory contract as of the commencement of this bankruptcy case and is now subject to assumption or rejection by the Debtor pursuant to § 365 of the Bankruptcy Code.

**II.   CIGNA Must Continue To Perform Pursuant To The Services Agreement.**

36. Section 365(a) of the Bankruptcy Code provides that, the Debtor, subject to the court's approval, may assume or reject any executory contract. To date, the Services Agreement has not been assumed or rejected.

37. Because the Services Agreement is an executory contract, until the Debtor decides to assume or reject the Services Agreement or this Court orders otherwise, CIGNA must continue to perform thereunder.

38. Pursuant to § 365 of the Bankruptcy Code, prior to a debtor making a decision as to whether to assume or reject an executory contract, the executory contract remains enforceable

DUANE MORRIS LLP
SAN FRANCISCO

DM2\2934216.1 F2163/00014

8

**MOTION TO COMPEL - CASE NO. 11-31376 DM**
Case: 11-31376   Doc# 154   Filed: 07/20/11   Entered: 07/20/11 11:13:15   Page 8 of 11

against the non-debtor party but not enforceable against the debtor. *In re Pac. Gas & Elec. Co.*, No. 02-3464, 2004 U.S. Dist. LEXIS 22023, at *21-22 (N.D. Cal. Sept. 30, 2004) (citing *NLRB v. Bildisco*, 465 U.S. 513, 532 (1984)).

39. Further, while a debtor is making the decision to assume or reject an executory contract, the non-debtor party may not resort to self-help or cease performing under the contract. *In re Coast Trading Co. Inc.*, 26 B.R. 737, 741 (Bankr. D. or. 1982). Indeed, an executory contract must remain in effect and the other party must continue to perform thereunder lest the powers provided to a debtor pursuant to § 365 of the Bankruptcy Code would be stripped of any meaning. *See, e.g.*, *In re Feyline Presents, Inc.*, 81 B.R. 623 (Bankr. D. Colo. 1988).

40. In this case, because the Services Agreement is an executory contract governed by § 365 of the Bankruptcy Code, CIGNA must continue to perform under the Services Agreement unless and until the Debtor seeks to reject the Services Agreement or this court orders otherwise.

41. Accordingly, this Court should enter an Order (a) compelling CIGNA to perform pursuant to the Services Agreement and (b) requiring CIGNA to extend the run-out period for submission and payment of claims under the Plan to compensate for the time lost to date in processing such claims because of CIGNA's improper conduct.

### III. CIGNA Should Be Required To Pay Damages For Violating The Automatic Stay.

42. Upon the filing of a bankruptcy petition, § 362(a) of the Bankruptcy Code automatically imposes a stay preventing third parties from taking action against a debtor or property of the bankruptcy estate. Further, § 362(k)(1) provides that a party injured by any willful violation of the stay "shall recover actual damages plus costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."

43. An Order granting compensatory and punitive damages should be entered against CIGNA for willfully violating the automatic stay imposed by § 362 of the Bankruptcy Code.

44. In sending the Termination Notice and ceasing to perform under the Services Agreement, CIGNA willfully violated the automatic stay imposed by § 362 of the Bankruptcy Code. Specifically, § 362 prevents a non-debtor from terminating an executory contract or ceasing to perform thereunder absent a court order granting it relief from the automatic stay to effectuate a termination of the executory contract. *In re Computer Communs.*, 824 F.2d 725, 731 (9th Cir. 1987) (affirming award of damages where counterparty unilaterally terminated executory contract without seeking relief from the automatic stay). As noted above, § 362 of the Bankruptcy Code permits a debtor to recoup damages incurred as a result of a willful stay violation. *Sternberg v. Johnston*, 595 F.3d 937, 940 (9th Cir. 2009), *cert. denied* 2010 U.S. Lexis 6338 (Oct. 4, 2010).

45. In this case, CIGNA's failure to perform under the Services Agreement constitutes a willful violation of the automatic stay because (i) CIGNA was aware of the case *sub judice* and (ii) its failure to perform was intentional. As the United States Court of Appeals for the Ninth Circuit has stated:

> A "willful violation" does not require a specific intent to violate the automatic stay. Rather, the statute provides for damages upon a finding that the defendant knew of the automatic stay and that the defendant's actions which violated the stay were intentional. Whether the party believes in good faith that it had a right to the property is not relevant to whether the act was "willful" or whether compensation must be awarded.

*In re Bloom*, 875 F.2d 224, 227 (9th Cir. 1989) (citation omitted). Accordingly, CIGNA's awareness of this bankruptcy case, together with CIGNA's intentional failure to perform under the Services Agreement, constitutes a willful and continuing violation of the automatic stay.

46. Because CIGNA has not sought relief from the automatic stay, and because CIGNA has ceased performing under the Services Agreement thereby willfully violating the automatic stay, compensatory and punitive damages should be awarded. At a minimum, CIGNA must be required to compensate the Debtor its costs and attorneys' fees. Further, particularly in

DM2\2934216.1 F2163/00014           10

**MOTION TO COMPEL - CASE NO. 11-31376 DM**
Case: 11-31376   Doc# 154   Filed: 07/20/11   Entered: 07/20/11 11:13:15   Page 10 of 11

light of the impact on the Plan participants of CIGNA's actions, punitive damages are appropriate. It would be the Debtor's intention to utilize any punitive damage award to reimburse Plan participants, limited by the amount of that award, to the extent of (i) any interest, late charges, or other fees they have incurred and (ii) any damages which they may have suffered as a result of the loss of discounts from providers.

**WHEREFORE**, the Debtor prays that this Court enter an Order (i) compelling CIGNA to perform under the Services Agreement including extending the run-out period, (ii) awarding compensatory and punitive damages to the Debtor on account of CIGNA's willful violation of the automatic stay; (iii) authorizing the Debtor to utilize any punitive damages award to compensate Plan participants and (iv) granting such other and further relief as this court deems just and proper.

Dated: July 20, 2011                          **DUANE MORRIS LLP**

                                                     By:     /s/ Aron M. Oliner (152373)
                                                                      ARON M. OLINER
                                         Proposed Special Counsel for the Debtor,
                                                                       HOWREY LLP