# McGRANE LLP

Attorneys at Law

Please reply to:
**William McGrane**

Direct E-mail:
William.McGrane@mcgranellp.com

Four Embarcadero Center
Suite 1400
San Francisco, CA 94111
Phone: (415) 766-3590

December 6, 2012

(Via email w/encl.)
Hon. Dennis Montali
U.S. Bankruptcy Court
235 Pine Street, 19th Floor
San Francisco, CA 94104

Re: **Howrey LLP**
**Case No. 11-31376**

Dear Judge Montali:

On Tuesday, December 4, 2012, I filed my personal Opposition to Amended Stay Motion (Docket No. 886). Today, while innocently opening my mail, I happened to glance at the cover of my copy of the December/January 2013 American Bankruptcy Institute Journal. There I noticed that the front page article related to the issue of 'who owns alter ego'. That lead article is attached hereto as Exhibit 1 for your consideration in connection with the contested matter regarding the Trustee's Stay Motion that is now set for hearing on December 21, 2012.[1]

---

[1] As the Trustee has yet to file any reply brief, this letter brief is **_not_** subject to B.L.R. 9013-1 (e) governing submission of "Supplementary Materials," which reads: "Prior to the noticed hearing date, counsel may bring to the Court's attention relevant judicial opinions published after the date the opposition or reply was filed by filing and serving a Statement of Recent Development, containing a citation to and providing a copy of the new opinion without argument. Otherwise, **_once a reply is filed_**, no additional memoranda, papers or letters shall be filed without prior Court approval." (**_Emphasis_** added.)

More to the point, the attached article relies heavily on a Fifth Circuit case ***not*** cited by the Trustee in any of his various briefs, <u>Highland Capital Management LP v. Chesapeake Energy Corporation (In re Seven Seas Petroleum, Inc.)</u>, 522 F.3d 575 (5th Cir. 2008) (Exhibit 2 hereto).  The <u>Highland</u> case is, however, both much later in time ***and*** very much at odds with a case that *is* heavily relied upon by the Trustee, to wit, <u>S.I. Acquisition, Inc. v. Eastway Delivery Service, Inc. (In re S.I. Acquisition Inc.)</u>, 817 F.2d 1142 (5th Cir.1987).

As Texas law is in no way controlling here, I did not bother to take <u>S.I. Acquisition</u> forward and I was thus personally very surprised to realize that Mr. Diamond's own home jurisdiction of Texas is so clearly against him on the 'who owns alter ego' issue and that, despite that fact, he has represented the very opposite to Your Honor.  Frankly, as this incident shows, fooling me is pretty easy.  But even attempting to fool you like this is neither healthy nor something *I* would ever attempt.  Believe me.

                Very truly yours,

                McGRANE LLP

                William McGrane

# EXHIBIT 1

By Kavita Gupta

# Chasing the Money
## Pursuing a Debtor's Shareholders under Alter-Ego Liability Theory

A creditor sues a closely held corporation. Suspecting that the corporation's shareholders are improperly using the corporate form to limit their liability, the creditor adds the shareholders as defendants to its lawsuit to hold them personally liable. The corporation then files for bankruptcy and the automatic stay[1] suspends the creditor's action. What happens to the creditor's alter-ego claim against the shareholders?

For years, various courts held that the bankruptcy trustee[2] had exclusive standing to pursue alter-ego liability claims against a corporate debtor's shareholders, thereby divesting creditors of the right to proceed with such claims when the corporation filed for bankruptcy.[3] However, recent decisions in the Fifth and Ninth Circuits[4] have challenged these prior rulings. As a result, creditors can, in certain cases, proceed with their alter-ego claims against corporate shareholders despite the corporation's bankruptcy filing.



**Kavita Gupta**
Winthrop Couchot PC
Newport Beach, Calif.

Kavita Gupta is Of Counsel at Winthrop Couchot PC in Newport Beach, Calif.

### Alter-Ego Liability Theory

Although one or more individuals can assume the corporate form to do business as a separate legal entity, the corporate form must be used for legitimate business purposes. When the corporate form is abused, a court may disregard it, rendering the shareholders personally liable for acts done in the corporation's name.[5] Any party, even the corporation itself, can sue a corporation's shareholders under an alter-ego liability theory to hold them personally liable for the corporation's legal obligations. To assert such a claim, a party must allege: (1) a unity of interest and ownership between the corporation and its equitable owner(s) such that the separate personalities of the corporation and the shareholder do not in reality exist; and (2) an inequitable result if the acts in question are treated as being those of the corporation alone.[6] Courts, when determining whether there is a viable alter-ego claim, consider a number of factors, such as the commingling of funds and other assets of the two entities, use of the same offices and employees, disregard of corporate formalities, identical directors and officers, and use of one as a mere shell or conduit for the affairs of the other.[7] "No one characteristic governs, but...courts must look at all the circumstances to determine whether the doctrine should be applied."[8]

### Standing to Assert Alter-Ego Claims after a Corporation Files a Petition

When a corporation files for bankruptcy, the trustee "stands in the shoes of the bankrupt corporation and has standing to bring any suit...[it] could have instituted had it not petitioned for bankruptcy."[9] State law determines whether a claim against a third party belongs to the creditor or to the trustee.[10] When a trustee has standing to assert a corporation's claim, that standing is exclusive and divests all creditors of the power to bring the claim.[11]

### A Trustee's Standing to Pursue Alter-Ego Claims

The law governing a trustee's exclusive standing to bring an action against a corporation's shareholders (thereby divesting creditors of the power to sue those parties) has evolved over time. In *Caplin v. Marine Midland Grace Trust Co.*,[12] the U.S. Supreme Court held that the trustee was generally limited to asserting claims owned by the debtor.[13] In *Stodd v. Goldberger*,[14] the California Court of Appeals ruled that a trustee had standing to assert alter-ego liability claims against the corporation's shareholders *if* it could allege that they had engaged in conduct that injured the corporation.[15] The court then enumerated examples of shareholder conduct that injured the corporation, such as fraudulent

---

1   11 U.S.C. § 362.
2   Section 1107(a) gives a debtor in possession the same rights and powers as a chapter 11 trustee. 11 U.S.C. § 1107.
3   *See Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130 (2d Cir. 1993); *Steyr-Daimler-Puch of Am. Corp. v. Pappas*, 852 F.2d 132 (4th Cir. 1988); *In re Schimmelpennick*, 183 F.3d 347 (5th Cir. 1999); *Koch Ref. v. Farmers Union Central Exch. Inc.*, 831 F.2d 1339 (7th Cir. 1987); *CBS Inc. v. Folks (In re Folks)*, 211 B.R. 378 (B.A.P. 9th Cir. 1997); and *In re Davey Roofing Inc.*, 167 B.R. 604 (Bankr. C.D. Cal. 1994).
4   *See In re Seven Seas Petroleum Inc.*, 522 F.3d 575, 587 (5th Cir. 2008), and *Ahcom Ltd. v. Smeding*, 623 F.3d 1248, 1252 (9th Cir. 2010).
5   *See, e.g., Mesler v. Bragg Mgmt. Co.*, 39 Cal.3d 290, 300 (1985). Moreover, in California, "[a] claim against a defendant, based on the alter-ego theory, is not itself a claim for substantive relief, *e.g.*, breach of contract...but rather, *procedural*, *i.e.*, to disregard the corporate entity as a distinct defendant and to hold the alter-ego individuals liable on the [corporation's] obligations...where the corporate form is being used by the individuals to escape personal liability, sanction a fraud, or promote injustice." *Hennessey's Tavern Inc. v. Am. Air Filter Co.*, 204 Cal.App.3d 1351, 1359 (1988) (emphasis added).

6   *See, e.g., Sonora Diamond Corp. v. Sup. Ct.*, 83 Cal.App.4th 523, 538 (2000).
7   *Sonora*, 83 Cal.App.4th at 538-39.
8   *Id.* at 539.
9   *Smith v. Arthur Andersen LLP*, 421 F.3d 989,1002 (9th Cir. 2005).
10  *Butner v. United States*, 440 U.S. 48, 54-55 (1979).
11  *Estate of Spirtos v. One San Bernardino County Superior Court Case Numbered SPR 02211*, 443 F.3d 1172, 1176 (9th Cir. 2006).
12  406 U.S. 416 (1972).
13  *Caplin*, 406 U.S. at 428. *See also Stodd v. Goldberger*, 73 Cal.App.3d 827, 833 (1977).
14  73 Cal.App.3d 827 (1977).
15  *Stodd*, 73 Cal.App.3d at 833.

*continued on page 74*

Case: 11-31376    Doc# 896    Filed: 12/06/12    Entered: 12/06/12 17:01:05    Page 4 of 18

transfers of corporate assets, conversion of corporate assets and deposits of corporate funds into a shareholder's personal bank accounts.[16]

## A Trustee's Exclusive Standing to Pursue "General" Alter-Ego Claim

After *Caplin* and *Stodd*, various courts ruled that if a shareholder's alleged misconduct could be interpreted as an injury to the corporation *in general*, then the trustee had exclusive standing to assert an alter-ego claim against the shareholder. For example, in *In re Schimmelpennick*,[17] the Fifth Circuit ruled that the trustee had exclusive standing to assert a creditor's alter-ego claim. There, the creditor had asserted a generalized injury to the debtor's bankruptcy estate. The court reasoned that giving exclusive standing to the trustee would ensure that the bankruptcy estate would not be wholly or partially consumed for the benefit of one creditor or a small number of creditors.[18]

In *In re Davey Roofing Inc.*,[19] a creditor sued a bankrupt corporation's principal under an alter-ego liability theory in a California state court, seeking to hold him personally liable for a debt that the corporation owed to the creditor.[20] Because the creditor's allegations included a claim that the principal had misappropriated corporate assets for his own benefit, the bankruptcy court ruled that the creditor had alleged a general injury to the corporation itself. Therefore, the corporation had exclusive standing to assert alter-ego claims and all creditors were bound by the outcome of its alter-ego action.[21] Similarly, in *In re Folks*,[22] a creditor pursuing an alter-ego claim against a corporation's individual shareholder in a bankruptcy court alleged that he had failed to observe corporate formalities and used corporate bank accounts and funds for personal expenditures. The Ninth Circuit Bankruptcy Appellate Panel determined that these allegations constituted a "general claim" for alter-ego liability, rather than a claim asserting a "particularized injury" to the creditor itself. It ruled that the alter-ego claim constituted property of the corporation's bankruptcy estate and that the trustee had exclusive standing to assert such a claim on behalf of himself and all of the creditors.[23]

## Shift Away from Trustee's Exclusive Standing to Pursue "General" Alter-Ego Claims

Both the Fifth and Ninth Circuits have recently shifted away from the view that a trustee has exclusive standing to pursue "general" alter-ego claims or alter-ego claims asserting a "generalized injury" to the corporation. For example, in *In re Seven Seas Petroleum Inc.*,[24] the Fifth Circuit rejected the "notion that a claim belongs to the estate or is otherwise only assertable by the trustee merely because it could be brought by a number of creditors, instead of just one."[25] It distinguished between a creditor's interests in the claims of the debtor against a third party—which were enforced by the trustee, and the creditor's own direct claim against the third party—which only the creditor could enforce.[26]

Moreover, in *Ahcom Ltd. v. Smeding*,[27] the Ninth Circuit rejected the *Davey Roofing* and *Folks* courts' focus on allegations of a "general" alter-ego claim, or "generalized injury" to the corporation as the determinant of whether a creditor or the corporation had standing to bring an alter-ego claim against a corporation's shareholders. In *Ahcom*, a creditor obtained an arbitration award against a corporation, which then filed for bankruptcy.[28] The creditor sued the corporation's shareholders in a California state court to enforce the arbitration award, alleging that they were personally liable under an alter-ego liability theory.[29] The corporation removed the creditor's action to district court, which ruled that the shareholders' alleged misconduct had harmed all of the corporation's creditors and not just the specific creditor that had filed the suit. Therefore, it determined that the creditor's alter-ego claim was property of the bankruptcy estate and that the trustee had exclusive standing to pursue the claim.[30]

On appeal, the Ninth Circuit reversed, ruling that California law did not recognize a "general" alter-ego claim, which allowed a corporation or its shareholders to be treated as alter-egos for purposes of all the corporation's debts.[31] Moreover, contrary to *Davey Roofing* and *Folks*, the Ninth Circuit determined that the California appellate court in *Stodd* had simply distinguished between which "alter-ego" claims could be properly brought by the trustee and which could not.[32] For example, allegations of fraudulent transfers, conversion of corporate assets by shareholders and depositing of corporate funds into personal bank accounts all constituted examples of misconduct resulting in injury to the corporation. Therefore, because the corporation had standing to pursue actions for such injuries, the trustee had exclusive standing to pursue these same actions when the corporation filed for bankruptcy.[33]

However, neither the corporation nor the trustee had standing to pursue alter-ego claims for conduct that resulted in injury to a specific creditor. In *Ahcom*, the creditor's action to enforce an arbitration award against the corporation was not the result of an injury to the corporation, but instead arose from an injury to that specific creditor. Thus, notwithstanding the corporation's bankruptcy case, the creditor had standing to assert an alter-ego claim against the corporation's share-

---

16 *Id.* at 834.
17 183 F.3d 347 (5th Cir. 1999).
18 *Schimmelpennick*,183 F.3d at 360.
19 167 B.R. 604 (Bankr. C.D. Cal. 1994).
20 *Davey Roofing*, 167 B.R. at 606.
21 *Id.* at 608.
22 211 B.R. 378 (B.A.P. 9th Cir. 1997).
23 *Folks*, 211 B.R. at 387-88.
24 522 F.3d 575 (5th Cir. 2008).

25 *Seven Seas*, 522 F.3d at 588.
26 *Id.* (citing *Steinberg v. Buczynski*, 40 F.3d 890, 893 (7th Cir. 1994)).
27 623 F.3d 1248 (9th Cir. 2010).
28 *Ahcom*, 623 F.3d at 1249.
29 *Id.*
30 *Id.* at 1249-50.
31 *Id.* at 1252.
32 *Id.*
33 *Id.*

holders because its action had nothing to do with the corporation's bankruptcy proceeding.[34]

Similarly, in *Shaoxing County Huayue Import & Export v. Bhaumik*,[35] a creditor sued a corporation in California state court for breach of contract.[36] It later added the corporation's shareholder as a defendant, asserting that he was the alter-ego of the corporation.[37] The corporation filed for bankruptcy and attempted to stay the action against the shareholder,[38] arguing that the trustee had sole standing to pursue an alter-ego claim against him.[39] Citing *Stodd* and *Ahcom*, the California appellate court ruled that the trustee could not pursue an alter-ego claim without alleging injury to the corporation that gave the corporation a right of action.[40] Because the creditor had asserted a breach-of-contract claim against the corporation and alleged that the shareholder was personally liable as the corporation's alter-ego, the creditor was not seeking to assert a right of action belonging to the corporation.[41] Therefore, the creditor's alter-ego claims were not property of the bankruptcy estate, and its alter-ego action against the shareholder was not subject to the automatic stay.[42]

## Practical Implications

The *Seven Seas*, *Ahcom* and *Shaoxing* decisions reflect a shift in how courts in the Fifth and Ninth Circuits determine who has standing to pursue an alter-ego liability remedy after a corporation commences a bankruptcy case. A trustee no longer has exclusive standing to assert alter-ego claims and divest creditors of the right to pursue such claims against the corporation's shareholders. Accordingly, these decisions have added several layers of complexity to a corporation's decision to file a bankruptcy case, claims analysis and the classification of claims in a chapter 11 plan. These complexities include, without limitation:

• A prospective corporate debtor must recognize that the automatic stay no longer bars certain categories of alter-ego claims against its shareholders—*e.g.*, a creditor's action for breach of contract or to enforce a judgment. Accordingly, such actions will continue post-petition, potentially impairing management's ability to right the corporate ship during the bankruptcy case. Therefore, a corporate debtor commencing a bankruptcy case in reliance on the automatic stay risks an adverse ruling that a creditor has standing to file or continue to prosecute an action against the corporation's shareholders;

• Officers and shareholders who are targets of these outside-the-corporate walls alter-ego claims may assert indemnity claims against the debtor under the standard provisions that are commonly included in articles of incorporation and bylaws. They may also have indemnity rights under D&O insurance policies; and

• An unsecured creditor that has recourse to nonestate assets may hold a claim that is not "substantially similar" to other unsecured claims. Therefore, in jurisdictions where, for example, *Ahcom* holds sway, a debtor may have to separately classify the claims of those creditors who have alter-ego claims rights under § 1122.

Consequently, a practitioner representing a corporation should, prior to filing a bankruptcy petition, evaluate the viability of creditors' alter-ego claims against each of the corporation's shareholders and, if necessary, advise them to retain counsel to defend against such claims. Depending on the circumstances, shareholders or officers might consider filing for bankruptcy concurrently with the corporation to stay any litigation against them and to ensure that the creditors' claims (including those against the shareholders based on alter-ego liability) remain subject to the bankruptcy claims process.

For a creditor, the authorities discussed herein may provide a vehicle for a possible recovery from a corporate debtor's shareholders because certain alter-ego actions against the shareholders are not subject to the automatic stay. Moreover, the automatic stay does not shield a debtor corporation from having to respond to discovery that is reasonably calculated to lead to admissible evidence against the shareholders for alter-ego liability.[43] abi

---

34 *Id.*
35 191 Cal.App.4th 1189 (2011).
36 *Shaoxing*, 191 Cal.App.4th at 1193.
37 *Id.*
38 *Id.* at 1194.
39 *Id.*
40 *Id.* at 1198-99.
41 *Id.* at 1199.
42 *Id.*

43 *See Groner v. Miller (In re Miller)*, 262 B.R. 499, 502 (B.A.P. 9th Cir. 2001).

Copyright 2012
American Bankruptcy Institute.
Please contact ABI at (703) 739-0800 for reprint permission.

Case: 11-31376    Doc# 896    Filed: 12/06/12    Entered: 12/06/12 17:01:05    Page 6 of 18

# EXHIBIT 2



**In The Matter Of: SEVEN SEAS PETROLEUM INC, Debtor; HIGHLAND CAPITAL MANAGEMENT LP; ML CBO IV (CAYMAN) LTD; PAMCO CAYMAN LIMITED; PAM CAPITAL FUNDING LP; FAMCO VALUE INCOME PARTNERS, LP; FAMCO OFFSHORE LTD, Appellants v. CHESAPEAKE ENERGY CORPORATION; SEVEN SEAS PETROLEUM INC, Appellees**

No. 07-20301

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

522 F.3d 575; 2008 U.S. App. LEXIS 6835; 49 Bankr. Ct. Dec. 210; 173 Oil & Gas Rep. 289

**March 31, 2008, Filed**

**PRIOR HISTORY:** [**1]
Appeal from the United States District Court for the Southern District of Texas.
*Highland Capital Mgmt., L.P. v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.), 2007 U.S. Dist. LEXIS 23583 (S.D. Tex., Mar. 30, 2007)*

**COUNSEL:** For HIGHLAND CAPITAL MANAGEMENT LP, Appellant: Paul Brian Lackey, Michael Philip Aigen, Jamie Ryan Welton, Lackey Hershman, Dallas, TX.

For ML CBO IV (CAYMAN) LTD, PAMCO CAYMAN LTD, PAM CAPITAL FUNDING LP, FAMCO VALUE INCOME PARTNERS, LP, FAMCO OFFSHORE LTD, Appellants: Paul Brian Lackey, Michael Philip Aigen, Jamie Ryan Welton, Dallas, TX.

For CHESAPEAKE ENERGY CORP, Appellee: Thomas S Leatherbury, Paul E Heath, Vinson & Elkins, Trammell Crow Center, Dallas, TX.

For SEVEN SEAS PETROLEUM INC, Appellee: Tony M Davis, Baker Botts, Houston, TX; Randall A Rios, Munsch, Hardt, Kopf & Harr, Houston, TX.

**JUDGES:** Before KING, DEMOSS, and SOUTHWICK, Circuit Judges.

**OPINION BY:** KING

**OPINION**

[*578] KING, Circuit Judge:

A secured creditor of a bankrupt corporation was sued by an unsecured creditor of the same corporation in state court and removed the claims against it to federal court, asserting that the claims were property of the bankruptcy estate and that the unsecured creditor had no right to assert them. The bankruptcy court agreed that the claims were property of the estate, denied the unsecured creditor's motion to remand, and dismissed the claims. [**2] The district court affirmed on appeal. For the reasons that follow, we conclude that the claims are not property of the bankruptcy estate and must be remanded to state court.

I.

The appellants in this case, a group of investment funds (the "bondholders"), hold $ 30 million in unsecured notes issued by Seven Seas Petroleum, Inc., a

Page 2

522 F.3d 575, *578; 2008 U.S. App. LEXIS 6835, **2;
49 Bankr. Ct. Dec. 210; 173 Oil & Gas Rep. 289

Houston-based company that was forced into bankruptcy in December 2002. Seven Seas issued the notes as part of a $110 million debt offering in May 1998. The bondholders did not purchase the unsecured notes from Seven Seas; instead, they purchased the unsecured notes either in private transactions or on the secondary market at various times in 1999, 2000, and 2002.

Prior to its bankruptcy, Seven Seas explored and developed oil and gas properties in South America through the operations of its wholly-owned subsidiaries. To comply with certain SEC reporting requirements, Seven Seas engaged Ryder Scott Company, a reservoir-evaluation consulting firm, to provide reserve estimates calculated in accordance with the SEC's "proved reserves" guidelines. These reserve estimates were incorporated into Seven Seas' annual reports on Form 10-K beginning in 1998, when the [**3] company's stock began trading on the American Stock Exchange, and were also included in the prospectus for the $110 million debt offering.

The reserve estimates prepared by Ryder Scott were important to the bondholders for two reasons. First, the bondholders claim to have relied on these estimates when deciding whether to invest in the unsecured notes. Second, Seven Seas' ability to issue secured debt--which would be senior to the unsecured notes held by the bondholders--was tied to the reserve estimates. Specifically, under the terms of the unsecured notes, Seven Seas could not issue secured debt exceeding the greater of $25 million or the sum of cash on hand, certain receivables, and thirty percent of the discounted net present value of reserves.

Seven Seas did in fact issue $45 million in senior, secured notes in July 2001, shortly after it had reported reserves of [*579] 47.9 million barrels of oil, with a discounted value of just over $394 million, on its 10-K for the year ended December 31, 2000. Robert A. Hefner, III, the chairman and CEO of Seven Seas, led a group of investors that purchased half of the secured notes. This group included several of the company's other directors. [**4] Chesapeake Energy Corporation, an Oklahoma-based independent oil and gas producer, purchased the remaining half of the notes. The collateral for the secured notes was substantially all of Seven Seas' assets. In addition, the secured notes featured detachable warrants that gave the holders the right to purchase Seven Seas stock for $1.78 per share. These warrants represented options on 40% of the company's common shares. Seven Seas planned to use the proceeds from the secured notes to fund an exploratory well in Colombia, as well as for other business operations.

Things did not go well for Seven Seas. By July 2002 it became apparent that the exploratory well in Colombia, which had reached a depth of almost 19,000 feet, was likely to be a failure. Shortly thereafter, Seven Seas announced that it was suspending further development of its shallow reserves. The following month, the company revised its reserve estimates downward to 16.3 million barrels--a 66% decrease from the figure reported in Seven Seas' 10-K for the year ended December 31, 2001--and took a substantial write-down to account for the diminished discounted value of this revised reserves figure. In September 2002, Seven Seas' [**5] management informed representatives of investors in the unsecured notes that the company's assets were worth $49 million, but that liabilities on the secured notes alone were $52 million. These events prompted a number of investors in the unsecured notes, including some of the bondholders, to file an involuntary Chapter 7 bankruptcy petition against Seven Seas in the Bankruptcy Court for the Southern District of Texas. Seven Seas converted the involuntary bankruptcy case to a Chapter 11 reorganization, and a trustee was appointed.

The trustee commenced an adversary proceeding against Chesapeake and the other holders of the secured notes on behalf of the Seven Seas bankruptcy estate. Among other things, the trustee sought to re-characterize the $45 million secured debt transaction as an equity contribution.[1] The trustee also brought tort claims against Chesapeake, alleging, among other things, that it had breached duties that it owed to Seven Seas and interfered with management's fiduciary duties.

> 1 In addition to the fact that the detachable warrants gave holders of the secured notes the right to purchase Seven Seas common stock for $1.78 per share, the trustee identified several [**6] aspects of Chesapeake's investment in the secured notes that gave the transaction the substance and character of an equity contribution. The original agreement between Chesapeake and Seven Seas did not require Seven Seas to make interest payments to Chesapeake during the first two years after the transaction. It also gave Chesapeake substantial control over Seven Seas, including the

Page 3

522 F.3d 575, *579; 2008 U.S. App. LEXIS 6835, **6;
49 Bankr. Ct. Dec. 210; 173 Oil & Gas Rep. 289

rights to appoint two directors to the company's board, receive dividend payments, participate in future public and private offerings, and approve certain budgets, expenditures, and business plans.

The trustee's first amended complaint in the adversary proceeding dropped most of the claims against Chesapeake (retaining only the claim seeking to re-characterize Chesapeake's investment in the secured notes as an equity contribution), but added claims against Hefner and other Seven Seas directors for breach of various fiduciary duties. According to the trustee's amended complaint, Hefner and the directors knew that Seven Seas was insolvent or of questionable solvency and arranged [*580] to provide additional financing--in the form of the $ 45 million secured debt offering that they participated in along with Chesapeake--on [**7] terms that were highly advantageous for the holders of the secured notes but detrimental to the company and its other creditors. Since their $ 45 million investment was secured by substantially all the assets of the company, the holders of the secured notes faced little risk. However, they stood to profit tremendously if the exploratory well in Colombia proved to be a success, because the secured notes' detachable warrants gave them the right to increase their equity stake in the company. For the company and its unsecured creditors, though, the $ 45 million secured debt transaction was a tremendously risky proposition: if the exploratory well turned out to be dry, the company would likely have to enter bankruptcy, and would have few, if any, assets available to satisfy the claims of unsecured creditors.

The trustee and Chesapeake eventually reached a settlement whereby Chesapeake agreed to give up some of its collateral in exchange for a complete release of claims by the Seven Seas bankruptcy estate. The settlement agreement was part of the trustee's second amended reorganization plan, which was confirmed by the bankruptcy court in August 2003. [2] Chesapeake was subsequently dismissed [**8] with prejudice from the adversary proceeding. The trustee continued to pursue claims against Hefner and the other directors on behalf of the estate in an action that is still pending in the district court.

> 2   The release contained in the plan provides that "the Trustee, on behalf of the [Seven Seas bankruptcy] Estate . . . shall be deemed to have compromised and settled with, and fully released and forever discharged [Chesapeake] . . . from any and all past, present, or future claims, . . . including, without limitation, all causes of action, whether known or unknown which the Estate . . . now ha[s], claims to have, ha[s] ever had, or would but for this release, have had in the future arising from, related to or on account of the [trustee's adversary proceeding against Chesapeake], . . . all matters raised or which could have been raised in the [the adversary proceeding], . . . or the [Seven Seas bankruptcy case] . . . ."

Meanwhile, shortly after Seven Seas entered bankruptcy, the bondholders sued Ryder Scott in state court for negligent misrepresentation. [3] They later added claims for fraud, violation of the Texas Securities Act, and aiding and abetting fraud. In support of the misrepresentation [**9] claim, the bondholders alleged that Ryder Scott owed them a duty to use reasonable care in calculating the reserve estimates, that Ryder Scott breached this duty, that the bondholders relied on the reserve estimates, and that, as a consequence, they lost almost all of their investment in the unsecured notes. Similarly, in support of the fraud claim, the bondholders alleged that they relied upon the reserve reports, which Ryder Scott knew to be false or to have been made with a reckless disregard for truth. The Texas Securities Act and aiding and abetting fraud claims charged that Ryder Scott had aided the commission of securities fraud and given substantial assistance in support of a fraudulent scheme, respectively.

> 3   Two of the bondholders were not initially parties to this suit but were added as plaintiffs later.

Two months after the plan was confirmed in the Seven Seas bankruptcy case and Chesapeake was dismissed from the trustee's adversary proceeding, the bondholders amended their state-court complaint to add Hefner and Chesapeake as defendants, bringing claims of conspiracy to defraud and aiding and abetting fraud against both. In their amended complaint, the bondholders made general [**10] allegations [*581] regarding Ryder Scott's role in calculating the reserve estimates, the bondholders' reliance on the reserve estimates, the issuance of $ 45 million in secured notes, and the 66% downward revision in reserve estimates. With regard to the circumstances of the $ 45 million

Page 4

522 F.3d 575, *581; 2008 U.S. App. LEXIS 6835, **10;
49 Bankr. Ct. Dec. 210; 173 Oil & Gas Rep. 289

secured debt transaction, the picture that emerges from the bondholders' amended complaint is similar to the one found in the trustee's first amended complaint in the adversary proceeding, i.e., both complaints describe how the secured debt transaction was structured in a way that minimized the risk to the holders of the secured notes and yet gave them the means to capture the upside of the exploratory well in Colombia. In addition, the bondholders alleged that without the reserve estimates provided by Ryder Scott, the terms of the unsecured notes would have limited Seven Seas to issuing $ 25 million in secured debt.

Because they are the central focus of this appeal, we reproduce here, in pertinent part, the two claims asserted by the bondholders against Chesapeake. First, in a count labeled "Conspiracy to Defraud," the bondholders charged that:

> Chesapeake [], Hefner, and Seven Seas entered into a common plan, [**11] scheme or design to defraud investors in the [unsecured notes], including [the bondholders], by issuing and purchasing the [secured notes] . . . in order to decrease the assets available to investors in the [unsecured notes]. Chesapeake [], Hefner and Seven Seas accomplished this fraud by employing the material misrepresentations and/or omissions contained in Ryder Scott's reserve reports in order to induce potential investors and existing investors in [the unsecured notes] . . . to either acquire interests in . . . or to refrain from selling interests in [the unsecured notes]. Chesapeake [] and Hefner knew that the misrepresentations and/or omissions contained in Ryder Scott's reserve estimates were false or had been made with reckless disregard as to their truth.

Next, in a count labeled "Aiding And Abetting Fraud," the bondholders charged that:

> Chesapeake [] and Hefner and Ryder Scott are also liable for all damages caused by the aforementioned fraudulent schemes because each of these Defendants was aware the conduct by Seven Seas constituted a breach of duty and gave substantial assistance or encouragement to [] Seven Seas to continue with the scheme.

Chesapeake invoked the bankruptcy [**12] removal statute, *28 U.S.C. § 1452*, to remove the claims against it to the District Court for the Southern District of Texas, asserting as the basis for bankruptcy jurisdiction that the claims were property of the Seven Seas bankruptcy estate and had been released through the confirmation of the plan in the bankruptcy proceeding. 4 The [*582] claims were eventually referred to the bankruptcy court, which entertained motions in an adversary proceeding. The bondholders moved to remand the case to state court, arguing, among other things, that the claims against Chesapeake belonged to the bondholders and were not property of the Seven Seas bankruptcy estate. Chesapeake filed a motion to dismiss the bondholders' complaint, arguing that the claims were property of the estate, could only be brought by the trustee, and had been released in the plan. In the alternative, Chesapeake argued that principles of judicial estoppel barred the claims because the bondholders had initiated the involuntary bankruptcy proceedings against Seven Seas, controlled a creditors committee that supported the plan, and never objected to the plan's release of claims against Chesapeake. 5

> 4   The bankruptcy removal statute [**13] authorizes a party to "remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under" the bankruptcy jurisdiction statute. *28 U.S.C. § 1452(a)*. Ryder Scott and Hefner did not remove the claims brought against them in the state court action, and the trial court granted summary judgment in favor of both. The Houston Court of Appeals (First District) reversed with regard to Ryder Scott and affirmed with regard to Hefner, relying in part on the bankruptcy court's determination (in a related proceeding) that the claims against Hefner were property of the estate and concluding that the injury for which relief was sought against Hefner was derivative of a direct injury to Seven Seas. *See Highland Capital Mgmt., L.P. v. Ryder Scott Co., 212 S.W.3d 522, 531 (Tex. App.--Houston*

Page 5

522 F.3d 575, *582; 2008 U.S. App. LEXIS 6835, **13;
49 Bankr. Ct. Dec. 210; 173 Oil & Gas Rep. 289

*[1st Dist.] 2006, pet. denied)*. The Texas Supreme Court denied discretionary review. Chesapeake argues that the state court appeal "do[es] not involve Chesapeake and [is] not relevant to the central issue of this appeal: whether [b]ondholders assert claims against Chesapeake [**14] that were estate property and that were released under the confirmed bankruptcy plan that [b]ondholders themselves supported."

5  Additional motions and pleadings raised largely the same issues. In a motion to implement and enforce the plan that was filed in the main bankruptcy proceeding, Chesapeake argued that the claims asserted by the bondholders were property of the estate and requested that the bankruptcy court order the bondholders to cease prosecution of their suit against Chesapeake. The trustee also filed a "response" in support of Chesapeake's motion to implement. The motion to implement was consolidated with the adversary proceeding involving the removed claims. In addition, some of the bondholders were not added as plaintiffs in the state court suit against Ryder Scott, Hefner, and Chesapeake until after Chesapeake had removed the claims against it to federal court, so Chesapeake actually filed another notice of removal to remove claims asserted by the second group of plaintiffs in the state court litigation. These claims were identical to the claims that Chesapeake had already removed (and were consolidated with the earlier-removed claims in the bankruptcy court adversary [**15] proceeding), so there is no need to differentiate between the two sets of claims here.

The bankruptcy court held hearings and entered orders denying the bondholders' motion to remand and dismissing the claims against Chesapeake. In a supporting memorandum opinion, the bankruptcy court determined that the claims asserted by the bondholders were property of the Seven Seas bankruptcy estate, reasoning that:

> whether a claim is property of the estate depends on the nature of the injury and whether the debtor could have raised the claim under state law as of the commencement of the case. If Chesapeake and Hefner conspired to create claims with collateral rights senior to other creditors, then the harm is generalized to all creditors. Not only "could have" the Debtor raised the claims against Chesapeake, . . . the Debtor did raise those claims [in the trustee's adversary proceeding]. Therefore the claims against Chesapeake . . . are property of the estate.

The bankruptcy court then concluded that it had subject matter jurisdiction over the case and that the motion to remand should be denied because the claims were property of the estate, and allowing them to proceed would, in effect, be a plan [**16] modification (since under the terms of the plan the estate's claims against Chesapeake were released).

Turning to Chesapeake's motion to dismiss, the bankruptcy court held that dismissal was appropriate because the bondholders did not have the right to assert claims belonging to the estate. In addition, after noting that the bondholders had participated in the bankruptcy proceeding [*583] and benefitted from the estate's release of claims against Chesapeake, the bankruptcy court stated that because the bondholders "represented . . . that Chesapeake would be released from claims based on alleged misconduct that is essentially the same misconduct that" formed the basis for the bondholders' state-court claims against Chesapeake, permitting them to sue Chesapeake "would . . . be allowing [them] to play 'fast and loose' with the court."

The bondholders appealed to the district court, which affirmed without explicitly concluding that the bondholders' claims against Chesapeake were property of the estate. Rather, the district court recognized that the bankruptcy court had "brave[d] the quagmire" of deciding whether the claims were property of the estate, but determined that it "need not reach this [**17] issue because (1) subject-matter jurisdiction was satisfied through [the bondholders'] attempt to subvert the Plan, and (2) the Bankruptcy Court permissibly enforced the Plan's release against [the bondholders] through equitable principles." Specifically, the district court found that the bankruptcy court had subject matter jurisdiction because the bondholders, in suing Chesapeake, "were effectively seeking to have the state court invalidate the Plan's release . . . and settlement" of claims against Chesapeake. It then concluded that estoppel principles barred the bondholders' claims against Chesapeake, reasoning that it

Page 6

522 F.3d 575, *583; 2008 U.S. App. LEXIS 6835, **17;
49 Bankr. Ct. Dec. 210; 173 Oil & Gas Rep. 289

was inconsistent for the bondholders to sue Chesapeake after they had initiated the bankruptcy case, approved the plan and its release of Chesapeake, and "represented to the Bankruptcy Court that they were releasing Chesapeake from its alleged misconduct." The bondholders filed timely notice of appeal.

## II.

"Bankruptcy court rulings and decisions are reviewed by a court of appeals under the same standards employed by the district court hearing the appeal from bankruptcy court; conclusions of law are reviewed *de novo*, findings of fact are reviewed for clear error, and [**18] mixed questions of fact and law are reviewed *de novo*." *Century Indem. Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.), 208 F.3d 498, 504 (5th Cir. 2000)* (citing *Traina v. Whitney Nat'l Bank, 109 F.3d 244, 246 (5th Cir. 1997)*). The bankruptcy court's finding that it had subject matter jurisdiction is a legal determination that we review de novo. *U.S. Brass Corp. v. Travelers Ins. Group (In re U.S. Brass Corp.), 301 F.3d 296, 303 (5th Cir. 2002)*. Whether a specific cause of action belongs to a bankruptcy estate is likewise a matter of law that we decide by reference to the facial allegations in the complaint. *Schertz-Cibolo-Universal City, Indep. School District v. Wright (In re Educators Group Health Trust), 25 F.3d 1281, 1285 (5th Cir. 1994)*.

## III.

The bondholders challenge the bankruptcy court's denial of their motion to remand as well as its dismissal of their claims against Chesapeake. Since the bankruptcy court primarily rested both of these decisions on its determination that the claims against Chesapeake belong to the Seven Seas bankruptcy estate, resolution of this appeal largely turns on the question whether the claims are property of the estate or the bondholders. [**19] If the claims belong to the estate, then it was not error for the bankruptcy court to deny remand (because it has jurisdiction over all property of the estate) and dismiss the claims (because the trustee has exclusive standing to assert claims belonging to the estate).

[*584] **A.**

The filing of a bankruptcy petition creates an estate that is comprised of, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case." *11 U.S.C. § 541(a)(1)*. The phrase "all legal or equitable interests of the debtor in property" has been construed broadly, and includes "rights of action" such as claims based on state or federal law. *See Am. Nat'l Bank of Austin v. MortgageAmerica Corp. (In re MortgageAmerica Corp.), 714 F.2d 1266, 1274 (5th Cir. 1983)*; *In re Educators Group Health Trust, 25 F.3d at 1283*. If a claim belongs to the estate, then the bankruptcy trustee has exclusive standing to assert it. *In re Educators Group Health Trust, 25 F.3d at 1284*. However, the trustee has no right to bring claims that belong solely to the estate's creditors. *See Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 92 S. Ct. 1678, 32 L. Ed. 2d 195 (1972)*.

Whether a particular state-law claim belongs to [**20] the bankruptcy estate depends on whether under applicable state law the debtor could have raised the claim as of the commencement of the case. *In re Educators Group Health Trust, 25 F.3d at 1284* (citing *S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re S.I. Acquisition), 817 F.2d 1142 (5th Cir. 1987)*; *In re MortgageAmerica, 714 F.2d at 1275-77*). As part of this inquiry, we look to the nature of the injury for which relief is sought and consider the relationship between the debtor and the injury. *Id. at 1284-85*; *see In re E.F. Hutton Sw. Props. II, Ltd., 103 B.R. 808, 812 (Bankr. N.D. Tex. 1989)* ("The injury characterization analysis should be considered as an inseparable component of whether an action belongs to the [estate] or [creditor].". "If a cause of action alleges only indirect harm to a creditor (i.e., an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate." *In re Educators Group Health Trust, 25 F.3d at 1284* (citations omitted). "Conversely, if the cause of action does not explicitly or implicitly allege harm to the debtor, then the [**21] cause of action could not have been asserted by the debtor as of the commencement of the case, and thus is not property of the estate." *Id.*

Our decision in *Educators Group Health Trust* illustrates these principles. There, a group of school districts obtained health benefits for their teachers from Educators Group Health Trust ("EGHT"). *Id. at 1283*. When EGHT went bankrupt, the school districts sued the principals of EGHT's third party-administrator on various theories, including mismanagement of EGHT and fraud. *Id.* We held that certain claims relating to the alleged mismanagement, such as claims that the

Page 7

522 F.3d 575, *584; 2008 U.S. App. LEXIS 6835, **21;
49 Bankr. Ct. Dec. 210; 173 Oil & Gas Rep. 289

principals of the third-party administrator negligently managed EGHT or conspired to make it insolvent, were property of the EGHT bankruptcy estate, reasoning that the claims alleged an injury to the school districts that derived from a direct injury to EGHT. *Id.* at 1285. However, we held that other claims, such as fraud, conspiracy to commit fraud, and misrepresentation, belonged solely to the school districts, *id.* at 1286, after explaining that:

> We do agree . . . with the plaintiff school districts' contention that some of the causes of action allege a direct injury to themselves, [**22] which is not derivative of any harm to the debtor. For example, the plaintiff school districts allege . . . that the defendants intentionally misrepresented *to them* the financial situation of EGHT, and that they materially relied on such representations to their detriment. To the extent that this cause of [*585] action and others allege a direct injury to the plaintiff school districts, they belong to the plaintiff school districts and not the estate.

*Id.* at 1285.

**B.**

The bondholders contest the bankruptcy court's determination that the claims are property of the estate by arguing that the claims could not have been brought by Seven Seas prior to the bankruptcy proceeding. They characterize the claims as arising out of a fraud, in which Chesapeake conspired or assisted, involving the reserve estimates. According to the bondholders, Seven Seas could not have brought claims based on the damages that *they* suffered as a result of *their* reliance on the false reserve estimates when *they* invested in the unsecured notes, as Seven Seas simply was not harmed by misrepresentations made to the bondholders to induce them to buy (or refrain from selling) the notes on the secondary market. Chesapeake counters [**23] that the harm complained of by the bondholders is strictly derivative or indirect because the issuance of the secured notes and the alleged conspiracy involving the reserve estimates were acts that contributed to Seven Seas' subsequent lack of assets to repay its creditors. Nothing here is peculiar or personal to the bondholders, Chesapeake contends; instead, the claims as pled are common to all of Seven Seas' unsecured creditors.

As a preliminary matter, we recognize that the bondholders and Chesapeake are linked in a variety of ways to Seven Seas and the bankruptcy proceeding. Both Chesapeake and the bondholders are creditors of Seven Seas, and the bondholders' claims against Chesapeake ultimately arise from the fact that the bondholders invested in the unsecured notes issued by Seven Seas. However, the existence of common parties and shared facts between the bankruptcy and the bondholders' suit does not necessarily mean that the claims asserted by the bondholders are property of the estate. Indeed, as *Educators Group Health Trust* demonstrates, it is entirely possible for a bankruptcy estate and a creditor to own separate claims against a third party arising out of the same general [**24] series of events and broad course of conduct. *See also Feld v. Zale Corp. (In re Zale Corp.), 62 F.3d 746, 753 (5th Cir. 1995)* ("Shared facts between the third-party action and a debtor-creditor conflict do not in and of themselves suffice to make the third-party action 'related to' the bankruptcy [for purposes of finding bankruptcy jurisdiction]."). We turn our focus, then, to the specific claims at issue here.

Having examined the claims asserted by the bondholders against Chesapeake, we warn that it is somewhat difficult to discern the precise theory of recovery they advance. But as we discuss below, whether the claims will ultimately prove to be legally or factually valid is not our concern. The narrow question before us is whether the claims belong to the estate or to the bondholders. Answering this question requires that we apply the principles discussed above--namely, we consider whether under state law Seven Seas could have raised the claims as of the commencement of the bankruptcy, and examine the nature of the injury for which relief is sought.

Taking this latter point first, we think that the claims allege more than an injury that is merely derivative of an injury to Seven [**25] Seas. For example, the conspiracy to defraud claim alleges that Chesapeake "knew that the misrepresentations and/or omissions contained in Ryder Scott's reserve estimates were false or had been made with reckless disregard as to their truth," and that Chesapeake, Hefner, and [*586] Seven Seas "employ[ed] the material misrepresentations and/or omissions . . . in order to induce potential investors and

Page 8

522 F.3d 575, *586; 2008 U.S. App. LEXIS 6835, **25;
49 Bankr. Ct. Dec. 210; 173 Oil & Gas Rep. 289

existing investors in [the unsecured notes] . . . to either acquire interests in . . . or to refrain from selling interests in [the unsecured notes]." If Chesapeake knew that the reserve estimates were false and used them to induce the bondholders to purchase or refrain from selling the unsecured notes, then there was a direct injury to the bondholders that was independent of any injury to Seven Seas. Indeed, we fail to see what direct injury Seven Seas might have suffered on account of the specific wrongdoing that the bondholders complain of here. Although Seven Seas is not named as a defendant, the bondholders' theory is that Seven Seas itself was a wrongdoer, in conjunction with Chesapeake and Hefner. It is thus not surprising that the injury that this claim alleges is not derivative of an [**26] injury to Seven Seas.

Similarly, the bondholders state in their aiding and abetting fraud claim that Chesapeake is "liable for all damages caused by the aforementioned fraudulent schemes because [it] was aware the conduct by Seven Seas constituted a breach of duty and gave substantial assistance or encouragement to [] Seven Seas to continue with the scheme." Presumably the "aforementioned fraudulent schemes" that the bondholders refer to in this claim relate to the publishing of false reserve estimates; elsewhere the bondholders allege that they "relied upon the material misrepresentations and omissions contained in reserve reports for [] Seven Seas," and that their "reliance . . . was the proximate cause of . . . damages." Thus, to the extent that the aiding and abetting fraud claim effectively seeks to hold Chesapeake liable for giving assistance to Seven Seas in publishing false reserve estimates that the bondholders relied on to their detriment, this claim too alleges a direct injury to the bondholders.

We also doubt that, under applicable state law, Seven Seas could have raised either claim as of the commencement of the bankruptcy case. Conspiracy to defraud essentially requires [**27] a showing of a common purpose to defraud, supported by a concerted action. *See Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp., 435 S.W.2d 854, 857 (Tex. 1968)*. "But the gist of a civil conspiracy is the damage resulting from commission of a wrong which injures another, and not the conspiracy itself." *Id. at 856* (citations omitted). Here the underlying wrong is fraud in connection with the purchase of bonds in the secondary market, and Seven Seas would not have been in a position to assert the bondholders' reliance on any alleged misrepresentations, or to claim to have suffered damages on account of such reliance, as would be necessary to state a claim based on the particular fraud that the bondholders complain of. *See Stone v. Lawyers Title Ins. Corp., 554 S.W.2d 183, 185 (Tex. 1977)*. The same is true for the aiding and abetting fraud claim.

We do recognize that the conspiracy to defraud claim contains an allegation that "Chesapeake [], Hefner, and Seven Seas entered into a common plan, scheme or design to defraud investors in the [unsecured notes], including [the bondholders], by issuing and purchasing the [secured notes] . . . in order to decrease the assets available [**28] to investors in the [unsecured notes]." Chesapeake argues that this and similar statements elsewhere in the bondholders' complaint show that any alleged wrongdoing on the part of Chesapeake caused direct injury only to Seven Seas, by impacting its ability to pay its creditors. [6] [*587] We disagree. This argument overlooks the bondholders' inducement allegations, which, as described above, complain of an injury that is not merely derivative of an injury to Seven Seas. [7]

> 6 A form of this argument can also be seen in the bankruptcy court's statement, made in support of its determination that the claims belong to the estate, that "[i]f Chesapeake . . . conspired to create claims with collateral rights senior to other creditors, then the harm is generalized to all creditors."
> 
> 7 Furthermore, although the issuance of the secured notes ultimately impacted all of Seven Seas' unsecured creditors when the company went bankrupt, since substantially all of the company's assets had been tied up as collateral for the benefit of the holders of the secured notes, it does not necessarily follow that the bondholders suffered no direct injury on account of the issuance of the secured notes. In fact, the provision [**29] in the unsecured notes that limited Seven Seas' ability to issue secured debt (by tying the issuance of secured debt in excess of $ 25 million to, among other things, the discounted value of reserves) was meant to protect the holders of the unsecured notes from precisely the scenario that unfolded: the issuance of a large amount of secured debt, relative to the value of the company's assets, that left few if any of those assets uncollateralized.

Page 9

522 F.3d 575, *587; 2008 U.S. App. LEXIS 6835, **29;
49 Bankr. Ct. Dec. 210; 173 Oil & Gas Rep. 289

Seven Seas' other unsecured creditors, such as lessors or suppliers, had no such protection written into their agreements with Seven Seas, so far as we know. Thus, if Chesapeake, Hefner, and Seven Seas conspired to publish overstated reserve estimates in order to get around the unsecured notes' limitation on secured debt, the holders of the unsecured notes, including the bondholders, were harmed by the issuance of the secured notes in a way that other unsecured creditors were not.

In sum, then, we believe that the claims brought by the bondholders allege an injury that is not merely derivative of an injury to Seven Seas, and that Seven Seas could not have asserted the claims as of the commencement of the bankruptcy case. That is not to say, [**30] of course, that Seven Seas might not also have suffered its own direct injury because of some wrongdoing on the part of Chesapeake, or could not have brought any claims against Chesapeake as of the commencement of the case. Indeed, the trustee did bring claims against Chesapeake on behalf of the estate, alleging, among other things, that Chesapeake breached duties that it owed to Seven Seas and interfered with management's duties to Seven Seas. But the bondholders' claims and the estate's claims are not mutually exclusive: there is nothing illogical or contradictory about saying that Chesapeake might have inflicted direct injuries on both the bondholders and Seven Seas during the course of dealings that form the backdrop of both sets of claims. In the present posture of this case we are only dealing with allegations, and we must take them on their face. The claims asserted by the bondholders against Chesapeake allege an injury that is not merely derivative of an injury to Seven Seas, and could not been brought by Seven Seas. We hold that these claims are not property of the Seven Seas bankruptcy estate.

It bears emphasizing that our holding here is a narrow one that in no way passes [**31] on the merits of the claims. It is not our place to consider whether the bondholders' allegations are sufficient to state a cause of action under Texas law, or to speculate as to what set of facts might ultimately be proven in support of recovery. For this reason, several of the objections that Chesapeake raises against the claims--that the claims do not allege that the bondholders had any contractual privity with Chesapeake, or allege that Chesapeake owed the bondholders any legal duties, or explain how Chesapeake might have benefitted when the bondholders acquired interests in the unsecured notes--are largely irrelevant to the narrow issue before us. Simply put, the fact that the bondholders ultimately may be unable to [*588] prevail on the claims does not render the claims property of the estate.

We also wish to dispel any notion that a claim belongs to the estate or is otherwise only assertable by the trustee merely because it could be brought by a number of creditors, instead of just one. Drawing on certain language found in *Schimmelpenninck v. Byrne (In re Schimmelpenninck), 183 F.3d 347 (5th Cir. 1999)*, Chesapeake suggests that the claims in this case allege a "generalized injury" or [**32] raise a "generalized grievance," and that the trustee, rather than the bondholders, is therefore the appropriate party to advance them. In *Schimmelpenninck*, we considered whether a creditor's alter ego and single business enterprise claims against a subsidiary of the debtor were subject to the automatic stay provisions of *section 362 of the Bankruptcy Code*. *Id. at 350*. The *section 362(a)(3)* stay applies to two types of claims: claims that belong to the debtor under applicable state (or federal) law, and claims that seek to recover property of the estate that is controlled by a person or entity other than the debtor. [8] *See In re S.I. Acquisition, 817 F.2d at 1150*. Before considering whether the claims asserted by the creditor in *Schimmelpenninck* fell into the second category of claims subject to the automatic stay, by reason of their seeking to recover property of the estate, we noted that:

> It is in this perspective that the distinction between general and personal claims is both significant and consistent with the Bankruptcy Code. It is axiomatic that a trustee has the right to bring actions that will benefit the estate. Such claims can either be founded on the rights of the debtor [**33] or on the rights of the debtor's creditors. If the right belongs to the debtor's creditors, the distinction between personal and general claims takes on significance: A trustee can assert the general claims of creditors, but is precluded from asserting those creditor claims that are personal. In other words, even if a claim "belongs to" the creditor, the trustee is the proper party to assert the claim, for the benefit of all creditors,

Page 10

522 F.3d 575, *588; 2008 U.S. App. LEXIS 6835, **33;
49 Bankr. Ct. Dec. 210; 173 Oil & Gas Rep. 289

provided the claim advances a generalized grievance.

*In re Schimmelpenninck, 183 F.3d at 359* (footnote omitted).

> 8  We note that Chesapeake does not argue that the bondholders, through their claims against Chesapeake, are improperly seeking to recover property of the estate that is merely under the control of Chesapeake (i.e., that any recovery against Chesapeake will really be a recovery of assets that belong to the estate). Rather, Chesapeake's position is that the claims themselves are property of the estate.

We agree with Judge Posner that labeling certain claims of creditors "personal"--as opposed to "general"--"is not an illuminating usage." *Steinberg v. Buczynski, 40 F.3d 890, 893 (7th Cir. 1994)*. These terms are perhaps best understood as descriptions [**34] to be applied after a claim has been analyzed to determine whether it is properly assertable by the debtor or creditor, and not as a substitute for the analysis itself. As Judge Posner explains:

> The point is simply that the trustee is confined to enforcing entitlements of the [debtor]. He has no right to enforce entitlements of a creditor. He represents the unsecured creditors of the [debtor]; and in that sense when he is suing on behalf of the [debtor] he is really suing on behalf of the creditors of the [debtor]. But there is a difference between a creditor's interests in the claims of the [debtor] against a third party, which are enforced by the trustee, and the creditor's own direct--not derivative--claim against the third party, which only the creditor . . . can enforce.

[*589] *Id.* The discussion of personal and general claims in *Schimmelpenninck* was not meant to work a change to this well-established rule, even when the claims at issue may be brought by a number of creditors instead of just one. Rather, our point was that some claims that are usually brought by creditors outside of bankruptcy (and thus in a sense may be said to "belong to" the creditors and not the debtor) are nonetheless [**35] vested exclusively in the trustee in bankruptcy. This is so not merely because the claims are common to a number of creditors, but because they ultimately seek to recover assets of the estate that are not under the debtor's control--by reason of a fraudulent transfer, [9] for instance, or because of the existence of separate corporate entities that are a sham. This much is made clear by our subsequent explanation that "[a]s not all claims necessarily 'belong to' the debtor--because either by statute or common law the debtor is precluded from asserting the action--another mechanism must exist to prevent individual creditors from annexing assets of the estate to gain an advantage." *In re Schimmelpenninck, 183 F.3d at 360*. It is "[a]ctions by individual creditors asserting a generalized injury *to the debtor's estate*, which ultimately affects all creditors[,]" that can be said to raise a "generalized grievance," not actions by creditors that are merely common to a number of them. *Id. at 360* (emphasis added).

> 9  A typical fraudulent transfer claim is perhaps the paradigmatic example of a claim that is "general" to all creditors in *Schimmelpenninck*'s sense of that term. It is normally the debtor's [**36] creditors, and not the debtor itself, that have the right to assert a fraudulent transfer claim outside of bankruptcy, but in bankruptcy such a claim is usually brought by the trustee, for the benefit of all creditors. This is because the claim is really seeking to recover property of the estate. *See In re MortgageAmerica, 714 F.2d at 1272*.

### C.

Our conclusion that the claims brought by the bondholders are not property of the Seven Seas bankruptcy estate requires that the claims be remanded to state court for lack of jurisdiction unless we can identify some other basis for bankruptcy jurisdiction. As noted previously, the district court affirmed the denial of remand and dismissal of the claims but did not reach the issue of whether the claims belonged to the estate or the bondholders. It thus provided alternate grounds for those two decisions. First, it concluded that "subject matter jurisdiction was satisfied through [the bondholders'] attempt to subvert the Plan." It then determined that equitable principles barred the bondholders' claims against Chesapeake, based on aspects of the bondholders' participation in the Seven Seas bankruptcy proceeding.

After a plan is confirmed, the bankruptcy [**37]

Page 11

522 F.3d 575, *589; 2008 U.S. App. LEXIS 6835, **37;
49 Bankr. Ct. Dec. 210; 173 Oil & Gas Rep. 289

court's jurisdiction is limited to matters pertaining to the implementation or execution of the plan. *Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.), 266 F.3d 388, 390 (5th Cir. 2001)*. This jurisdiction extends to matters that "impact compliance with or completion of the reorganization plan." *In re U.S. Brass Corp., 301 F.3d at 305*. The district court was thus correct in assuming that bankruptcy jurisdiction would exist over any claims that attempt to "subvert" a confirmed plan.

Nonetheless, we cannot accept the district court's conclusion that the bondholders, in suing Chesapeake, "were effectively seeking to have the state court invalidate the Plan's release . . . and settlement" of claims against Chesapeake. The plan only purports to release claims against Chesapeake that are held by the estate. It does not release claims against Chesapeake that are held by third parties. [*590] Indeed, it could not be otherwise. "'While it is true that the bankruptcy court's confirmation of the plan binds the debtor and all creditors vis-a-vis the debtor, it does not follow that a discharge in bankruptcy alters the right of a creditor to collect from third parties.'" *In re Zale Corp., 62 F.3d at 760 n.44* [**38] (quoting *First Fidelity Bank v. McAteer, 985 F.2d 114, 118 (3d Cir. 1993))*. *Section 524 of the Bankruptcy Code* limits the scope of a discharge in bankruptcy by providing that "discharge of any debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." *11 U.S.C. § 524(e)*. This section "prohibits the discharge of debts of nondebtors." *In re Zale Corp., 62 F.3d at 760* (citations omitted). Since the plan only releases the estate's claims against Chesapeake (as that was all it could release), the bondholders' pursuit of their own claims against Chesapeake cannot be characterized as an attempt to invalidate the release contained in the plan, and jurisdiction is not available on this basis.

Furthermore, the estoppel principles discussed by the district court are insufficient to either confer jurisdiction on the bankruptcy court or justify dismissal of the bondholders' claims. The district court reasoned that it was inconsistent for the bondholders to sue Chesapeake after they had initiated the bankruptcy case, approved the plan and its release of Chesapeake, and "represented to the Bankruptcy Court that they were releasing [**39] Chesapeake from its alleged misconduct." Chesapeake makes similar points in its brief. First of all, we have come across no indication that the bondholders ever represented that they intended to release *their* claims against Chesapeake. That the bondholders' claims and the estate's claims may have arose out of the same series of events does not link them in such a way that the release of one set of claims acts as a release of the other.

More importantly, we disagree with the broader contention that, given the bondholders' involvement in the bankruptcy proceeding, it would somehow be inequitable to allow them to sue Chesapeake. In fact, we think just the opposite: it would be inequitable to penalize creditors for their active participation in a bankruptcy proceeding by precluding them from asserting claims that they hold against a party that also has some liability to the estate. The bondholders served on the creditors committee and approved the plan's release of claims against Chesapeake. We may even assume that they led the charge in calling for the commencement of an adversary proceeding against Chesapeake; after all, as unsecured creditors they stood to benefit if the estate obtained [**40] any recovery against Chesapeake or otherwise subordinated Chesapeake's claims as a secured creditor. But these actions are not inconsistent with the bondholders' pursuit of their own claims against Chesapeake. As unsecured creditors the bondholders were entitled to push for actions that would benefit the estate and remedy damages it suffered. They were also entitled to assert their own claims against a third party based on discrete wrongs that caused direct damages to them. We see nothing in equity that would justify a contrary result.

**IV.**

For the foregoing reasons, we VACATE the orders of the bankruptcy court denying remand and dismissing the bondholders' claims, and REMAND this case to the bankruptcy court with instructions that it be remanded to state court. Costs shall be borne by Chesapeake.