1
**DIAMOND MCCARTHY LLP**
Stephen T. Loden, Esq. *(pro hac vice)*
2
Andrew B. Ryan, Esq. *(pro hac vice)*
909 Fannin, 15th Floor
3
Houston, TX 77010
Telephone: 713-333-5100
4
Facsimile: 713-333-5199
sloden@diamondmccarthy.com
5
aryan@diamondmccarthy.com
*Counsel for Allan B. Diamond,*
6
*Chapter 11 Trustee for Howrey LLP*
7
8
**KORNFIELD, NYBERG, BENDES & KUHNER, P.C.**
Eric A. Nyberg, Esq. (Bar No. 131105)
9
Chris D. Kuhner, Esq. (Bar No. 173291)
1970 Broadway, Suite 225
10
Oakland, CA 94612
Telephone: 510-763-1000
11
Facsimile: 510-273-8669
e.nyberg@kornfieldlaw.com
12
c.kuhner@kornfieldlaw.com
*Local Counsel for Allan B. Diamond,*
13
*Chapter 11 Trustee for Howrey LLP*

14
UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
15
SAN FRANCISCO DIVISION

16

| | |
|---|---|
| In re | Case No. 11-31376 DM |
| | Chapter 11 |
| HOWREY LLP, | |
| Debtor. | |
| | |
| ALLAN B. DIAMOND, Chapter 11 Trustee for Howrey LLP | |
| | Adv. Proc. No. 13-_____ |
| Plaintiff, | |
| | |
| v. | **ORIGINAL COMPLAINT** |
| | |
| JULIE GABLER, JEFFREY JUDD, and RICHARD WILLOUGHBY | |
| | |
| Defendants. | |

17
18
19
20
21
22
23
24
25
26

Plaintiff, Allan B. Diamond, chapter 11 trustee (the "Trustee") for the estate of Howrey LLP ("Howrey" or the "Debtor"), brings this adversary proceeding against Julie Gabler, Jeffrey Judd, and Richard Willoughby (the "Individual Defendants" or "Gabler," "Judd," and "Willoughby") and alleges as follows:

## INTRODUCTION

1.     The Trustee files this lawsuit to recover distributions of substantial sums of money to the Individual Defendants while Howrey was insolvent, and/or in violation of Howrey's partnership agreement.  Howrey was insolvent by no later than the end of June 2010 ("Second Quarter of 2010") and remained insolvent throughout its dissolution and bankruptcy. Despite its insolvency, Howrey transferred tens of millions of dollars as "distributions" to former Howrey partners – including the Individual Defendants.  These transfers violated Howrey's partnership agreement, and were made for no consideration or less than reasonably equivalent value to Howrey.  The Trustee is therefore entitled to recover payments made to, or on behalf of the Individual Defendants, totaling approximately $596,183.

## PARTIES

2.     Plaintiff is the chapter 11 trustee for Howrey.  On September 22, 2011, this Court entered an order granting a motion to appoint a chapter 11 trustee.  On October 7, 2011, the U.S. Trustee for the Northern District of California appointed the Trustee as chapter 11 trustee for Howrey.  On October 12, 2011, this Court entered an order approving the appointment of the Trustee.  Pursuant to Sections 1104, 1106, 1108 and other relevant provisions of the Bankruptcy Code, the Trustee is administering the Debtor's estate and liquidating its assets for the benefit of creditors.

2

3. Defendant Gabler is an individual who may be served with process by any manner of service authorized by Rule 7004 of the Federal Rules of Bankruptcy Procedure. Gabler was formerly a Level I Partner in Howrey's Brussels office and signed Howrey's Partnership Agreement (as defined below). Gabler dissociated from Howrey on or about March 15, 2011.

4. Defendant Judd is an individual who may be served with process by any manner of service authorized by Rule 7004 of the Federal Rules of Bankruptcy Procedure. Judd was formerly a Level II Partner in Howrey's San Francisco office and signed Howrey's Partnership Agreement (as defined below). Judd dissociated from Howrey on or about December 31, 2009.

5. Defendant Willoughby is an individual who may be served with process by any manner of service authorized by Rule 7004 of the Federal Rules of Bankruptcy Procedure. Willoughby was formerly a Level II Partner in Howrey's London office and signed Howrey's Partnership Agreement (as defined below). Willoughby dissociated from Howrey on or about April 30, 2010.

## JURISDICTION & VENUE

6. This adversary proceeding is commenced pursuant to sections 541 through 550 of the Bankruptcy Code and in accordance with Rule 7001 of the Federal Rules of Bankruptcy Procedure.

7. This Court has subject matter jurisdiction over this action pursuant to section 1334(b) of Title 28 of the United States Code, in that this adversary proceeding arises in, arises under, and/or relates to Howrey's chapter 11 case.

8. This adversary proceeding is a core proceeding under section 157(b)(2) of Title 28 of the United States Code, such that this Court has jurisdiction to hear and determine this

Case: 11-31376   Doc# 1459   Filed: 09/09/13   Entered: 09/09/13 10:48:52   Page 3 of 31

proceeding and to enter an appropriate order and judgment. To the extent necessary, the Trustee consents to entry of a final order or judgment by this Court.

9.      This Court is the proper venue for this adversary proceeding pursuant to section 1409(a) of Title 28 of the United States Code because the Debtor's chapter 11 case is pending in this judicial district.

## FACTUAL BACKGROUND

**A. Howrey's Formation, Structure, and Governing Law.**

10.     **Formation**.  In July 1956, four antitrust attorneys formed Howrey, Simon, Baker & Murchison ("Howrey Simon"). Decades later, in 2000, Howrey Simon merged with Arnold, White & Durkee Corporation, an intellectual property law firm. The combined law firm became Howrey LLP or, as referred to here, Howrey.

11.     **Structure**.  Howrey was governed by the Partnership Agreement of Howrey Simon Arnold & White LLP, effective January 31, 2000 (the "Partnership Agreement"). The Partnership Agreement provided, among other things, that Howrey initially would have two classes of partners: Level II Partners and Level I Partners.

12.     **Level II Partners.**  Howrey required its Level II Partners to contribute to the firm's permanent capital and maintain capital accounts. Level II Partners had voting rights with respect to all matters submitted to the partnership for a vote, including the exclusive right to vote on amendments to the Partnership Agreement.

13.     Howrey was supposed to distribute profits to the Level II Partners according to their percentage interest in the partnership's profits. Each Level II Partner's compensation was to be calculated, on a cash basis, as a percentage of Howrey's distributable net income.

4

14.     During each calendar year, Level II Partners received advances against their share of Howrey's anticipated profits.  These advances were not guaranteed; instead, the Level II Partners agreed to return to Howrey any advances made during each calendar year that exceeded the partner's share of the firm's actual profits.

15.     Specifically, Paragraph 9.2 of the Partnership Agreement states, in relevant part:

> Such Draws are not salaries or any other form of guaranteed compensation, and are ***at all times subject to reconciliation with a partner's actual share of Partnership profits*** during the time such partner is a partner of the Firm.  In the event a partner ceases to be a partner for any reason, and such partner's draws within a calendar year exceed his/her share of actual cash basis Partnership profits for the period of time he/she was a partner in such year, such excess draws will be a ***debt owed to the Firm*** and ***personally guaranteed*** by such partner.

*See* Partnership Agreement at ¶ 9.2 (emphasis supplied).

16.     **Level I Partners**.  Howrey's Level I Partners shared many of the same characteristics as Level II Partners.  Level I Partners attended Howrey's partnership meetings and had limited voting rights, including the right to vote on Howrey's dissolution.

17.     Regardless of a partner's level or category, all Howrey partners were compensated from Howrey's profits.  And Howrey specifically was to compensate Level I Partners from the firm's profits in at least four specific ways.

18.     <u>First</u>, each calendar year, Howrey provided Level I Partners with an estimate of their annual base compensation.  Upon information and belief, Howrey withheld 15% of the Level I Partners' annual base compensation during each calendar year from 2009 until 2011.  If there were not sufficient profits to pay all or part of the withheld 15% to the Level I Partners, those partners would not receive their entire annual base compensation.

5

19. <u>Second,</u> Howrey could (and did) require Level I Partners to return distributions received during calendar years when Howrey had insufficient profits to pay Level I Partners even 85% of their annual base compensation.

20. <u>Third,</u> Howrey's Level I partners were eligible for baseline profit sharing compensation if Howrey reached its performance goals, and higher profit sharing if the firm exceeded its performance goals by 10% or more.

21. <u>Fourth,</u> Level I Partners shared in Howrey's profits through discretionary bonuses. Level I bonuses were based on "Firm Performance" and paid from a bonus pool established from Howrey's annual partnership profits.

22. In addition to compensation-based profit sharing, Howrey also distributed firm profits to Level I Partners based on capital each contributed to the firm. Howrey demanded capital contributions from Level I Partners because they were already sharing in Howrey's profits, and should be obligated to contribute to its capital.

23. On or about April 8, 2009, Howrey's Executive Committee required each Level I Partner to make a capital contribution to Howrey equal to ten percent (10%) of their annual base compensation. In return for this capital contribution, Level I Partners were entitled to a distribution of Howrey's annual profits, based upon the amount of their capital contribution and Howrey's annual performance.

24. In addition to their voting rights and profit sharing, Level I Partners also held themselves out to the public as Howrey partners. Many Level I Partners signed engagement agreements with Howrey clients. All Level I Partners identified themselves as Howrey partners on the firm's website (without any differentiation made between Level I and Level II status), and many had their promotions to Level I Partner announced via press releases or news stories. In

6

fact, many Level I Partners still claim their status as a former "partner" of Howrey on the websites of their current law firm.

25. **Fixed or Contract Partners**. Like Level II and Level I partners, fixed or contract partners were also compensated from Howrey's profits. Like Level I partners, fixed or contract partners were also entitled to bonus payments derived from a pool of profits created for their compensation.

26. Moreover, Fixed or Contract partners were also issued Schedule K-1's prepared by Howrey's accountants at Salter & Company L.L.C., and were described internally and by the firm's audit as "partial equity partners" or "fixed equity partners." Schedule K-1's issued to Fixed or Contract partners listed their share of Howrey's profits or losses.

27. Regardless of level or location, Paragraph 13.9 of the Partnership Agreement contains three key provisions to which all partner signatories were bound. First, Howrey's clients were clients of the partnership – not of any individual partner. Second, withdrawing or dissociating partners could not solicit Howrey's clients before their departure from the firm. Third, "all partners . . . ha[d] a fiduciary duty to assist the Firm in preserving and protecting all aspects of its business, and no partner . . . shall act in any way contrary to the interests of the Firm in this or in any other regard." See Partnership Agreement at ¶ 13.9 (emphasis supplied).

28. **Governing Law**. Because Howrey was "qualif[ied] and operate[d] as a Limited Liability Partnership under the District of Columbia Uniform Partnership Act of 1996, as amended" (*see id.* at ¶¶ 1.1-1.2), Howrey's partners (hereinafter "Former Howrey Partners") were governed by District of Columbia law with respect to their partnership obligations to each other and to Howrey.

29. Specifically, Paragraph 23 of the Partnership Agreement originally stated:

7

> Subject to the terms, conditions and provisions of this Agreement, the undersigned parties agree to continue their Partnership in accordance with the laws of the District of Columbia, and this Agreement shall be governed by and construed in accordance with the laws of the District of Columbia.

*See id*. at ¶ 23.

30.    Howrey did attempt to change its applicable law from the District of Columbia to New York through a March 16, 2002, amendment to the Partnership Agreement ("Amendment 1"). From March 16, 2002, to March 9, 2011, Amendment 1 purported to modify Paragraph 23 of the Partnership Agreement to read:

> ***[E]xcept as restricted by the laws of the District of Columbia applicable to a partnership formed under the laws of the District of Columbia*** which has the status of a limited liability partnership under such laws, this Agreement shall be governed by and construed in accordance with the laws of the State of New York and the laws of the State of New York shall govern relations among the partners and between the partners and the partnership.

*See id*. at Amendment No. 1 (emphasis supplied).

31.    Amendment 1 was void under District of Columbia law. Specifically, Section 33-101.03(b)(9) of the District of Columbia Official Code provides that a partnership agreement may not vary the law applicable to a limited liability partnership. The Comments to the 1997 Uniform Partnership Act ("Revised Uniform Partnership Act" or "RUPA") further confirm the meaning of Section 33-101-03(b)(9): "[s]ubsection (b)(9) makes clear that a limited liability partnership may not designate the law of a State other than the State where it filed its statement of qualification to govern its internal affairs and the liability of its partners." *See* RUPA, § 103 (Comments). Amendment 1 to the Partnership Agreement was therefore void and New York law never applied to Howrey.

32.    When Howrey amended its Partnership Agreement for the final time on March 9, 2011 ("Amendment 3"), it reinstated the application of "the laws of the District of Columbia" to

Case: 11-31376    Doc# 1459    Filed: 09/09/13    Entered: 09/09/13 10:48:52    Page 8 of 31

"relations among the partners and between the partners and the Partnership." *See id*. at Amendment 3.

33. From 2000 until the firm's dissolution in 2011, Howrey was governed by Title 33 of the District of Columbia Official Code as applied to limited liability partnerships ("Title 33"). Title 33 is very similar, if not identical, to RUPA.

**B. Howrey Goes From Boom to Bankruptcy in Less than Three Years.**

34. In January 2011, Howrey hit a financial wall, but the financial downfall of Howrey was inevitable by the Second Quarter of 2010 at the latest. From 2008 until 2011, Howrey increased its borrowing from Citibank in an effort to meet the cost of its rapid expansion and to plug financial holes caused by the firm's declining hourly revenue and collections. With insufficient hourly cases, Howrey began to rely even more on contingent fee cases in the hopes that a significant contingency recovery would save the firm.

35. By the Second Quarter of 2010, however, Howrey's management – if not the Former Howrey Partners – knew or should have known that the firm could not be saved. From 2008 and through dissolution in 2011, Howrey suffered from three fundamental (and ultimately insurmountable) financial problems.

36. First, Howrey faced plummeting demand for its legal services. As the global economy entered a lingering recession in 2008, Howrey faced consistently decreasing demand for hourly fee work. But even when Howrey found hourly work, the firm all too often would be forced to "write off" time spent working on the client's matter (under policies described as "unregulated"), which limited the firm's ability to collect on book entries it depended on to meet its budget and financial obligations.

9

37. <u>Second</u>, Howrey filled the gap in hourly fee work by dedicating more attorney time to contingent fee cases. Rather than adjust attorney staffing to meet demand and reduce expenses, Howrey simply shifted attorneys to its growing stable of contingent fee cases. But this move did not generate revenue because Howrey's contingency fee cases were either expensive failures or long-term investments with no hope of realizing cash recoveries in time to save the firm from its disastrous financial condition.

38. <u>Third</u>, many of Howrey's clients were not paying their bills. Much of Howrey's accounts receivable ("<u>A/R</u>"), while touted as exceeding $100 million, was never collected. Internally, Howrey partners referred to this A/R as inflated, uncollectible bad debts, or just plain "crap."

39. These three structural economic problems were exacerbated by an increasing number of partner departures. After Howrey's management revealed that Howrey missed budget projections by approximately 35% in 2009, Howrey began to lose partners and, when partners left, so did cash – in the form of lost revenue, lost clients, and return of capital. Instead of reducing partner distributions to reflect Howrey's true financial condition, Howrey paid the Former Howrey Partners over $45 million in distributions in the Second Quarter of 2010 and more than $58 million over the next three quarters. Combined with the structural economic problems plaguing Howrey's business, these excessive partner distributions were made at a time that Howrey was insolvent or had unreasonably small capital. With increased borrowing used to fuel the firm and pay the partners, Howrey was on the road to financial collapse.

      1. <u>Howrey's Fixed Costs Create a Constant Need for Huge Cash Flow.</u>

40. Although historical profitability allowed Howrey to grow aggressively, it left the firm with substantial – and fixed – overhead. Rather than keep significant cash reserves to cover

Case: 11-31376    Doc# 1459    Filed: 09/09/13    Entered: 09/09/13 10:48:52    Page 10 of 31

this overhead in the event of a disruption to its cash flow, Howrey distributed all (or virtually all) of its available cash to the Former Howrey Partners. As a result, Howrey theoretically could fund its operations in one of two ways – generate sufficient cash revenues from its operations each month, or take on additional debt. From 2008 until its dissolution in 2011, Howrey took on more and more debt as its inability to fund its operations through revenue increased. And by the Second Quarter of 2010, it was reasonably foreseeable that Howrey was doomed to have unreasonably small capital, be unable to pay its debts as they would become due, and thus fail. Howrey's increasing debt, combined with its ever-decreasing cash flow, put Howrey into a death spiral.

41. For almost a decade prior to its bankruptcy, Howrey relied heavily on borrowing tens of millions of dollars from Citibank. Howrey's borrowing from Citibank took many forms, including lines of credit, term loans, and letters of credit (collectively, the "Citibank Debt").

42. Howrey's increased borrowing was driven by the cost of high, fixed overhead that outpaced its revenue. While most firms had de-leveraged during 2008 and 2009, Howrey had not engaged in serious cost-cutting measures. According to an internal study provided by Citibank, Howrey's overhead and expense situation worsened in 2009 in three key ways.

43. First, Howrey's overhead expenses as a share of overall revenue increased by 18%. Second, Howrey increased its number of equity partners, even as much of the legal industry – with an eye toward profit – eliminated or reduced similar partnership positions. Third, Howrey used increased capital contributions to fund overhead or expansion, whereas many of Howrey's peer firms used similar capital payments to decrease debt obligations.

44. Starting in the Spring of 2009, Howrey began a cycle of defaulting and then restructuring the Citibank Debt that would continue until the firm's dissolution. By May 2009,

Case: 11-31376   Doc# 1459   Filed: 09/09/13   Entered: 09/09/13 10:48:52   Page 11 of 31

Howrey had breached certain loan covenants due to the firm's excessive borrowing in relation to its A/R and work in progress. Specifically, Howrey borrowed $23 million on the Citibank Debt, only to disclose to the bank that it had insufficient work-in-progress and A/R to justify its borrowing.

45. Howrey remained in default on the Citibank Debt for months as it renegotiated the terms of its loan and secured a waiver of its then-existing defaults. In the Fall of 2009, Howrey was able to get out of default of the Citibank Debt by renegotiating the terms of its debt to relax its borrowing base requirements. Whereas Howrey historically had borrowed against A/R aged 90-days or less, the Fall 2009 refinancing permitted Howrey to borrow against A/R aged up to 120 days. As a result, Howrey became even more dependent on strong collections in order to repay debt incurred on aged A/R.

46. Howrey did not remain in compliance with the terms of its renegotiated Citibank Debt for long. By January 2010, Mr. Hennessy, Howrey's CFO, had begun comparing Howrey's financial troubles to those of failed firms. At the same time, Howrey's chairman and managing partner, Robert Ruyak ("Howrey's Chairman"), was concerned that Citibank would cut-off Howrey's use of the Citibank Debt, especially when the firm's cash flow position would worsen in April and May 2010.

47. Howrey's Chairman was correct to predict problems with Citibank in the Spring of 2010. In April 2010, Howrey once again ran out of room on its line of credit by breaching a borrowing base covenant on the Citibank Debt. That is, even under the lax borrowing base standards negotiated after the Spring 2009 default, Howrey did not have sufficient A/R or work in progress to justify the huge sums it was borrowing to fund operations and partner draws.

Case: 11-31376    Doc# 1459    Filed: 09/09/13    Entered: 09/09/13 10:48:52    Page 12 of 31

48.     Like 2009, Howrey remained in breach of its covenants under the Citibank Debt as it worked to complete the renegotiated loan terms and obtain yet another waiver of then-existing defaults.  Again, Howrey renegotiated the terms of the Citibank Debt so that Howrey could borrow greater amounts on older A/R and on work in progress, becoming even more dependent on strong demand for its services and collection of stale accounts.  Howrey also obtained a separate $10 million line of credit on its contingent fee cases.

49.     In approximately October 2010, after yet again breaching borrowing base, Howrey and Citibank entered into further negotiations resulting in the completion of a restructuring of the Citibank Debt.  Howrey knew – or should have known – that its deteriorating financial condition would once again prevent the firm from complying with the loan covenants on its newly restructured Citibank Debt.

50.     Within approximately thirty days, Howrey breached its borrowing base requirements, and completely exhausted the $10 million line of credit for the contingent fee cases.  In December 2010, Howrey had to approach Citibank for another round of refinancing or else the firm would collapse.  In Mr. Hennessy's words, this final round of refinancing kept Howrey on life support.

51.     Even the December 2010 refinancing of the Citibank Debt did little to improve Howrey's chances of survival.  Howrey simply converted a portion of the Citibank Debt that was on Howrey's line of credit into a term loan.  This was simply reshuffling deck chairs on the Titanic.  As explained in detail below, Howrey's financial condition was so structurally unsound that it had long passed the point where the firm would survive.

13

2. <u>Weakening Demand and Increasing Write-Offs Reduce Howrey's Hourly Collections.</u>

52.     Because demand for Howrey's hourly services did not match its substantial overhead, Howrey's partners had a terrible 2009.  Although Howrey projected it would have profits per partner of $980,000 in 2009, the firm's actual profits per partner were $646,000 – nearly 35% less than the Level II Partners expected.

53.     A significant contributor to Howrey's poor 2009 performance results was weakening demand for its hourly services.  Weakening demand for Howrey's hourly services had two dramatic effects on the firm's financial health.

54.     <u>First</u>, Howrey's expenses remained high as the firm retained attorneys who simply could not bill enough to justify their employment.  Members of Howrey's Executive Committee and their financial staff discussed how low attorney hours were on an annualized basis, and even those hours were "pretty useless" for predicting hourly revenue because the hours were "stuffed full of contingent work."

55.     Howrey's flagship antitrust practice, for example, saw a staggering 22% decline in hourly work in 2009 compared to 2008.  Another segment of the firm's practice saw an astounding 95% drop from $20 million in hourly business to approximately $1 million between 2009 and 2010.

56.     The decline in billable hours at Howrey was further exacerbated by a significant increase in write-offs.  In March 2010, Mr. Hennessy sent a memorandum to all partners announcing a new and more restrictive write-offs policy.  In explaining the policy to one partner, Mr. Hennessy explained:

> The driver behind the policy change is the ***significant increase*** in 2009 for unbilled time write offs. . . This is ***only one change*** meant to ***tighten controls*** across the Firm . . . [G]iven the 2009 decline in

Case: 11-31376    Doc# 1459    Filed: 09/09/13    Entered: 09/09/13 10:48:52    Page 14 of 31

realization and it's [sic] ***impact on Firm profitability***, we need to give the realization issue priority.

(emphasis supplied).

57.     Second, weakening hourly demand distorted Howrey's financial picture.  Howrey had historically judged billable demand by multiplying hours billed by the firm's preferred rates.  During 2009 and 2010, Howrey was not selling its time at preferred rates, resulting in a discrepancy between projected revenue and actual revenue.  In the words of one Executive Committee Member, "[i]t is like a seller o[f] cars calculating its sales based on the manufacturers price rather than the price at which the cars are sold."  As a result, Howrey's demand number was "inflate[d]" and "encourage[d] people to believe [Howrey is] doing better than we are."

58.     By the Spring of 2010, Howrey knew the demand for its services had fallen sharply as contrasted to 2009 and the pre-financial collapse revenues upon which its practice was built.  With billings and collections lower for the start of 2010 than in 2009, Howrey was funding its shortfalls with more debt.  As Howrey's Chairman commented to one of the firm's management consultants, "Business is still flat. . . it is hard to give anyone positive signs at this point."

59.     By the end of May 2010, Howrey's financial reporting revealed that demand was flat, bills were aging, and collections were down.

60.     In June 2010, Howrey management disclosed to the Level II Partners that they had no reportable income for the first two quarters of 2010 because although Howrey had net income in the first quarter, it was insufficient to cover non-equity partner compensation.  Put another way, Howrey was not bringing in enough money to cover its overhead, much less declare a profit.  And, of course, the shortfalls were funded with debt.

61.     Howrey management knew that the situation was worsening.  Indeed, Howrey management projected that the weak demand for hourly services would yield an average of just 1400 attorney hours in 2010.  The situation was even worse than these numbers revealed, however, because a greater percentage of the record-low attorney hours were attributed to contingency cases that were only generating expenses, not recoveries.

   3.   Howrey's Increasing Reliance on Contingency Fee Cases Worsens Its Financial Position Without a Reasonable Prospect of Short-Term Recoveries.

62.     As demand for Howrey's hourly services dropped, the firm more than doubled the amount of attorney time it invested in contingency fee cases.  Historically, Howrey only spent approximately 3 to 4% of its total attorney hours on contingency fee cases.  By 2009, contingency fee cases accounted for over 8% of all attorney hours worked at Howrey, and grew to 11% in 2010.

63.     By February 2010, Howrey's management knew that the increasing investment in contingent fee cases was a "specific area" of the firm's finances that needed to be watched.  According to documents prepared for Howrey's annual partner retreat, Howrey's management knew that it "would put the firm at risk" and "mortgage the future" to "borrow to meet the gap" between hourly revenue and contingent fee matters.  But that is exactly what Howrey's management did – and all without the short-term promise of a significant contingency fee recovery.

64.     Howrey was not investing in simple contingent fee cases.  Instead, Howrey routinely invested in contingency cases that would require years of litigation (and retention of pricey experts at Howrey's expense) in complex class action lawsuits, cases against the United States government, patent lawsuits, and antitrust matters.  Given the complexity and expenses involved, Howrey management and the Former Howrey Partners knew or should have known

16

that these contingent fee cases would not – and could not – pay off quickly, if they ever paid off at all.

65.     Due to the long life cycle of contingency fee cases (and Howrey's court losses on certain cases), Howrey did not generate substantial revenue on contingency fee cases in either 2009 or 2010.   For example, Howrey dedicated over 8% of the firm's attorney hours toward contingent fee cases in 2009, but only recovered $2 million—or barely one-half of one percent of its annual operating expense.

66.     As early as May 2009, Howrey's CFO was worried that Howrey would exhaust its borrowing capabilities under the Citibank Debt before its contingency fee investments generated a return.   Mr. Hennessy's concerns were well-founded, and shared by others at the firm.

67.     Howrey's contingency fee investments were simply not generating revenue.  By April 2010, partners were reporting to Howrey's management that the "contingency effect" was creating "problem[s]" for individual partners.  As one partner noted: "More importantly . . . this feels to me like the straw that could break the back of the firm."

68.     By May 31, 2010, Howrey had a "deferred investment" of more than $80.7 million in contingency cases, with no significant, immediate return on that investment on the horizon.   Around this time, Howrey's Chairman – in response to partner complaints of "increasing frustration with the performance of the contingency portfolio" – admitted that the "timing and success" of the contingent fee cases "cannot be predicted," and expressed concern that the Former Howrey Partners were "looking too much to them for salvation . . . people are now getting to[o] dependent on some good news on that front."

Case: 11-31376   Doc# 1459   Filed: 09/09/13   Entered: 09/09/13 10:48:52   Page 17 of 31

69.     By Second Quarter of 2010, there was little – if any – good news on the contingency fee front.  Indeed, Howrey would lose several of its contingency cases entirely.

70.     For example, Howrey invested over $30 million in a case known as Hispanic Farmers, a class action against the United States government.  Howrey filed the Hispanic Farmers case in 2000, but the trial court denied Howrey's first motion for class certification in 2002 and the renewed motion in 2004.  In 2006, six expensive years after Howrey filed the Hispanic Farmers suit, a federal appellate court affirmed the trial court's denial of class certification.  Without a certified class, the likelihood of any significant cash recovery on the Hispanic Farmers case was substantially less than 50%.  To date, Howrey has not recovered any money from the Hispanic Farmers case.

71.     Howrey invested $12 million more in a case known as the National Guard case, another class action suit against the U.S. Government.  By the Second Quarter of 2010, the U.S. Government had moved for summary judgment, and in August 2010, Howrey's case was dismissed when the federal district court granted the U.S. Government's motion.  An appellate court affirmed summary judgment in favor of the U.S. Government and against Howrey's clients.  To date, Howrey has not recovered any money from the National Guard case.

72.     Howrey's management knew or should have known that recovery on two other antitrust class actions – known as Southeast Milk and Northeast Milk – was not likely in 2010 or 2011.  Although Howrey filed Southeast Milk in 2008, the class of plaintiffs was not certified until September 2010, and the certification ruling was under review until April 2011.  The earliest settlement in Southeast Milk was signed on July 12, 2011 – four months after Howrey's bankruptcy.

Case: 11-31376    Doc# 1459    Filed: 09/09/13    Entered: 09/09/13 10:48:52    Page 18 of 31

73.     Similarly, Northeast Milk was not filed until October 2009, and Howrey did not enter an appearance in the case until March 2010. Although part of Northeast Milk settled in December 2010, Howrey had no reasonable expectation of receiving that money quickly, as the court had to approve the settlement, hold various hearings, and approve an award of attorneys' fees to the plaintiffs' lawyers.

74.     Thus, by the Second Quarter of 2010, Howrey had no genuine or realistic expectation of significant contingent fee recoveries to offset the weakening demand for hourly services. Its final hope was to collect a significant sum of its diminishing A/R which was not likely (if even possible) given the poor quality of its receivables.

4.     Howrey's A/R was Stale and Uncollectable.

75.     With weak hourly demand and non-paying contingency fee cases, Howrey scrambled to squeeze revenue from its A/R. But Howrey's repeated efforts to collect A/R proved difficult and, in many cases, impossible. As a result, Howrey's collection efforts fell far short of the firm's internal budget.

76.     On or about December 10, 2009, Howrey's Chairman sent an email to all Howrey partners informing them that the firm had $189 million in A/R, but that the firm needed to collect $105 million from clients in two weeks to reach certain budget goals. But Howrey collected just $50 million – less than half of the amount needed to make budget.

77.     The start of 2010 revealed more problems in collecting A/R from clients. Although Howrey touted its A/R as often exceeding $100 million, much of the A/R was stale and aged. In early 2010, Howrey partners began to discuss a "call to arms" to collect on the invoices before Second Quarter of 2010. As part of this call to arms, Howrey's Cash Flow Committee had established by February 2010 a "Hall of Shame" for partners whose A/R was "both over 120

19

days outstanding and over $150,000.00." Initially, there were 35 partners on Howrey's Hall of Shame with A/R in excess of $15.5 million. As discussed below, membership in the Hall of Shame would grow throughout 2010.

78. The call to arms to collect Howrey's A/R did not result in substantial cash for the firm – but instead revealed that many clients had multi-million dollar invoices that were past due for more than one year. It also revealed other clients with six-figure invoices who were in jail, had frozen bank accounts, or otherwise had no immediate access to money.

79. Two Howrey partners stated what firm management should have known. One partner identified Howrey's A/R as "inflated" and "unregulated." Another was more colloquial: Howrey had "some real dog accounts."

80. By April 2010, Howrey claimed to have approximately $125 million in A/R. But much of this A/R was not on good and collectible accounts. Almost half of Howrey's invoices had not been paid in over sixty days. Over $47 million (or 37%) of Howrey's A/R were invoices that had not been paid in over ninety days. Throughout 2010, A/R aged over 120 days compromised over 33% of Howrey's A/R. And by October 2010, when Howrey finally began tracking how much of its A/R was more than 180 days past due, over 29% of its A/R – totaling nearly $30 million – had aged beyond six months.

81. Despite its intimate knowledge of the firm's weak A/R, Howrey's management continued to project that the firm would recover 90% of all of the A/R on its books, even when the true collection rate was far closer to 50% than 90%.

     5. <u>In January 2011, Howrey Hits the Wall Management Saw or Should Have Seen Coming Since the Second Quarter of 2010</u>.

82. By November 2010, Howrey's financial position worsened to the point that Howrey's management disclosed to the Executive Committee and other partners that the firm

Case: 11-31376    Doc# 1459    Filed: 09/09/13    Entered: 09/09/13 10:48:52    Page 20 of 31

would again breach its loan covenants on the Citibank Debt. Specifically, in addition to the borrowing base eligibility defaults discussed previously, the Citibank Debt contained a "clean up" covenant, which required Howrey to bring the debt on its revolving line of credit to a zero balance for thirty days during each calendar year. Effective November 1, 2010, Howrey owed approximately $55.6 million on its operating line of credit, and its financial managers knew that "collections are well below target which will make it difficult for us to clean up the line by December 1st."

83.     Once Howrey's partners learned of the firm's impending default, partner departures increased significantly.

84.     In January 2011, when the full state of Howrey's finances was disclosed to the remaining Former Howrey Partners, it became apparent to the partners that the firm would not survive. Howrey had dramatically missed its budgeted compensation, with profits per partner falling to less than $550,000 – or hundreds of thousands less than 2010 or 2009, and less than half of 2008. The remaining Former Howrey Partners began leaving the firm in droves and Howrey's descent into dissolution was quick.

85.     As Howrey approached dissolution, the firm continued to make payments to or for the benefit of the Former Howrey Partners, including borrowing approximately $20 million just prior to January 15, 2011, to fund the partners' tax obligations. Shortly thereafter, Howrey disclosed to Citibank that it was yet again in default under the Citibank Debt and by the last week of January 2011, Howrey no longer had unfettered use of its cash to pay creditors. As a result, creditors went unpaid as Howrey could not pay its debts as they came due.

86.     By February 2011, Howrey had defaulted on the Citibank Debt yet again. Not only was Howrey far outside its borrowing base requirements, but it had lost so many partners

Case: 11-31376   Doc# 1459   Filed: 09/09/13   Entered: 09/09/13 10:48:52   Page 21 of 31

that it breached additional loan covenants related to the number of partner departures within certain timeframes.

87. On March 3, 2011, Citibank began prohibiting Howrey from using its cash collateral without the bank's specific and express consent. On March 4, 2011, Howrey's Chairman scheduled a vote of Howrey's remaining partners on whether the firm should dissolve.

88. Faced with mounting bills, intense oversight by its creditors, and insufficient capital to keep operating, on March 9, 2011, the Former Howrey Partners held a vote on whether the law firm should dissolve. Both Level I and Level II partners were entitled to, and did, vote on dissolution. The Partnership Agreement required an 85% vote in favor of dissolution for the firm to be dissolved.

89. Shortly after the March 9, 2011, vote, Martin Cunniff, a member of Howrey's Dissolution Committee, confirmed that over 85% of the partnership had voted to dissolve Howrey. Effective March 15, 2011, and after fifty-six years in business, Howrey proceeded to dissolve under District of Columbia partnership law.

## CLAIMS FOR RELIEF

### COUNT I
**Avoidance and Recovery of Distributions as Actual Fraudulent Transfers
Pursuant to 11 U.S.C. §§ 548(a)(1)(A) & 550
(Against the Individual Defendants)**

90. The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Original Complaint, as if set forth herein.

91. Howrey transferred draws, base compensation, bonuses, interest on capital and return of capital to the Individual Defendants on or between the Second Quarter of 2010 and March 15, 2011 (collectively, the "Distributions").

22

92. Defendant Gabler received the following Distributions:

| Date | Amount |
|---|---|
| 04/07/2010 | $52,500.00 |
| 06/25/2010 | $5,000.00 |

93. Defendant Judd received the following Distributions:

| Date | Amount |
|---|---|
| 04/29/2010 | $85,660.07 |
| 08/09/2010 | $208,755.00 |

94. Defendant Willoughby received the following Distributions:

| Date | Amount |
|---|---|
| 04/02/2010 | $10,088.10 |
| 04/28/2010 | $133,635.02 |
| 12/17/2010 | $100,545.00 |

95. The Distributions constituted one or more transfers of property of the Debtor and were made using funds contained in the Debtor's bank account(s).

96. Howrey made the Distributions with actual intent to hinder, delay, or defraud one or more entities to which Howrey was indebted or became indebted on or after the date of such transfers.

97. The circumstances surrounding Howrey's transfer of the Distributions reveal several badges of fraud. First, the transfer was to insiders – *i.e.*, the Former Howrey Partners. Second, before Howrey made the transfer, it knew that the Former Howrey Partners would be

threatened with clawback suits in the event of Howrey was placed into bankruptcy. Third, the Distributions constituted Howrey's attempt to remove or conceal its assets from creditors. Fourth, Howrey did not receive any value – much less reasonably equivalent value – for the Distributions. Fifth, Howrey was insolvent, unable to pay its debts as they became due, and/or had unreasonably small capital at the time it made the Distributions.

98.     The Individual Defendants were initial transferees of such transfers and/or the entities for whose benefit the transfers were made.

99.     The Debtor made such Distributions within two years of the Petition Date.

100.    Pursuant to 11 U.S.C. § 548(a)(1)(B) and 11 U.S.C. § 550, the Trustee is entitled to judgment against each of the Individual Defendants: (a) avoiding the Distributions; (b) directing the Distributions be set aside; and (c) requiring the Individual Defendants, as the recipients of the Distributions and/or the persons or entities for whose benefit the Distributions were given, to return the Distributions, or the value thereof, to the Trustee for the benefit of the Howrey chapter 11 estate.

### COUNT II
**Avoidance and Recovery of Distributions as Actual Fraudulent Transfers
Pursuant to 11 U.S.C. §§ 544, 550 and D.C. Code § 28-3104(a)(1)
(Against the Individual Defendants)**

101.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Original Complaint, as if set forth herein.

102.    There are at least six creditors of Howrey who hold unsecured claims that are allowable under Section 502 of the Bankruptcy Code and whose claim arose prior to the date of the Dissolution (hereinafter the "Golden Creditors"). Specifically, the Trustee identifies the following six Golden Creditors whose claims arose before any of the transfers identified in this Complaint:

24

| Creditor | Date Howrey Incurred Debt | Amount |
|---|---|---|
| Liu, Shen & Associates | December 9, 2009 | $739.29 |
| Adams & Adams | April 30, 2010 | $397.00 |
| LA Best Photocopies, Inc. | July 6, 2010 | $4,390.00 |
| Advanced Discovery LLC | September 9, 2010 | $77.22 |
| LexisNexis, Inc. | November 12, 2010 | $5,562.15 |
| Ricoh Professional Services Corp. | January 18, 2011 | $235,269.94 |

103.    Howrey transferred the Distributions to the Individual Defendants.

104.    The Distributions constituted one or more transfers of property of the Debtor and were made using funds contained in the Debtor's bank account(s).

105.    Howrey made the Distributions with actual intent to hinder, delay, or defraud one or more entities to which Howrey was indebted or became indebted on or after the date of such transfers.

106.    The circumstances surrounding Howrey's transfer of the Distributions reveal several badges of fraud.  First, the transfer was to insiders – i.e., the Former Howrey Partners. Second, before Howrey made the transfer, it knew that the Former Howrey Partners would be threatened with clawback suits in the event of Howrey was placed into bankruptcy.  Third, the Distributions constituted Howrey's attempt to remove or conceal its assets from creditors. Fourth, Howrey did not receive any value – much less reasonably equivalent value – for the Distributions.  Fifth, Howrey was insolvent, unable to pay its debts as they became due, and/or had unreasonably small capital at the time it made the Distributions.

107.    The Individual Defendants were initial transferees of such transfers and/or the entities for whose benefit the transfers were made.

108. Pursuant to 11 U.S.C. § 544, 11 U.S.C. § 550, and Section 28-3104(a)(1) of the D.C. Code, the Trustee is entitled to judgment against each of the Individual Defendants: (a) avoiding the Distributions; (b) directing the Distributions be set aside; and (c) requiring the Individual Defendants, as the recipients of the Distributions and/or the persons or entities for whose benefit the Distributions were given, to return the Distributions, or the value thereof, to the Trustee for the benefit of the Howrey chapter 11 estate.

**COUNT III**
**Avoidance and Recovery of Distributions as Constructively Fraudulent Transfers**
**Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550**
**(Against the Individual Defendants)**

109. The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Original Complaint, as if set forth herein.

110. Howrey transferred the Distributions to the Individual Defendants.

111. The Distributions constituted one or more transfers of property of the Debtor and were made using funds contained in the Debtor's bank account(s).

112. Howrey was insolvent, unable to pay its debts as they became due, and/or had unreasonably small capital by the Second Quarter of 2010.

113. Howrey received no value or less than reasonably equivalent value in exchange for the Distributions.

114. Howrey made the Distributions within two years of the Petition Date.

115. The circumstances surrounding Howrey's transfer of the Distributions reveal several badges of fraud. First, the transfer was to insiders – i.e., the Former Howrey Partners. Second, before Howrey made the transfer, it knew that the Former Howrey Partners would be threatened with clawback suits in the event of Howrey was placed into bankruptcy. Third, the Distributions constituted Howrey's attempt to remove or conceal its assets from creditors.

26

Fourth, Howrey did not receive any value – much less reasonably equivalent value – for the Distributions. Fifth, Howrey was insolvent, unable to pay its debts as they became due, and/or had unreasonably small capital at the time it made the Distributions.

116.    The Individual Defendants were initial transferees of such transfers and/or the entities for whose benefit the transfers were made.

117.    Pursuant to 11 U.S.C. § 548(a)(1)(B) and 11 U.S.C. § 550, the Trustee is entitled to judgment against each of the Individual Defendants: (a) avoiding the Distributions; (b) directing the Distributions be set aside; and (c) requiring the Individual Defendants, as the recipients of the Distributions and/or the persons or entities for whose benefit the Distributions were given, to return the Distributions, or the value thereof, to the Trustee for the benefit of the Howrey chapter 11 estate.

**COUNT IV**
**Avoidance and Recovery of Distributions as Constructively Fraudulent Transfers**
**Pursuant to 11 U.S.C. §§ 544, 550 and D.C. Code § 28-3105(a)**
**(Against the Individual Defendants)**

118.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Original Complaint, as if set forth herein.

119.    There are at least six creditors of Howrey – *i.e.*, the Golden Creditors identified above – that hold unsecured claims that are allowable under Section 502 of the Bankruptcy Code whose claim arose prior to the date of the Distributions.

120.    Howrey transferred the Distributions to the Individual Defendants.

121.    The Distributions constituted one or more transfers of property of the Debtor and were made using funds contained in the Debtor's bank account(s).

122.    Howrey was insolvent, unable to pay its debts as they came due, and/or had unreasonably small capital by the Second Quarter of 2010.

27

123.    Howrey received no value or less than reasonably equivalent value in exchange for the Distributions.

124.    Howrey made the Distributions within two years of the Petition Date.

125.    The circumstances surrounding Howrey's transfer of the Distributions reveal several badges of fraud.  First, the transfer was to insiders – *i.e.*, the Former Howrey Partners. Second, before Howrey made the transfer, it knew that the Former Howrey Partners would be threatened with clawback suits in the event of Howrey was placed into bankruptcy.  Third, the Distributions constituted Howrey's attempt to remove or conceal its assets from creditors. Fourth, Howrey did not receive any value – much less reasonably equivalent value – for the Distributions.  Fifth, Howrey was insolvent, unable to pay its debts as they became due, and/or had unreasonably small capital at the time it made the Distributions.

126.    The Individual Defendants were initial transferees of such transfers and/or the entities for whose benefit the transfers were made.

127.    Pursuant to 11 U.S.C. § 544, 11 U.S.C. § 550, and Section 28-3105(a) of the D.C. Code, the Trustee is entitled to judgment against each of the Individual Defendants: (a) avoiding the Distributions; (b) directing the Distributions be set aside; and (c) requiring the Individual Defendants, as the recipients of the Distributions and/or the persons or entities for whose benefit the Distributions were given, to return the Distributions, or the value thereof, to the Trustee for the benefit of the Howrey chapter 11 estate.

**COUNT V**
**Accounting and Turnover**
**Pursuant to 11 U.S.C. § 542**
**(Against Defendants Judd and Willoughby)**

128.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Original Complaint, as if set forth herein.

28

129. Upon information and belief, Defendants Judd and Willoughby received draws within the 2010 calendar year that exceeded their share of actual cash basis Partnership profits. Defendants Judd and Willoughby have not returned these excess draws, which is a breach of the Partnership Agreement.

130. The Trustee is entitled to a money judgment against Defendants Judd and Willoughby in an amount equal to their excess draws in 2010.

131. Pursuant to 11 U.S.C. § 542(a), the Trustee is entitled to judgment against Defendants Judd and Willoughby compelling them to account for and turnover all excess draws received from Howrey during 2010, which is a liquidated debt due and owing to Howrey.

## COUNT VI
### Unjust Enrichment
### (Against the Individual Defendants)

132. The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Original Complaint, as if set forth herein.

133. Howrey transferred the Distributions to the Individual Defendants.

134. The Individual Defendants received a benefit from the Distributions that were transferred by Howrey.

135. It is inequitable and unjust for the Individual Defendants to have received, been enriched by, and retained the benefits of the Distributions.

136. Equity and good conscience require that the Individual Defendants disgorge the Distributions.

137. The Trustee is entitled to judgment against the Individual Defendants in an amount to be determined at trial, with prejudgment interest thereon at the legal rate, and such other relief as may be deemed just and proper.

29

## COUNT VII
### Money Had and Received
### (Against the Individual Defendants)

138. The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Original Complaint, as if set forth herein.

139. The Individual Defendants hold money received from Howrey as a result of the Distributions.

140. The money belongs to the Trustee in equity and good conscience.

141. The Trustee is entitled to judgment against the Individual Defendants in an amount to be determined at trial, with prejudgment interest thereon at the legal rate, and such other relief as may be deemed just and proper.

## PRAYER

Wherefore, the Trustee respectfully requests that the Court enter judgment and grant it the following relief against the Defendants:

1. Avoiding the Distributions to the Individual Defendants as actual and/or constructive fraudulent transfers under applicable federal and state law;

2. Requiring the Individual Defendants to return the Distributions, or the value thereof;

3. Awarding the Trustee his attorneys' fees incurred in the prosecution of this action as allowed by law;

4. Awarding prejudgment and post-judgment interest as allowed by law; and

5. All other relief to which the Trustee may be entitled, in law or at equity.

//

//

//

//

//

Case: 11-31376    Doc# 1459    Filed: 09/09/13    Entered: 09/09/13 10:48:52    Page 30
of 31

Dated:    September 9, 2013                      Respectfully submitted,


                                                _____/s/ Andrew B. Ryan_____
                                                Stephen T. Loden, Esq. *(pro hac vice)*
                                                Andrew B. Ryan, Esq. *(pro hac vice)*
                                                DIAMOND MCCARTHY LLP
                                                909 Fannin, 15th Floor
                                                Houston, TX 77010
                                                Telephone: 713-333-5100
                                                Facsimile: 713-333-5199
                                                sloden@diamondmccarthy.com
                                                aryan@diamondmccarthy.com
                                                *Counsel for Allan B. Diamond,*
                                                *Chapter 11 Trustee for Howrey LLP*


                                                Eric A. Nyberg, Esq. (Bar No. 131105)
                                                KORNFIELD, NYBERG, BENDES
                                                & KUHNER, P.C.
                                                Chris D. Kuhner, Esq. (Bar No. 173291)
                                                1970 Broadway, Suite 225
                                                Oakland, CA 94612
                                                Telephone: 510-763-1000
                                                Facsimile: 510-273-8669
                                                e.nyberg@kornfieldlaw.com
                                                c.kuhner@kornfieldlaw.com
                                                *Local Counsel for Allan B. Diamond,*
                                                ***Chapter 11 Trustee for Howrey LLP***